# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| CYTYC CORPORATION, | ) | |
| | ) | |
| | ) | |
| Movant, | ) | |
| | ) | Civil Action No. 05 10932 WGY |
| v. | ) | |
| | ) | |
| DEKA PRODUCTS LIMITED PARTNERSHIP | ) | |
| | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

## MEMORANDUM IN SUPPORT OF CYTYC CORPORATION'S APPLICATION TO VACATE ARBITRATION AWARD

Lisa J. Pirozzolo (BBO #561922)
Saklaine Hedaraly (BBO #651671)
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA  02109
(617) 526-6000

HOWREY SIMON ARNOLD & WHITE, LLP
Matthew M. Wolf
Marc A. Cohn
1299 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 383-6858

*Attorneys for Cytyc Corporation, Inc.*

May 10, 2005

## TABLE OF CONTENTS

BACKGROUND ...................................................................................................................1

    A.    The Relevant Technology ....................................................................................1

    B.    Formation Of And Performance Under The Agreement ...............................3

    C.    Procedural History ..............................................................................................6

ARGUMENT.......................................................................................................................8

I.      THE PANEL MANIFESTLY DISREGARDED APPLICABLE LAW ...........................9

    A.    The Panel Disregarded New Hampshire Contract Law................................10

    B.    The Panel Disregarded The Law Governing Interest Due...........................13

II.    THE AWARD IS UNFOUNDED IN REASON OR FACT ...........................................13

III.   THE AWARD DOES NOT "DRAW ITS ESSENCE" FROM THE PARTIES'
       AGREEMENT..........................................................................................................15

IV.   THE PANEL EXCEEDED THE SCOPE OF ITS AUTHORITY ...................................18

V.    THE PANEL REFUSED TO CONSIDER MATERIAL EVIDENCE.............................19

CONCLUSION.................................................................................................................20

## TABLE OF AUTHORITIES

### CASES

*Advest, Inc. v. McCarthy,*
914 F.2d 6 (1st Cir. 1990)........................................................................................9

*Bacardi Corp. v. Congreso de Uniones Industriales de Puerto Rico,*
692 F.2d 210 (1st Cir. 1982)........................................................ 15, 15-16, 16

*Bull HN Information Systems v. Hutson,*
229 F.3d 321 (1st Cir. 2000)..............................................................................9, 16

*Bull HN Information Systems v. Hutson,*
983 F. Supp. 284 (D. Mass. 1997) ........................................................17, 19

*Challenger Caribbean Corp. v. Union General de Trabajadores de Puerto Rico,*
903 F.2d 857 (1st Cir. 1990)............................................................. 8-9, 14

*Dorado Beach Hotel Corp. v. Union de Trabajadores de La Industria
Gastronomica de Puerto Rico, Local 610,*
811 F. Supp. 41 (D.P.R. 1993) ..........................................................................16

*Hoteles Condado Beach, La Concha & Convention Center v. Union de
Tronquistas Local 901,*
763 F.2d 34 (1st Cir. 1985).................................................... 12-13, 13, 17

*Kenerson v. Morgan Guaranty Trust Co.,*
889 F. Supp. 523 (D.N.H. 1995)........................................................................14

*Local 1445, United Food & Commercial Workers International Union v. Stop &
Shop Cos.,*
776 F.2d 19 (1st Cir. 1985)...............................................................................15

*Lohnes v. Level 3 Communications, Inc.,*
272 F.3d 49 (1st Cir. 2001).................................................................................14

*McCarthy v. Citigroup Global Markets, Inc.,*
No. 04-477-JD, 2005 U.S. Dist. LEXIS 2901 (D.N.H. Jan. 28, 2005)..............9, 10, 12

*St. Joseph Hospital v. Rizzo,*
141 N.H. 9 (1996)...............................................................................................14

# STATUTES

9 U.S.C. § 6 ................................................................................................................ 1

9 U.S.C. § 10................................................................................................. 1, 18, 19

Mass. Gen. Laws ch. 251, § 12 .................................................................................. 19

N.H. Rev. Stat. Ann. § 382-A:1-205 .......................................................................... 10

N.H. Rev. Stat. Ann. § 382-A:2-208 ..................................................................... 10, 12

N.H. Rev. Stat. Ann. § 524:1-b ................................................................................... 13

Cytyc Corporation ("Cytyc") respectfully submits this Memorandum In Support Of Its Application To Vacate an Arbitration Award pursuant to 9 U.S.C. §§ 6 & 10.[1]

## BACKGROUND

An arbitration panel's discretion is broad, but not limitless. The First Circuit has established clear boundaries for the exercise of discretion and has mandated that arbitration awards exceeding those boundaries not be enforced. Cytyc brings this application to vacate the arbitration award (the "Award") because the two panelists in the underlying arbitration strayed far beyond those boundaries, as set forth below.

- The panel manifestly disregarded governing law by: (1) ignoring New Hampshire statutes that *must* be considered when construing a contract, and (2) disregarding statutory provisions dictating how interest is to be calculated.

- The Award is unfounded in reason and fact and is based upon an illogical construction of the agreement at issue.

- The panel's ruling is divorced from the language of the agreement in dispute. The panel issued its Award based on what, in hindsight, it believed would have been fair in light of subsequent commercial events; the Award is plainly *not* based on the language of the agreement actually bargained for and agreed to by the parties in 1993.

- The panel exceeded its authority by deciding issues of patent law that were never submitted to arbitration and that do not arise out of, or relate to, the agreement.

- The panel refused to consider material evidence concerning the propriety of deducting commissions paid by Cytyc from the royalty base calculations.

Consequently, the Award should be vacated and the dispute returned to arbitration with the instruction that New Hampshire law be followed and that all material evidence be considered.

### A.    The Relevant Technology

The technology at issue – the essentials of which have never been in dispute – involves a method of preparing a thin, uniform layer of cells on a microscope slide. This technology, which

---

[1]    The Award was issued in two parts, which are attached to the Declaration of Marc A. Cohn In Support Of Cytyc Corporation's Application To Vacate Arbitration Award, filed herewith, at Exhibits A and B. "Exhibit __" refers to the exhibits attached to the Cohn Declaration.

is particularly useful for cervical cancer screening, has all but replaced the conventional Pap-smear. (Exhibit D at 1-2.)  In a traditional Pap-smear test, a doctor collected a cervical cellular sample from a patient using a swab, rubbed the swab on a microscope slide, and sent the slide to a lab for review under a microscope by a cytotechnician.  In an effort to solve problems with reviewing traditional Pap-smear slides, Cytyc began developing a computerized system – called an "Imager" – that could scan Pap-smear samples and identify areas of the slide for further analysis. (*Id.* at 2.)  The non-uniformity of traditional Pap-smear samples presented difficulties in the context of computer screening.  Thus, Cytyc recognized that a standardized sample preparation process was a prerequisite to developing a successful imaging system. (*Id.*)

To that end, in the late-1980s, Cytyc's founder, Stan Lapidus, invented a device that draws a solution laden with cells through a filter using a pressure pump. (*Id.*)  The cells accumulate on the filter in a thin layer and the filter is then pressed against a glass slide, thereby leaving a thin, uniform layer of cells on the slide.  Such slides are suitable for effective human and/or computerized imaging and analysis. (*Id.*)  While marketed since 1994 for non-gynecological applications, Cytyc received approval in 1996 from the FDA to commercialize its ThinPrep® slide preparation system for use in preparing Pap test samples.  The system comprises two products:  (i) the ThinPrep® processor (the "Processor") – *i.e.* the machine that prepares the slides; and (ii) the ThinPrep® Pap Test Kit (the "Kit"). (*Id.* at 6.)

The Kit – which was the subject of the parties' arbitration – contains four components: (i) a ***Cytyc proprietary*** glass microscope slide ("slide"), (ii) a molded plastic collection device made by a third-party ("collection device"), (iii) a filter cylinder ("filter"), and (iv) a vial of preservative solution ("preservative"), ***which is protected by a Cytyc patent***. (*Id.* at 6-7.)[2]  The preparation of a ThinPrep Pap Test sample slide is straightforward.  The physician first takes a sample of cells from the patient using the collection device and swirls the device in the

---

[2]  Claimant DEKA Products Limited Partnership ("DEKA") conceded during the arbitration that it did not develop -- and had no intellectual property rights in – the slide, collection device, or preservative solution.  (Exhibit E at 6.)

preservative solution, transferring the cells into the solution. (*Id.*) The doctor then ships the vial to a laboratory for processing. (*Id.*) The ThinPrep Processor located at the laboratory is loaded by a technician with a microscope slide, a filter, and a vial of preservative solution laden with cells. (*Id.*) The Processor inserts the filter into the vial of solution and, using negative pressure, draws the solution through the filter, on which the cells accumulate. (*Id.*) Finally, the machine presses the filter against the glass slide, depositing the cells in a thin layer thereon. (*Id.*) The slide is then analyzed by a cytotechnologist under a microscope to identify potentially abnormal cells. (*Id.*)

### B.    Formation Of And Performance Under The Agreement

In the late-1980s, while Cytyc was developing its ThinPrep® system, Cytyc solicited DEKA's assistance in implementing some of the details associated with pumping fluid through the filter. (Exhibit C at "Recitals.")  Cytyc – then a tiny start-up company with very little capital – ultimately entered into the agreement at issue in this arbitration (the "1993 Agreement") in consideration for DEKA's technical assistance.

Under the 1993 Agreement, DEKA receives a 1% royalty on sales of "Products," reflecting DEKA's limited contribution to the overall ThinPrep project. (Exhibit C § 3.01.) The 1993 Agreement defines royalty-bearing "Products" as (i) "any filter cylinder or similar disposable provided such disposable utilizes the Cytyc Technology, the FMS Technology or both" and (ii) "a physical device for the controlled instrumented processing of particles for the preparation of slides provided such device utilizes the Cytyc Technology, the FMS Technology or both . . . ." (*Id.* §§ 1.01(g)-(i).) Of critical importance, the Agreement provides that "Product Disposables presently includes Cytyc's 'TransCyt Filters.'" (*Id.* § 1.01(g).) *Cytyc's "TransCyt Filters" and "ThinPrep Processor" are expressly included within the definition of Products but no other Kit products are mentioned in that definition even though both parties were well aware of two of those products – i.e., the preservative and the slide – when the Agreement was signed.* (Exhibit E at 5-6.)

Prior to execution of the 1993 Agreement, the parties executed a May 1990 Letter of Intent, upon which the Agreement was based. In that letter, the parties stated that "[v]ials filled with collection medium [*i.e.*, the preservative solution] are explicitly excluded from this Agreement." (Exhibit E at 7.) Between the time of that Letter of Intent until the 1993 Agreement was executed, the parties never changed their position that the preservative solution was to be excluded from the royalty. For example, in a September 26, 1991 letter, Cytyc summarized one of many discussions between the parties confirming that the filter would be the only royalty-bearing disposable: "[Cytyc] will pay DEKA a 1% royalty on Cytyc filter cylinders which use FMS Technology; we call these devices TransCyt™ Filters" and "sales of solution-containing vials and Cytyc image processing systems are specifically excluded." (*Id.* at 7-8.)

Approximately three weeks later, in an October 14, 1991 draft agreement prepared by DEKA's counsel, DEKA proposed language for the definition of "Product Disposables." (*Id.* at 8.) It was in this DEKA draft that the disputed language in the 1993 Agreement – *i.e.*, a "filter cylinder or similar disposable" utilizing the relevant technology – was first proposed *by DEKA*. In its cover letter enclosing the draft, DEKA told Cytyc that this draft language "reflects [Cytyc's] discussion with [DEKA] as confirmed in your letter of September 26." (*Id.*) DEKA thus told Cytyc that the language "any filter cylinder or similar disposable" did not include vials of preservative solution. DEKA's October 14, 1991 letter also acknowledged that the filters "may be components within a larger unit" – *i.e.*, a Kit. (*Id.*) DEKA thus told Cytyc that the language "any filter or similar disposable" would require a royalty only on the filter, even if the filter were bundled with other products. Throughout the arbitration, DEKA had failed to point to *a single document* which altered this explicit position and asked Cytyc for a royalty on any disposable product other than the filter.

Evidence of post-contractual conduct also shows that the parties did not contemplate a royalty on any products other than the filter and Processor. Throughout the decade between execution of the Agreement and DEKA's filing of a Demand for Arbitration, Cytyc routinely indicated – in a wide variety of contexts and with no objection from DEKA – that the filter was

4

the only royalty-bearing product and that the other products in the Kit were not royalty-bearing. (*Id.* at 9.) For example, from 1998 forward, Cytyc described its royalty calculations in detailed quarterly reports sent directly to DEKA. (*See id.*) These reports clearly show that, in addition to a royalty on the Processors, Cytyc was paying only on filter sales and not on the other products in the Kit. (*Id.*)

In the third quarter of 2001, Cytyc realized it had made an overpayment of royalties to DEKA. Cytyc told DEKA in a November 27, 2001 letter about the overpayment and stated that the preservative, slide, and collection device "are not subject to the license agreement" and that Cytyc was thus not paying royalties on them. (Exhibit E at 10.) Assuming that DEKA actually believed that the 1993 Agreement entitled DEKA to royalties on those products, one would expect to see in the record an immediate objection. To the contrary, the undisputed evidence showed that it was not until DEKA sent Cytyc a draft arbitration Demand *two years later*, in late-2003, that DEKA took the position that Cytyc was in breach for paying royalties only on the filter. (*Id.*) Indeed, the arbitration panel found that DEKA's claim was limited by the applicable statute of limitations because DEKA should have known it had a claim. (Exhibit A at 3.)

Further, while DEKA's chief financial officer destroyed his notes of the various DEKA/Cytyc meetings between November 2001 and October 2003 – *after he acknowledged that he thought a dispute was brewing*[3] (*id.*) – there is no evidence that DEKA ever said that Cytyc should have been paying royalties on the non-filter products sold in the Kit. By all indications, that was not DEKA's view of the requirements of the Agreement even well into 2002. For example, in May 2002, that same chief financial officer wrote to Cytyc: "As we discussed, I have summarized below the additional data I think we need to review to mutually agree *on the appropriate sales value to be allocated to the filter sales*." (*Id.* at 11.) Far from

---

[3]  By all accounts, both Cytyc and DEKA viewed the dispute at the time as involving *solely* the amount of royalties due on the filter; there is simply no evidence that DEKA ever asserted that a royalty was due under the 1993 Agreement on the slide, preservative solution, or collection device prior to the Demand itself – despite two years of negotiations between the parties.

saying that allocation of Kit revenue to the filter royalty was a breach, DEKA expressly affirmed Cytyc's position that allocation of some kind was appropriate. Similarly, when DEKA later wrote Cytyc in August 2002, it did not suggest that allocation itself was inappropriate or otherwise claim that a royalty was due on any product beyond the filter. (*Id.*)

As will be discussed, despite the fact that Cytyc consistently presented this evidence in all its briefs to the panel and in oral argument during the hearing, the Award is devoid of any mention of these documents and testimony. (*See* Exhibits A & B.) In fact, contrary to this evidence, the panel made the baffling finding that "[t]he evidence shows that the parties never intended that royalties would be paid on parts of the Kit rather than the Kit as a whole." (Exhibit A at 2.) The evidence described, however – indeed, all of the evidence adduced – unambiguously shows that the parties contemplated a royalty *only* on the filter and that, at a minimum, the preservative solution was "explicitly excluded" from the definition of royalty-bearing "Products." (Exhibit E at 3-11.)

### C.    Procedural History

In 2001, Cytyc realized that it had inadvertently overpaid royalties to DEKA. In a letter dated November 27, 2001, Cytyc told DEKA about the error, which totaled a little over $420,000. (Exhibit D at 11.) Cytyc's letter apparently prompted DEKA to retain KPMG to audit Cytyc's royalty payments back to 1996 pursuant to the audit provisions of the 1993 Agreement. (*Id.*) KPMG ultimately concluded in September 2003 that Cytyc had underpaid DEKA *on the filter* by about 2%, a discrepancy that Cytyc disputed. (*Id.* at 12.)

In an October 2003 letter enclosing a draft Demand, DEKA asserted for the first time that Cytyc had breached the Agreement. (Exhibit D at 12; Exhibit E at 10.) DEKA primarily objected to Cytyc's method of determining the share of Kit revenue attributable to the filter, arguing that Cytyc had undervalued the filter and thereby underpaid royalties. (Exhibit E at Ex. 113.) DEKA also made the alternative argument that no apportionment at all should be made – *i.e.*, that it was entitled to a royalty on the full Kit revenues. (*Id.*) DEKA's claim in its October

2003 letter to a royalty on the full Kit revenues, as opposed to a royalty on just the filter, *was not based on any language in the 1993 Agreement*, but rather on a doctrine of patent infringement damages called the "Entire Market Value Rule." Thus, even when threatening to bring the arbitration, DEKA did not argue that the 1993 Agreement mandated that a royalty be paid on the three non-filter components of the Kit. (*Id.*)

Pursuant to the dispute resolution procedures in the 1993 Agreement, in November 2003 DEKA filed a Demand for Arbitration with the American Arbitration Association (the "AAA"), claiming that Cytyc had underpaid royalties and committed related torts. (Exhibit F.) Like its October 2003 letter, DEKA's demand focused primarily on Cytyc's method of allocation of Kit revenues to the filter rather than the fact that Cytyc paid only on the filter. (*Id.*)

For the arbitration panel, the parties selected Hon. Robert R. Merhige, formerly of the United States District Court for the Eastern District of Virginia, Hon. Vincent L. McKusick, formerly of the Maine Supreme Judicial Court, and Hon. E. Leo Milonas, formerly of the Appellate Division of the Supreme Court of the State of New York. The overwhelming majority of the efforts of both parties – in discovery, briefing, expert reports, and otherwise – was dedicated to the issue of how to allocate Kit revenue to the filter for purposes of the royalty. A hearing was held on December 13, 14 & 15, 2004 in Boston, Massachusetts. At the hearing, Judge Merhige expressed concerns about a number of issues inimical to DEKA's claim, *e.g.*, the willful destruction of documents by a DEKA executive and DEKA's apparent effort to seek an interpretation of the underlying agreement based on fairness rather than the language of the contract. (*See, e.g.*, Exhibit G [Day 1] 22:4-13; *id.* [Day 2] 130:1-7, 134:3 – 135:20.)

Immediately following the hearing, Judge Merhige fell critically ill and, prior to the rendering of a decision, passed away. In correspondence with the remaining members of the panel, Cytyc expressed its concern that Judge Merhige's views might not have been heard and/or considered in deliberation with the other panel members and suggested that the panel find a substitute arbitrator if that were the case. (Exhibit H.) The remaining panelists never responded.

In a terse, Partial Final Award dated March 7, 2005, which failed to address any of Judge Merhige's apparent concerns, the remaining two members of the arbitration panel found that DEKA was owed a royalty on the full Kit revenue – *i.e.*, that Cytyc owed DEKA a royalty on the Cytyc-patented preservative solution, on the Cytyc proprietary slides, and on the third-party collection device – and not just the portion of that Kit revenue corresponding to the royalty-bearing filter. (Exhibit A at 1-3.) This ruling was based not on the Entire Market Value Rule argued by DEKA, or on any language in the Agreement, but rather on the panel's view of the parties' commercial relationship. (*Id.*)[4] In ruling, the panel not only ignored the parties' Letter of Intent , pre-, and post-contractual correspondence – which stated unambiguously that non-filter parts of the Kit were "explicitly excluded" from the royalty – but, more importantly, and bizarrely, the panel stated that such evidence did not even exist. (Exhibit A at 2-3.)

In its Partial Final Award, the panel declined to rule on the amount of royalties owed to DEKA and instructed the parties to submit briefs on the issue. (Exhibit A at 4.) On April 26, 2005, after completion of briefing on damages, the panel ruled that Cytyc owed DEKA over $7.5 million in underpaid royalties, plus over $500,000 in interest, dating back to a period years prior to the filing of the Demand. (Exhibit B at 1.) The panel also awarded DEKA $1 million in legal fees and costs, even though the panel had explicitly found that Cytyc had not acted in bad faith (*id* at 2) and, indeed, that Cytyc had been sufficiently candid in its calculations that DEKA should have known it had a claim prior to the statute of limitations cutoff. (Exhibit A at 3.)

## ARGUMENT

Cytyc recognizes that judicial review of an arbitration award is very limited and that such awards are generally accorded significant deference. Nevertheless, "[t]he considerable deference

---

[4]    Indeed, when compared to DEKA's October 23, 2003 letter and its Demand for Arbitration (*see* Exhibit E at Ex. 113; Exhibit F), the panel's ruling is a *non sequitur*. The sole basis for DEKA's claim to a royalty on all of the products in the Kit – rather than just on the filter – was the Entire Market Value Rule; the panel's ruling, however, fails even to mention that rule. The panel fashioned its equitable ruling in a manner DEKA likely never imagined.

due an arbitrator's decision 'does not grant carte blanche approval to any decision that the arbitrator might make. . . .'" *Challenger Caribbean Corp. v. Union General de Trabajadores de Puerto Rico*, 903 F.2d 857, 861 (1st Cir. 1990) (citation omitted). To that end, the First Circuit has identified several bases for vacatur of an arbitration award that are relevant to this dispute:

> [A] successful challenge to an arbitration award, apart from section 10, depends upon the challenger's ability to show that the award is "(1) unfounded in reason and fact; (2) based on reasoning so palpably faulty that no judge, or group of judges, ever could conceivably have made such a ruling; or (3) mistakenly based on a crucial assumption that is concededly a non-fact."

*Advest, Inc. v. McCarthy*, 914 F.2d 6, 8-9 (1st Cir. 1990) (citation omitted). As the *Advest* court noted, "[t]his standard of judicial review has taken on various hues and colorations in its formulations in this, and other, circuits." *Id.* at 9. For example, arbitration awards have been vacated if "arbitrary and capricious," if made in "manifest disregard of the law," if "completely irrational," or if they failed to "draw[] its essence from the underlying agreement." *Id.* at 8-9. Under this precedent, the Award in this case is subject to five independent bases for vacatur.

## I.    THE PANEL MANIFESTLY DISREGARDED APPLICABLE LAW

Vacatur is mandated here because the panel disregarded New Hampshire law in at least two material ways. *Bull HN Info. Sys. v. Hutson*, 229 F.3d 321, 330-31 (1st Cir. 2000) ("arbitral awards are subject to review . . . 'where it is clear from the record that the arbitrator recognized the applicable law – and then ignored it.'") (quoting *Advest*, 914 F.2d at 9). An application of this standard under the relevant First Circuit and New Hampshire law can be found in the recent decision *McCarthy v. Citigroup Global Markets, Inc.*, No. 04-477-JD, 2005 U.S. Dist. LEXIS 2901 (D.N.H. Jan. 28, 2005). In that case, the District of New Hampshire vacated an arbitration award for manifest disregard of applicable law, stating "the panel acknowledged the applicability of the [New Hampshire] wage laws but decided not to apply them because of the circumstances attending McCarthy's claim." *Id.* at *8. The court further noted: "the panel set aside the governing law in favor of its perception of an equitable result and industry practices. The

9

panel's decision not to consider the New Hampshire wage laws demonstrates its disregard for the governing law." *Id.* The panel in this case made the same critical errors as that in *McCarthy.*

### A.   The Panel Disregarded New Hampshire Contract Law

In this case, it was the governing New Hampshire contract law that "the panel set aside . . . in favor of its perception of an equitable result." *Id.* The parties' have never disputed the Agreement's provision that it is to be construed according to New Hampshire law. (Exhibit A § 13.3.)  While the panel paid lip service to this provision, it did not apply New Hampshire law.

New Hampshire statutes provide expressly that pre- and post- contractual evidence of the parties' intent *must* be considered when construing a contract.  For example:

> (1) Where the contract for sale involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, *any course of performance accepted or acquiesced in without objection <u>shall be relevant</u> to determine the meaning of the agreement*."

N.H. Rev. Stat. Ann. § 382-A:2-208 (emphasis added).  *See also* N.H. Rev. Stat. Ann. § 382-A:1-205 (1) ("A course of dealing is a sequence of *previous conduct* between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct.. . .  (3) A course of dealing between parties . . . *give[s] particular meaning to . . . an agreement* . . . (4) The express terms of an agreement and an applicable course of dealing or usage of trade shall be construed wherever reasonable as consistent with each other.") (emphasis added).  The official comment to section 208 similarly provides that "[t]he parties themselves know best what they have meant by their words of agreement and *their action under that agreement is the best indication of what that meaning was*." *Id.* § 382-A:2-208 cmt. (emphasis added).

Cytyc directed the panel to undisputed evidence that DEKA "accepted or acquiesced in" Cytyc's course of performance for a decade without objection. N.H. R.S.A. § 382-A:2-208. (*See* Exhibit E at 9-11, 36-40.)  For example, in the letter enclosing royalties for the first half of 1994, Cytyc wrote DEKA and enclosed a royalty based on Cytyc's sales of "ThinPrep machines

and filters." (Exhibit E at 9.)  No mention was made of the preservative solution or microscope slide – of which DEKA was aware – and DEKA never asked Cytyc for a royalty on those non-filter Kit products.  (*Id.*)  In addition, Cytyc's quarterly public filings with the SEC have consistently contained statements that it paid royalties "equal to 1% of net sales of the ThinPrep Processor [and] filter cylinder disposable products."  (*Id.* at 9-10)  DEKA never objected to these public statements that Cytyc was paying a royalty on the filter and not on other non-filter Kit products.  (*Id.* at 10.)  Other examples are found in royalty reports that Cytyc submitted to DEKA every quarter since 1998, in which Cytyc noted that it was paying a royalty based on only a portion of the full Kit revenue.  (*Id.*)  Thus, it was clear from the parties' course of performance, as "accepted" by DEKA, that they did not contemplate that a royalty would be paid on all of the products in the Kit, but rather that only on the filter product was royalty bearing.

Similarly, evidence of pre-contractual conduct demonstrates that the parties agreed in May 1990 that "[v]ials filled with collection medium [*i.e.*, the preservative] are explicitly excluded from this Agreement."  (Exhibit E at 7.)  In a September 26, 1991 letter, Cytyc again told DEKA that "sales of solution-containing vials . . . are specifically excluded."  (*Id.* at 7-8.)  Then, in an October 14, 1991 draft agreement prepared by DEKA's counsel, DEKA told Cytyc that the language at issue here – *i.e.*, a "filter cylinder or similar disposable" was meant to "reflect[] [Cytyc's] discussion with [DEKA] as confirmed in your letter of September 26."  (*Id.* at 8.)  ***DEKA thus expressly represented that the language "any filter cylinder or similar disposable" did not, and should not be construed to, include the preservative solution***.  (*Id.*)

During the arbitration, DEKA failed to point to a single document where it asked Cytyc for a royalty on any disposable other than the filter.  (*Id.*)  (It is thus not surprising that DEKA focused its efforts on its argument that Cytyc underpaid royalties for the filter.)  Nor did DEKA identify any instance where it changed it's the position reflected in its May 1990 Letter of Intent and subsequent correspondence that the preservative was "explicitly excluded" from the Agreement.  (*Id.* at 8-9.)  As DEKA's chief executive testified:

> **Q.** Is there a single conversation where you recall that you said to Mr. Lapidus, "I expect you will pay royalties on vials filled with collection medium?"
>
> **A.** No.

(*Id.*) Nor was Cytyc ever willing to pay such a royalty:

> **Q.** Is there a single conversation you recall where Mr. Lapidus said he would be willing to pay royalties on vials filled with collection medium?
>
> **A.** No.

(*Id.*)

Although both parties recognized that New Hampshire rules of contract construction apply (*see* Exhibit C § 13.3), and although Cytyc quoted from N.H. Rev. Stat. Ann. § 382-A:2-208 in its pre- and post-hearing briefs, the panel did not make one mention of any of this undisputed pre-and post-execution evidence of intent in its Award. Indeed, by the terms of the panel's own ruling, it is apparent that this evidence was not even considered. Specifically, the panel's finding that "the evidence shows that the parties never intended that royalties would be paid on parts of the Kit rather than the Kit as a whole" (Exhibit A at 2-3) is directly contradicted by this evidence, which shows that the parties did contemplate a royalty on only the filter "part of the Kit" and not on the preservative solution "part of the Kit." ***The only conclusion that can be drawn from the panel's finding is that it did not even consider these critical documents and evidence.*** The panel's failure to consider such evidence, which is deemed by statute to be relevant to the interpretation of a contract, constitutes a manifest disregard of New Hampshire law on contract construction.

Cytyc acknowledges that vacatur would likely not be appropriate had the panel considered but rejected this extrinsic evidence of the meaning of the Agreement, *e.g.*, by pointing to countervailing extrinsic evidence or overriding contractual language. But the panel made no such efforts at all. By failing to consider this evidence, the panel failed to construe the agreement in accord with the New Hampshire law acknowledged, but disregarded, by the panel. Just as in *McCarthy*, the Award should be vacated because it disregarded New Hampshire law. *McCarthy*, 2005 U.S. Dist. LEXIS 2901, at *8. Similarly, in *Hoteles Condado Beach, La*

*Concha & Convention Center v. Union de Tronquistas Local 901*, 763 F.2d 34, 42 (1st Cir.

1985), the First Circuit affirmed the vacatur of an arbitration award where the arbitrator had

refused to consider material evidence:

> We agree with the district court that the arbitrator in the instant case ignored the clear language of the contract . . . . Accordingly, the arbitrator abused his discretion in failing to consider whether the Company was justified in dismissing Otero under rule nine of the disciplinary rules appended to the collective bargaining agreement. ***This failure, coupled with the arbitrator's refusal to give any weight to the evidence presented at the arbitration hearing, resulted in conduct so improper as to warrant judicial review and to mandate vacatur of the arbitration award.***

*Id.* (emphasis added). The panel in this case manifestly disregarded New Hampshire law and

thus the award should be vacated and the Court should compel further arbitration proceedings to

construe the Agreement in accordance with New Hampshire law.

### B.    The Panel Disregarded The Law Governing Interest Due

The panel also manifestly disregarded New Hampshire law by awarding interest back to

the date on which DEKA's claims accrued, rather than from the date on which DEKA filed its

Demand for Arbitration – November 2003. In New Hampshire, interest is governed by N.H.

Rev. Stat. Ann. § 524:1-b, which provides that "there shall be added . . . interest thereon *from*

*the date of the writ or the filing of the petition* to the date of judgment . . . ." (Emphasis added.)

New Hampshire courts have expressly rejected the kind of interest awarded by the panel:

"'Interest is not awarded for the period between the time the claim arose and the commencement

of the action.'" *Kenerson v. Morgan Guar. Trust Co.*, 889 F. Supp. 523, 528 (D.N.H. 1995).

Although the panel expressly noted that New Hampshire law applied to the calculation of

interest, it disregarded that law and awarded interest in contravention of New Hampshire statute.

That manifest disregard of law justifies vacatur of the Award as to the interest amount.

### II.    THE AWARD IS UNFOUNDED IN REASON OR FACT

The Award must also be vacated because it is "unfounded in reason and fact" – *i.e.*, it is

unsupported by any contractual language and directly contradicted by the unambiguous record

13

evidence. *See Challenger Caribbean Corp.*, 903 F.2d at 861.  Initially, the parties never disputed that the plain language of the Agreement provides for a royalty only on "any filter cylinder or similar disposable." (Exhibit C § 1.01(g).)  The definition of "Products" in the Agreement does not refer, by words, to any non-filter products -- it refers only to "filters" and "similar disposables."   As Cytyc showed the panel, DEKA knew at the time it was negotiating the Agreement with Cytyc that non-filter products – *e.g.* the vials of preservative solution and the microscope slide – would be used in the ThinPrep slide preparation system.  (Exhibit E at 5.) Thus, only one conclusion can be drawn from the Agreement's provision that "Product Disposables *presently includes* Cytyc's 'TransCyt Filters'" – Product Disposables did not include the non-filter products (the slide and preservative solution) *then in existence and known to both parties*. *See St. Joseph Hosp. v. Rizzo*, 141 N.H. 9, 11-12 (1996) ("We reiterate the familiar axiom of statutory construction *expressio unius est exclusio alterius*: 'Normally the expression of one thing in a statute implies the exclusion of another.'") (citation omitted); *Lohnes v. Level 3 Communs., Inc.*, 272 F.3d 49, 61 (1st Cir., 2001) ("[T]he maxim *expressio unius est exclusio alterius* instructs that, 'when parties list specific items in a document, any item not so listed is typically thought to be excluded.'").

According to the panel, however, the Agreement's provision that it "includes" the filter means that the Agreement "includes" non-filter products the parties then knew about but did not mention. (Exhibit A at 2.)  That conclusion is, quite literally, nonsensical.  In 1993, DEKA knew that non-filter products might be sold with the filter.  (Exhibit E at 5.)  Nevertheless, the Agreement provides that royalty-bearing products "presently includes Cytyc's 'TransCyt Filter'." (Exhibit C § 1.01(g).)  The fact that DEKA knew about other products, but chose only to identify the filter as a royalty-bearing product – combined with evidence that the parties intended to exclude the non-filter products – cannot be reconciled with the panel's conclusion. The Award is unfounded in reason.

The Award is also unfounded in fact.  The parties' correspondence and mutually-executed Letter of Intent "explicitly excluded" the preservative solution from the royalty and this

14

evidence was unrebutted by any testimony or document. (Exhibit E at 7-9.) Neither DEKA nor

the panel cited any evidence – not one document or piece of testimony – showing that the parties

ever intended to include the preservative solution in the royalty. Indeed, it is facially

preposterous that Cytyc should be required to pay DEKA a royalty on a product – the

preservative – that Cytyc had patented, that Cytyc developed on its own, that Cytyc told DEKA

would be "explicitly excluded" from the Agreement, and that DEKA failed to list in the

Agreement as a royalty-bearing product.

     When an arbitrator's decision is unsupported by any evidence in the record, vacatur is

appropriate. In *Bacardi Corp. v. Congreso de Uniones Industriales de Puerto Rico*, 692 F.2d

210 (1st Cir. 1982), the First Circuit held that an arbitration award construing an agreement

should be vacated when unsupported by the record evidence:

> We agree with the district court that the arbitrator's discussion of Puerto Rico's
> legislative policy of protecting employees was irrelevant and improper. ***If***
> ***appellee can demonstrate that the arbitrator indeed had no evidence but the***
> ***company official's initial response upon which to conclude that the parties had***
> ***agreed to payment for Saturday holidays in negotiating the current agreement,***
> ***that might, coupled with the arbitrator's improper discussion of public policy,***
> ***be sufficient to show that the arbitrator was indeed unfaithful to the collective***
> ***bargaining agreement***.

*Id.* at 213-14 (emphasis added). *Accord Local 1445, United Food & Commercial Workers Int'l*

*Union v. Stop & Shop Cos.*, 776 F.2d 19, 22 (1st Cir. 1985) ("This is not a case of basing a

decision only on incredible evidence and public policy" in which vacatur would be appropriate)

(citing *Bacardi*). In this case, the panel's decision is not based on any evidence in the record.

The panel's conclusion was "unfounded in reason or fact" and should be vacated.

### III.    THE AWARD DOES NOT "DRAW ITS ESSENCE" FROM THE PARTIES' AGREEMENT

     The Award is also wholly divorced from the 1993 Agreement itself. *See Bacardi*, 692

F.2d at 211 ("'An arbitrator is confined to interpretation and application of the collective

bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may of

course look for guidance from many sources, yet his award is legitimate only so long as it draws

its essence from the collective bargaining agreement. When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award.'") (quoting *United Steelworkers of Am. v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597 (1960))); *Bull HN Info. Sys.*, 229 F.3d at 330-331 ("Essentially, arbitral awards are subject to review '"where an award is contrary to the plain language of the [contract]'") (quoting *Advest*, 914 F.2d at 9); *Dorado Beach Hotel Corp. v. Union de Trabajadores de La Industria Gastronomica de Puerto Rico, Local 610*, 811 F. Supp. 41, 45 (D.P.R. 1993) ("An arbitrator may not ignore the plain language of a contract. His award must draw its essence from the collective bargaining agreement and cannot reflect his own notion of industrial justice") (quoting *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 36, 38 (1987)).

Only one two-sentence paragraph in the panel's four-page Partial Final Award discusses the language of the 1993 Agreement – a 13-page contract containing roughly 49 separate provisions and defining 11 specific terms and phrases – and that paragraph does not even attempt to explain how the Agreement's language covers the non-filter products in the Kit. (Exhibit A at 2.) Indeed, rather than construe the Agreement according to principles of contract law, the panel simply imposed its view of what should be required. The panel found that DEKA was entitled to a royalty on the full Kit because Cytyc had enlisted DEKA's assistance in developing parts of the ThinPrep system. Only after the panel found that equity required DEKA to be paid a royalty on the full Kit did it look to see if the Agreement somehow prohibited that equitable result.

The panel simply failed to construe the Agreement, instead rendering an irrational construction thereof solely to "dispense [its] own brand of industrial justice." *Bacardi*, 692 F.2d at 211. In other words, the panel made its award based on what, in hindsight, it believed would have been fair in light of subsequent commercial events, *not* based on the language of the Agreement as bargained for by the parties in 1993.[5] This is improper and warrants vacatur.

---

[5]   At the hearing, Judge Merhige expressed concern to DEKA's counsel that DEKA's claim was based on just such an equities-based approach:

DEKA: We believe it [Cytyc's construction] is unfair, Your Honor, and that's why we're here.

In *Bull HN Information Systems v. Hutson*, 983 F. Supp. 284 (D. Mass. 1997), this Court vacated an arbitration award because the arbitrator had ignored express provisions in the agreement and instead meted out his own brand of "industrial justice":

> The Supreme Court has stated that "the arbitrator may not ignore that plain language of the contract." Indeed quite recently the First Circuit affirmed a grant of summary judgment by the district court vacating an arbitration award because "the arbitrator read the time provisions out of the contract, ignoring its 'essence'". In this instance, the Plan provides that no claim for arbitration may be advanced "more than two years after the claim or cause of action has arisen." This provision, not "any statute of limitation", is what must be interpreted and applied by the arbitrator.
>
> . . . Bull HN agrees that the letters drafted by Hutson's wife were sent within the two year period set forth in the Plan. If these letters were sufficient to constitute a demand under the Commercial Arbitration Rules which are made applicable under the arbitration provision in the Plan, it is bedeviling why the arbitrator would reach beyond the terms of the Plan to "any statute of limitations" when the "demand" would have been timely under the Plan provisions.

*Id.* at 291 (citations omitted). The Court found that the arbitrator's decision – that the claim was time barred – was made "in blatant disregard of both the Plan and the record":

> In sum, by the terms of his own decision it quite simply cannot be said that "the arbitrator [was] even arguably construing or applying the contract and acting within the scope of his authority." Rather, from all that appears the arbitrator was applying "his own notions of industrial justice." These circumstances fall within the "extremely narrow exception" when the arbitrator exceeded his authority that mandate vacating the arbitration award.

*Id.* at 292 (citations omitted). *See also Hoteles Condado Beach*, 763 F.2d at 41 ("The arbitrator is, however, 'confined to the interpretation and application of the collective bargaining agreement, and although he may construe ambiguous contract language, he is without authority to disregard or modify plain and unambiguous provisions.'") (citation omitted).

---

HON. MERHIGE: It'd better be more than that.

DEKA: I'm sorry?

HON. MERHIGE: I said it'd better be more than that if you're going to enjoy your trip.

(Exhibit G [Day 1] 22:4-13.)

Similarly, the panel in this case ignored the plain language of the Agreement and clear evidence in the record that directly contradicts its decision. The Award, which does not draw its essence from the 1993 Agreement, should be vacated. Because the panel declined to interpret the Agreement and instead fashioned a construction of the parties' relationship based on its own view of the scope of the underlying technology, vacatur is warranted.

### IV.    THE PANEL EXCEEDED THE SCOPE OF ITS AUTHORITY

The panel exceeded its authority by deciding issues of patent law that were never submitted to arbitration and that do not arise out of or relate to the underlying agreement containing the arbitration provision. *See* 9 U.S.C. § 10(a)(4) (arbitration may be vacated if "the arbitrators exceeded their powers"). Specifically, the panel improperly based its decision, at least in part, on a finding that each of the four products in the Kit were necessary parts of licensed patents. (Exhibit A at 2 ("The four disposables [in the Kit] are systematically integrated by design and function in order to work ***and in order to be patentable***.") (emphasis added).) Whether the products infringe any DEKA patents, however, was never an issue submitted to arbitration. DEKA's Demand is devoid of any patent infringement allegations and, indeed, such a claim would not "arise out of or relate to" a royalty dispute under the parties' agreement. (*See* Exhibit F.) Moreover, the panel refused to undertake any of the well-settled procedures for determining patent infringement, including claim construction and comparing any accused devices to the limitations in the patent's claims. Nothing remotely resembling patent infringement allegations was ever presented to the panel – by either party.

Moreover, the panel's ruling appears to be based on the testimony of DEKA's expert, Mr. Goldscheider, who testified that he never reviewed DEKA's patents and was not familiar with the technology. (*See* Exhibit I at 3.) Indeed, Mr. Goldscheider had never seen a DEKA patent claim that covers any of the products in the Kit, even the royalty-bearing filter:

> **Q.** So you are willing to say that a filter is patented even though you have never seen a claim that actually covers the filter, is that correct?
>
> **A.** I suppose so.

18

(Exhibit J at 14:2-9.) The panel's reliance on Mr. Goldscheider in this regard is truly remarkable because DEKA did not even ask Mr. Goldscheider to opine about whether the underlying technology was covered by any DEKA patent. (Exhibit K.) DEKA's witnesses were repeatedly pressed to identify what intellectual property might be embodied in the preservative, microscope slide, and collection device. They could never do so. (*See* Exhibit E at 4-5.)

The panel's finding that the non-filter products are somehow covered by DEKA's patented technology, which appears to be the basis for its decision, is thus *ultra vires*. The Award should be vacated to the extent it made any findings of patent infringement.

## V.    THE PANEL REFUSED TO CONSIDER MATERIAL EVIDENCE

Finally, the Award should be vacated because the panel "refused to hear evidence material to the controversy." Mass. Gen'l. Laws ch. 251, § 12(4). *See* 9 U.S.C. § 10(a)(3) (vacatur appropriate "where the arbitrators were guilty of misconduct . . . in refusing to hear evidence pertinent and material to the controversy"). DEKA argued for the first time in its final damages papers – after discovery had concluded, after all evidence had been taken, after the hearing had closed, and after the Partial Final Award had issued – that Cytyc had wrongfully subtracted commissions from the royalty base. Cytyc argued in response that the Agreement specifically permits the deduction of commissions (*see* Exhibit C § 1.01(e)) and, in any event, the issue had never before been raised by DEKA. (Exhibit L at 7-8.) If the panel were inclined to entertain DEKA's claim, Cytyc requested that it be permitted to present evidence that its deduction of commissions was proper. (*Id.*) Cytyc also pointed out that, in KPMG's audit of Cytyc's royalty payments in late-2002, KPMG did not make any suggestion that Cytyc had wrongfully deducted commissions, even though KPMG reviewed "selected sales invoices, from the electronic data produced by Cytyc" as well as "hard copy invoices." (*Id.*) Moreover, when DEKA's arbitration expert prepared his report on behalf of DEKA, nowhere did he suggest that Cytyc's deduction of commissions was improper. (*Id.*) To the contrary, DEKA's expert deducted commissions in calculating the royalty payment, just as Cytyc had done. (*Id.*) Not

once during the hearing or in its briefing did DEKA ever suggest that deducting commissions was inconsistent with the Agreement.

Cytyc urged, in its final submission to the panel (a reply brief to DEKA's brief on damages) that DEKA should not be permitted to reverse its course after the record had been closed and when no evidence had been taken on the issue. (*Id.*) Indeed, it is unclear whether the contractual language on which DEKA relied – that certain deductions be "stated on a customer invoice" – even applies to commissions, as opposed to discounts and the other items listed in § 1.01(e) of the Agreement. Since DEKA had never before raised this issue, it had not been briefed and no evidence had been taken on the meaning of the commissions provision.

The panel, however, refused to hear any evidence on the meaning of the language in the Agreement regarding the deduction of commissions and ruled without any record that the deductions were improper. (Exhibit B at 1.) The panel's ruling deprived Cytyc of a meaningful adjudication of the issue by allowing DEKA to submarine the issue until the final pleading in the case after the close of the hearing. The panel's refusal to hear any evidence on the propriety of Cytyc's deduction of commissions justifies vacatur of the Award and remand to arbitration for a determination of whether Cytyc properly deducted commissions.

## CONCLUSION

For the foregoing reasons, the Award should be vacated and DEKA's claims should be remanded to arbitration in accord with the Application to Vacate submitted herewith.

Dated: May 10, 2005

HOWREY LLP
Matthew M. Wolf
Marc A. Cohn
1299 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 383-6858

Lisa J. Pirozzolo (BBO #561922)
Saklaine Hedaraly (BBO #651671)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA  02109
(617) 526-6000

*Attorneys for Cytyc Corporation, Inc.*

20