## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

_____
)
CYTYC CORPORATION              )
                               )
           Applicant,     )
                               )
     v.                   )      CIVIL ACTION NO. 05-10932-WGY
                               )
DEKA PRODUCTS LIMITED    )
PARTNERSHIP,            )
                               )
           Respondent.   )
_____)

## DEKA'S REPLY IN FURTHER SUPPORT OF ITS APPLICATION
## TO CONFIRM ARBITRATION AWARD

As Cytyc would have this Court believe, the Arbitration Panel, which consisted of three experienced judges well-versed in contract law and commercial disputes, ignored the entire body of contract law, the relevant contract wording, and all of the extrinsic evidence. Indeed, as Cytyc puts it, the Panel did not even "exercise any judgment at all." Cytyc's Opposition brief [Court Docket # 11] at 11. Cytyc's characterizations, which rely on repetition rather than fact, amount to legally improper attempts to reargue positions appropriately rejected by the Panel.

## I.      THE PANEL EXPRESSLY CONSTRUED THE LICENSE AGREEMENT

### A.      The Panel Answered Each of Cytyc's Belated Questions

Despite Cytyc's oft-repeated but unsupported protests to the contrary, the Panel expressly construed the contract clause that Cytyc deems central to this case. Cytyc, however, now argues, for the first time, that the Panel failed to answer "critical questions" about that clause. Cytyc's brief at 6. Although Cytyc did not actually pose these questions to the Panel, the Panel _did_ answer these questions and exercised its sound judgment about the meaning of the contract:

| Cytyc's Question | Arbitration Panel's Answer |
|---|---|
| What does "filter cylinder or similar disposable" mean? | "The phrase 'or similar disposable provided such disposable utilizes the Cytyc Technology, the FMS Technology or both' cannot be read to be restricted to only the filter." Partial Final Award at 2. |
| Are the products in the Kit filter cylinders or similar disposable? | ". . . the term 'Disposables' includes the other disposables in the Kit and any improvements or modifications." *Id.* |
| What does "utilizes the Cytyc Technology, the FMS technology or both" mean?<br><br>Do the products in the Kit utilize the Cytyc Technology, the FMS Technology or both? | To answer both questions, the Panel quoted the technology licensing expert, Mr. Goldscheider:<br><br>"FMS Technology is a system; it is not a specific product. It is the operation of a system on certain components. In this particular situation the components [that utilize FMS] are the . . . filter, the collection device, the vial and the slide." Partial Final Award at 2. |

Thus, the Panel found that all four disposables, not just the filter cylinder, are "Product Disposables" that "utilize FMS Technology, Cytyc Technology, or both." The record was full of other testimony and evidence describing "FMS Technology" and "Cytyc Technology" and how all ThinPrep Test Kit disposables utilize that technology. *See, e.g.*, **Exh. 1,** Hearing Day 1, Testimony of Dean Kamen at 97-98 (describing FMS Technology); 135 ("Q.  What's your understanding of what disposables in the ThinPrep System utilize either the Cytyc Technology or the FMS Technology?  A. Whatever it takes to make a slide"); 216 ("we expected our 1 percent on the FMS Technology and anything similar that they [Cytyc] did or I did or we did together or their definition of Cytyc Technology . . . If you're using this stuff to make a slide, you're getting paid for it, I want my 1 percent of that if you made a slide") and 219:11-220:12 (detailing the very broad definition of "Cytyc Technology").

**B.     The Panel's Construction Is Entirely Supported by the Agreement**

The actual wording of the agreement easily supports the Panel's ruling.  *See* DEKA's opening brief [Court Docket # 9] at 7-10.    Moreover, a contract must be read as a whole. *Royal Oak Realty Trust v. Mordita Realty Trust*, 777 A.2d 860, 863 (N.H. 2001). In focusing on parol evidence, Cytyc has overlooked the context of the agreement.  That context shows that DEKA created an integrated system and method, not simply individual parts, and that DEKA should be compensated for Cytyc's use of that entire system and method.

For example, in the "Recitals" section of the License Agreement, the parties set out their intent, which was to enable Cytyc to use DEKA's FMS technology "to facilitate the preparation of slides for medical and laboratory purposes."  Exh. 3 to DEKA's Opening Brief [Docket # 9]. That express intent is consistent with Mr. Kamen's testimony that the royalty applies to "whatever it takes to make a slide," *i.e.*, to all parts of the ThinPrep system. The parties also agreed that the ThinPrep "method and apparatus utilizes pre-exiting fluid pumping and control technology owned and developed by DEKA (the 'FMS Technology' as defined below) . . ." *Id.* (emphasis added). Thus, the License Agreement itself confirms the Panel's holding that the entire ThinPrep system, including all four disposable components, utilizes FMS Technology, Cytyc Technology, or both in making slides.  As Mr. Kamen explained, DEKA created a technology that "is a system that uses solutions and filters, if it's one or the other or both [of the Technologies], I get my 1 percent."  **Exh. 1,** Hearing Day 1 at 211 (emphasis added). Accordingly, the Panel's decision draws its essence from the entire contract and must stand.

Cytyc now argues, however, that the Panel's construction of the License Agreement is "irrational" for refusing to limit the open-ended wording "presently includes the TransCyt Filter" to mean just the filter cylinder and nothing more.  *See* Cytyc's brief at 11-12.  The Panel heard

3

and expressly rejected this argument. *See* Partial Final Award at 2. Thus, Cytyc's rehashing of this argument is improper. *See Gupta v. Cisco Sys., Inc.*, 274 F.3d 1, 3 (1st Cir. 2001) (court is bound to accept arbitrator's contract interpretation, even if a different interpretation is possible).[1]

## II.   CYTYC WANTS THIS COURT TO REWEIGH THE EXTRINSIC EVIDENCE

Cytyc claims that it is not asking this Court to reweigh the evidence. Cytyc's brief at 11. But Cytyc is, in reality, asking this Court to do just that. That is why Cytyc has devoted so many pages in its brief to repeating and repeating again extrinsic evidence submitted at the hearing, particularly a letter exchanged two and three years <u>before</u> the License Agreement was finalized in 1993. The Panel already considered this evidence, however, and thus this Court must accept the Panel's fact findings. *See Gupta*, 274 F.3d at 3 ("[I]t is the arbitrator's view of the facts and of the meaning of the contract that [the parties] have agreed to accept").

### A.   The Panel Considered the Parol Evidence

The Panel did, in fact, consider parol evidence. During the hearing, Cytyc cross-examined Mr. Kamen on the parties' early negotiations and, in particular, on the very documents that Cytyc now cites as somehow showing that vials of preservative solution are excluded from the royalty. DEKA objected that this line of questioning concerned parol evidence, arguing that

---

[1]   Cytyc's improper rehashing of its failed arguments also ignores the underlying facts. For example, Cytyc claims that DEKA was supposedly aware of the non-filter components of the kit. But what the Panel learned, and what Cytyc fails to tell this Court, is that Cytyc withheld crucial FDA documents until the beginning of the Arbitration Hearing, and those documents show that, at the time the License Agreement was signed, Cytyc was not certain which of the required disposables it would sell and which the user--*e.g.*, a diagnostics lab--would purchase from other sources. Indeed, Cytyc at first had no intention of selling a slide or collection device and, thus, had no reason to include them as specific examples in the royalty provisions of the Agreement. *See* DEKA's Reply to Cytyc's Post-Hearing Brief (Exh. 16 to DEKA's opening brief) at 2-3 (summarizing the evidence on "similar disposables"). Accordingly, the parties selected a broad definition of "Product Disposables" to account for other royalty-bearing components that Cytyc might sell in the future.

the License Agreement has an integration clause (¶ 13.5) making such parol evidence irrelevant. The Panel overruled the objection and heard the evidence.  **Exh. 1,** Hearing Day 1 at 169.

That the Panel construed the License Agreement against Cytyc does not demonstrate that the Panel failed to consider Cytyc's parol evidence.  It shows only that the Panel considered the evidence but did not find it convincing.  That is not surprising because Cytyc has focused on correspondence, such as a May 1990 letter, from two and three years <u>before</u> execution of the agreement.  But later evidence, including Cytyc's performance, supports the Panel's holding.

**B.    The Extrinsic Evidence Supports the Panel's Ruling**

As seen above, the Panel focused on the wording of the Agreement, found it to clearly state the parties' intent, and thus did not need to rely on extrinsic evidence.  *See Royal Oak Realty Trust*, 777 A.2d at 863 (absent ambiguity, the parties' intent can be determined from the plain wording of the contract alone).  In any event, the parol evidence shows that the parties intended the license to apply to all components used for preparing slides.

First, Dean Kamen was the only person involved in the negotiation of the License Agreement to testify at the hearing.  When Cytyc cross-examined Mr. Kamen, Mr. Kaman explained that statements in the early negotiations that the solution is excluded referred to different potential uses of the solution, not to use of the solution for slide preparation:

> Q.    I'm asking you, does Cytyc, in your mind, owe a royalty for sales, for example, of the preservative solution?
>
> A.    If it's used in making a slide, yes.  If they sell their preservative solution from some other application, no.

**Exh. 1**, Hearing Day 1 at 155-156.  *See also* 206-07 ("So if Mr. Lapidus had some use for his solutions, which we had nothing to do with developing, we weren't going to get royalties on it. We were going to get royalties on the FMS system and the ability to make slides with it.").

Second, by January 1992, DEKA and Cytyc had entered into a "handshake understanding." *See* Exh. 17 to DEKA's Opening Brief. Under that handshake understanding, Cytyc paid royalties on "Disposables (Total)"--that is, on all disposables meant for use in the ThinPrep system. The Panel certainly noted this evidence because it held that royalties are due on "net sales of <u>total</u> disposables." Partial Final Award at 3 (emphasis added).

Cytyc failed to counter that evidence. Indeed, Cytyc's CEO, Mr. Sullivan, at first assumed that the phrase "Disposables (Total)" in the royalty schedule (Exh. 17 at p. 20407) included the vial of preservative fluid as well as the filter cylinder. But when he realized that this testimony contradicted Cytyc's case, he could only offer that he did not know what the term meant. See **Exh. 3,** Hearing Day 3 at 92 ("It could mean--I don't know what is in that disposable line item. <u>I would imagine that it would include preservative</u>--no. I don't know; I don't know") (emphasis added). The Panel, however, had no trouble interpreting the term "Disposables (Total)" to mean all disposables sold by Cytyc for the ThinPrep system. Indeed, the Chair of the Panel, Judge Milonas, was quite skeptical of Mr. Sullivan's evasive response. *Id*., Hearing Day 3 at 95 ("CHAIRMAN MILONAS: What else could it mean if it doesn't mean that? What else could it mean?").

On the other hand, DEKA's witness, Mr. Kamen, did recall the handshake understanding and that the royalty would apply to total disposables:

> Q.    In fact, after the word "disposables," do you see in parentheses the word "total"?
>
> A.    Yes, I do.
>
> Q.    Was that consistent with your handshake understanding with Stan that you would get 1 percent royalty on the sales value of the total disposables used in the ThinPrep System?
>
> A.    Yes.

**Exh. 1,** Hearing Day 1, pp. 139-141.[2]

The Panel considered all of this evidence in holding that the royalty applies to all disposables: "The evidence shows that the parties never intended the royalties would be paid on parts of the Kit rather than the Kit as a whole." Partial Final Award at 2-3.

### C.    Cytyc Puts Too Much Weight on Weak Parol Evidence

Cytyc has little else to offer, so it repeatedly turns to the same correspondence from 1990 and 1991 to somehow prove its position. But this extrinsic evidence cannot bear the weight of Cytyc's whole case. First, Cytyc's letter of September 26, 1991, discusses paying a royalty on any product "which uses FMS technology." *See* **Exh. 4**. But as demonstrated above, the final License Agreement requires the payment of a royalty if a product "utilizes the Cytyc Technology, the FMS Technology, or both." There was no dispute at the hearing that the definition of Cytyc Technology is broad. *See* **Exh. 1**, Hearing Day 1, Kamen testimony at 135, 216, and 219-220. This change has significance that Cytyc would like to ignore. It shows that the royalty applies broadly to all aspects of the ThinPrep system because "Cytyc Technology" includes patents (such as the '084 patent attached as Exh. 14 to DEKA's opening brief) directed to the slide preparation system as a whole, along with a long description of other associated

---

[2]    Cytyc asserts that DEKA somehow belatedly decided that it was entitled to 1% of all disposables used to make a slide. *See* Cytyc's brief at fn 1. But Cytyc again ignores the evidence. Mr. Duffy, DEKA's finance manager, testified that he told Cytyc that royalties weren't limited to the filter during one of the early, pre-arbitration meetings with Cytyc. **Exh. 2**, Hearing Day 2 at 131 ("At the first meeting we had, yes, we had a discussion about what the License Agreement said and the fact it covers . . . similar disposables"). Also, the audit conducted before the start of the Arbitration recognized DEKA's position that it was due a 1% royalty on all disposables. Moreover, Cytyc claims its royalty reports, which it did not start sending until 1998, were clear. But a number of witnesses, including most of Cytyc's own witnesses, contradict Cytyc's assertions. *See, e.g.* DEKA's Post-Hearing Brief (Exh. 15 to DEKA's opening brief) at 37-38 (summarizing testimony on Cytyc's ambiguous royalty reports).

technologies beyond the pre-existing FMS Technology.  *See* License Agreement at ¶ 1.01(a) (definition of Cytyc Technology).

Moreover the very phrase on which Cytyc relies--"Vials filled with collection medium are explicitly excluded"--does not appear in the final License Agreement.  Indeed, Cytyc rests its whole case on this single phrase, which appears in letters from May 1990 and September 1991 but does not appear in the 1993 License Agreement.  The absence of that phrase is telling.  Cytyc has never explained away its omission.

These significant differences between Cytyc's much-touted parol evidence and the final 1993 License Agreement are important and clearly show that those early letters were not the final position of the parties.  This parol evidence is, at best, just a part of the ebb and flow of the negotiations.  The parol terms are not reflected in the final 1993 License Agreement, however, and cannot be the sole basis for construing it.[3]

## III.    THE PANEL CONSIDERED ALL ARGUMENTS ON COMMISSIONS

Contrary to Cytyc's assertion, Cytyc had ample opportunity to address the "commissions" issue and, indeed, argued its position in a brief submitted to the Panel on April 4, 2005.   Any delay by DEKA in raising the issue was caused by Cytyc's refusal to produce its customer invoices.  After repeated requests, Cytyc finally produced only a small subset of invoices shortly before the hearing.  None of these invoices stated commissions.  Promptly after receiving the Partial Final Award, DEKA renewed its request for information on the claimed

---

[3] Cytyc also claims that it somehow relied on the "assurances" contained in this parol evidence, which predates the final Agreement by two and three years.  *See* Cytyc brief at 1.  That cannot be.   <u>DEKA</u> produced the only copy of these letters, as can be seen from the production stamps on these documents.  *See*, *e.g*., **Exh. 4**, Letter of September 26, 1991 (bearing stamp "D00954," the "D" standing for DEKA).  Cytyc did not have a copy of this parol evidence at the start of the arbitration and certainly cannot claim to have relied on it when it adopted its scheme to apportion kit revenues starting in 1996 or when it later readjusted its royalty calculation schemes in 1998 and 2001.

commissions.  *See* **Exh. 5,** Letter of March 10, 2005 ("if Cytyc contends that applicable commissions should be deducted from the Net Sales of disposables, DEKA requires appropriate documentation to support such deductions").  Cytyc still has not produced any customer invoices showing a properly deducted commission and thus cannot complain now.

## CONCLUSION

For all of the foregoing reasons, DEKA respectfully requests that this Court deny Cytyc's application to vacate and grant DEKA's cross-application to confirm the arbitration award.

DATED:  June 16, 2005

DEKA PRODUCTS LIMITED
PARTNERSHIP

/s/ Erik P. Belt
Lee Carl Bromberg, BBO # 058480
Erik Paul Belt, BBO # 558620
BROMBERG & SUNSTEIN LLP
125 Summer Street
Boston, MA 02110
Tel: (617) 443-9292
E-mail: ebelt@bromsun.com

01062/00507  390858.3

# EXHIBIT 1

1

Volume I
Pages 1 to 264
Exhibits-See Index

AMERICAN ARBITRATION ASSOCIATION

Case No. 11 Y 133 02624 03

- - - - - - - - - - - - - - - - - - -x
                                     :
DEKA PRODUCTS LIMITED                :
PARTNERSHIP,                         :
              Claimant,              :
                                     :
     vs.                             :
                                     :
CYTYC CORPORATION,                   :
              Respondent.            :
                                     :
- - - - - - - - - - - - - - - - - - -x


BEFORE:   Hon. E. Leo Milonas, Chairman
          Hon. Robert R. Merhige, Jr., Member
          Hon. Vincent L. McKusick, Member


PRESENT:

     Bromberg & Sunstein LLP
          (by Lee Carl Bromberg, Esq., and
          Erik Paul Belt, Esq.)
          125 Summer Street, Boston, MA 02110-1618,
               -and-
     DEKA Research & Development Corporation
          (by Maureen K. Toohey, Esq.)
          340 Commercial Street, Manchester, NH
          03101-1129, for the Claimant.


     (Continued on Page 2)

2

PRESENT (Continued):

    Howrey Simon Arnold & White, LLP
        (by Matthew M. Wolf, Esq., Marc A. Cohn,
        Esq. and Nabina Sinha, Esq.)
        1299 Pennsylvania Avenue, N.W.,
        Washington, DC 20004-2402,
            -and-
    Cytyc Corporation (by Mark J. Casey, Esq.)
        85 Swanson Road, Boxborough, MA 01719,
        for the Respondent.


    ALSO PRESENT:    Dean Kamen
                    Brendan Duffy
                    Robert Goldscheider
                    Amy West
                    Iain Cockburn
                    Patrick Sullivan
                    Yvette Thomas
                    John Turnbull


              -held at-
      American Arbitration Association
          133 Federal Street
          Boston, Massachusetts
        Monday, December 13, 2004
             9:06 a.m.


    (Anne H. Bohan, Registered Diplomate Reporter)

97

1   And I don't know whether he paid -- he may have paid

2   none of anything over the original 50 percent of the

3   original budget, but he paid a few hundred thousand

4   dollars over a period of a year or so, which covered

5   some of the costs.  He did.

6          Anyway, we set out and we started making

7   this machine, and it worked pretty well.

8      Q.   Now, let me go back for a second, Mr.

9   Kamen.  You mentioned FMS Technology.  What does

10  "FMS" stand for?

11         CHAIRMAN MILONAS:  How much longer will

12  direct take?

13         MR. BROMBERG:  I think it will be perhaps

14  another hour.

15     Q.   What is FMS Technology, Mr. Kamen?

16     A.   The words FMS are used by us and our

17  clients, because it's not a thing -- you can't point

18  to something.  This cup is not FMS.  But if I -- if

19  this was a filter, and I put this in here and I

20  sealed it and started sucking, and I could tell what

21  amount of the holes I was filling in the bottom,

22  because I'm reading the pressure gage and the

23  length, I'd say, "Oh, that's an FMS system."

24         FMS stands for Fluid Management System.  If

98

1    the bottom diaphragm was pumping in and out and

2    there was an inlet and outlet going to a heart-lung

3    machine, it would be FMS.  Depending on what you're

4    measuring and what your disposable is set up to do,

5    we've used FMS for various kinds of projects.  And

6    it stands for Fluid Management System.

7            And the reason we say it's fluid

8    management, sometimes you care about the volume,

9    sometimes you care about the pressure, sometimes you

10   care about the flow rate.  Sometimes we use it in

11   manifolds where we're pumping lots of different

12   fluids for lots of different places to eliminate

13   large pieces of equipment.  So we've done a lot of

14   projects that we lump into something called FMS.

15       Q.   At the time you met with Stan, had you

16   already worked on FMS projects?

17       A.   For many years.

18       Q.   Had you already obtained patents for FMS?

19       A.   Yes.  And in particular -- I'm sure you

20   have them -- we had patents on the infiltration

21   monitor, before we ever talked to Stan.

22                   (Documents marked as Claimant

23                   Exhibits 217, 219, 240 and 242

24                   in evidence)

135

1      Q.    What's your understanding of "product

2    disposables"?

3      A.    The stuff you put into the machine.

4      Q.    Now, let's take a look at Section (g),

5    which defines "product disposables."

6      A.    Yes.

7      Q.    It says, "'Product disposables' shall mean

8    any filter cylinder or similar disposable provided

9    such disposable utilizes the Cytyc Technology, the

10   FMS Technology or both."  Do you see that, sir?

11     A.    Yes.

12     Q.    What's your understanding of what

13   disposables in the ThinPrep System utilize either

14   the Cytyc Technology or the FMS Technology?

15     A.    Whatever it takes to make a slide.

16     Q.    Now, did there come a time, sir, when Cytyc

17   began --

18     A.    No.  Since Mr. Wolf said the spatula

19   technically isn't my technology and today said it

20   isn't their technology, I suppose if you could make

21   a slide without using the spatula, then I could

22   argue that it's not DEKA's technology or Cytyc's

23   technology or both --

24          ARBITRATOR McKUSICK:  Is the solution

136

1   included in the definition of "product disposables"?

2          THE WITNESS:  I guess that's what the issue

3   is here.  I can't imagine how you use FMS, Fluid

4   Management System, without fluid.  How do you make a

5   slide without the sample?  I believe that's

6   obviously an important piece of it.  This morning I

7   heard that the spatula isn't Cytyc technology.  I

8   don't want to claim that the spatula is DEKA

9   technology.  So I think, in spirit, if they're

10  selling it, I should be paid for it.  If they're not

11  selling it and the doctor gets the spatula somewhere

12  else, they didn't make money on it, I shouldn't make

13  money on it.

14         ARBITRATOR McKUSICK:  Would the solution be

15  included within the Cytyc technology?

16         THE WITNESS:  I would assume -- well, if

17  Cytyc is using their solution for some other

18  application, it can preserve cells -- if they're not

19  using their solution in our machine, if the fluid in

20  our machine is theirs, it's included.  Since we

21  didn't invent their solution, if there's an

22  invention there, and they want to use it in some way

23  unrelated to my machine, I shouldn't be covered,

24  just the way if I use FMS to build dialysis machines

139

1    So if they put the brush in the kit, oh, well, you

2    were going to get 1 percent of the 10 bucks.

3    Because we sell a kit for 10 bucks, we'll put the

4    brush in.  Now you get half a percent, so you don't

5    get 10 cents, you get 5 cents.  If they put an

6    after-dinner mint in there to thank the guy who took

7    the sample and the mint cost a nickel, my royalty

8    would be cut in half again.  It's getting a little

9    hard to understand this.  I'm sorry.

10            ARBITRATOR MERHIGE:  Just business.

11            THE WITNESS:  It's not with me.

12       Q.   Mr. Kamen, let me ask you, sir, whether

13    there came a time when Cytyc began to pay royalties

14    to DEKA.

15       A.   Actually, they paid -- in the very -- I

16    think like in 1991 or 1992, Stan put some of our

17    beta units I think down here at Harvard and maybe at

18    Tufts, and he put a couple of units out and actually

19    paid me royalties on the beta units.  It was not a

20    lot of money, it was a few thousand dollars, but I

21    got a check.

22            (Document marked as Claimant

23             Exhibit 176 in evidence)

24       Q.   Let me ask you, sir, to take a look at

140

1    Exhibit 176.  We have that up on the screen.  The

2    first page of that exhibit is a check from Cytyc to

3    DEKA for $5,953.  Do you see that, sir?

4        A.    Yes, I do.

5        Q.    It's dated January 16, 1992?

6        A.    No.  Dated January 13, 1992.

7        Q.    How about the check?  Look at the check.

8        A.    Where is the date?  Yes, January 16.

9        Q.    Then the second page of the exhibit, I

10   think you're pointing out, is a letter to you from

11   Stan that's dated January 16, 1992, correct?

12       A.    Yes.

13           (Discussion off the record)

14       Q.    No, that one says January 13th.

15       A.    Mine says the 13th.

16       Q.    The check is the 16th; the letter is the

17   13th.  Okay.  And he says in his second paragraph,

18   "I'm enclosing a royalty check based on ThinPrep

19   sales for 1991."  Do you see that?

20       A.    Yes, I do.

21       Q.    He says further down, "I would prefer to

22   pay you your royalty under a signed agreement but am

23   content doing it on the basis of our handshake

24   understanding."  Do you see that, sir?

141

1      A.    Yes, I do.

2      Q.    So your handshake understanding, is that

3   the 1 percent that you talked about before?

4      A.    Yes, it is.

5      Q.    If you look at the next page, sir, do you

6   see a reference -- do you see there a handwritten

7   sheet called "Cytyc Corp. Royalty Calculation --

8   1991?"

9      A.    Yes, I do.

10     Q.    Do you see a reference to "disposables,"

11  sir?

12     A.    Yes, I do.

13     Q.    To your understanding, what's the

14  percentage of royalty that you're paid on the

15  disposable, sir?

16     A.    1 percent.

17     Q.    In fact, after the word "disposables," do

18  you see in parentheses the word "total"?

19     A.    Yes, I do.

20     Q.    Was that consistent with your handshake

21  understanding with Stan, that you would get 1

22  percent royalty on the sales value of the total

23  disposables used in the ThinPrep System?

24     A.    Yes.

154

1      Q.    Before you started working with Mr.

2  Lapidus.

3      A.    That is true.

4      Q.    Now, you're aware there are four components

5  to the ThinPrep kit?

6      A.    Over the last few months I've been told

7  that.

8      Q.    And you're aware that that's the way that

9  the FDA approved the ThinPrep Pap Test Kit for use?

10     A.    We have been asking for the documentation

11 that went to the FDA, and we have not been able to

12 get it from you.  So I don't know how the FDA

13 approved it and whether they made any stipulation

14 about those particular four components in the early

15 submissions.  I believe that in the documents you've

16 given us recently that at least there is one version

17 of an approval which requires those four components.

18     Q.    Mr. Kamen, are FDA approvals publicly

19 available documents?

20     A.    I don't think all the backup for them is,

21 no.

22     Q.    I asked you whether you were aware that the

23 FDA approved the kit with four components.  It's a

24 publicly available document, correct?

155

1      A.    I don't know that they approved a kit with

2   four components.

3      Q.    Do you have any reason to dispute the fact

4   that the FDA approved the ThinPrep Pap Test Kit only

5   in its four-component configuration?

6      A.    I have no way to dispute it or not dispute

7   it, I don't know.

8      Q.    You claim in this arbitration that you're

9   entitled to 1 percent royalties on all four

10  components of that kit, correct?

11     A.    I'll claim that I'm entitled to 1 percent

12  of whatever Cytyc gets for making a slide.

13          ARBITRATOR MERHIGE:  Could you keep your

14  voice up.

15          THE WITNESS:  I'm sorry.  And I will talk

16  to you.

17     A.    I just don't want to get hung up on the

18  definition of a kit that I've never read precisely,

19  that's all.

20     Q.    I'm asking you, does Cytyc, in your mind,

21  owe a royalty for sales, for example, of the

22  preservative solution?

23     A.    If it's used in making a slide, yes.  If

24  they sell their preservative solution from some

156

1    other application, no.

2        Q.    Similarly, for the microscope slide, it's

3    your position that a royalty is owed, if it's sold

4    as part of the ThinPrep Pap Test Kit, correct?

5        A.    By Cytyc.

6        Q.    By Cytyc.

7        A.    Yes.

8        Q.    And the same with the collection device,

9    correct?

10       A.    By "collection device" you mean the

11   spatula?

12       Q.    Correct.

13       A.    If it's sold by Cytyc.

14       Q.    DEKA had no role in designing or developing

15   the preservative solution, correct?

16       A.    As to the chemical component of it?  As to

17   designing what's --

18       Q.    Correct.

19       A.    No.

20       Q.    And you're aware there's a patent on that?

21       A.    I'm aware there's a patent.

22       Q.    And you're aware that the patent predated

23   the signing of the agreement at issue in this case?

24       A.    I'm not, but I'll take your word for it.

169

1   collection medium were not, quote, "disposables

2   using the FMS Technology," correct?

3       A.    At the time of this letter, it says that

4   vials filled with collection medium are expressly

5   excluded from this agreement.

6       *Q.    At any point between the time of this

7   letter and the initiation of this dispute, did you

8   tell Cytyc that vials filled with collection medium

9   would be included within the agreement?

10          MR. BROMBERG:  Your Honor, if I may, just

11  for the record, we have what is basically a parol

12  evidence objection.  There's a lot of documentation.

13  Prior to the License Agreement, the License

14  Agreement itself says, this is the agreement, it has

15  an integration clause.  So we would interpose as a

16  formality a parol evidence objection to questioning

17  about documents that came before the License

18  Agreement.

19          CHAIRMAN MILONAS:  Overruled.  Go ahead.

20      Q.    You can answer the question.

21      A.    The question is?

22          MR. WOLF:  If the court reporter could read

23  the question back.

24          *(Question read)

206

1   he's looking at several pieces of these disposables.

2   I don't think that's what's in his head.

3      Q.   Do you read this definition of "product

4   disposables," as it's written on D 02471, to include

5   the preservative solution when used in a ThinPrep

6   Pap Test?

7      A.   When used, sure.  "Or similar disposables

8   utilized by the Product Hardware."

9      Q.   So was Mr. Hazard misleading Mr. Lapidus

10   when he said that the enclosed draft reflects your

11   discussion with Dean as confirmed in your letter of

12   September 26th?

13      A.   No.

14      Q.   But the letter of September 26th says --

15      CHAIRMAN MILONAS:  I think we've been

16   through this.  Let's move on.

17      MR. WOLF:  That's fine.

18      A.   Just for clarity, I don't think Mr. Hazard

19   misleads people.  He probably never met -- in fact,

20   I'm sure he never met him.

21      Q.   I'm confident he wasn't misleading Mr.

22   Lapidus at this point.

23      A.   So if Mr. Lapidus had some use for his

24   solutions, which we had nothing to do with

207

1   developing, we weren't going to get royalties on it.

2   We were going to get royalties on the FMS system and

3   the ability to make slides with it.

4        Q.    Let's look at Binder 1, Exhibit 40, which

5   is the final agreement.  Do you have that in front

6   of you, Mr. Kamen?

7        A.    Yes, I do.

8        Q.    This is the final signed License Agreement

9   at issue in this arbitration, correct?

10       A.    Yes, it is.

11       Q.    If you'd look at Section 3.01 --

12       A.    Okay.

13       Q.    -- which is on Page 4.

14       A.    Yes.

15       Q.    It says, "As consideration for the License

16  of FMS Technology during the Term, Cytyc agrees to

17  pay DEKA a royalty equal to 1 percent of the Net

18  Sales of Product or Improvements," correct?

19       A.    "Net sales of products or improvements."

20  Yes.

21       Q.    So the only thing that Cytyc has to pay a

22  royalty on is either a product or an improvement,

23  correct?

24       A.    That's what this agreement says.

210

1    a lawyer, I like this sentence.  The "filter

2    cylinder or similar disposable" provided that it

3    utilizes either.  It says "the," but if it uses

4    Cytyc Technology, the FMS Technology or both, which

5    covers what Cytyc did, what DEKA did or both.

6        Q.    My point was --

7        A.    I would read it as the word "the" is

8    either.  I don't know how you can read it with a

9    different meaning.

10       Q.    So if a filter cylinder does not utilize

11   the Cytyc Technology, the FMS Technology or both,

12   you would contend that nonetheless it's royalty

13   bearing?

14       A.    Say that one again.

15       Q.    I was just setting a foundational question;

16   I didn't realize there would be a point of dispute

17   here, Mr. Kamen.  But the way I read this -- and I'm

18   asking you as the signatory of the agreement, the

19   one that was primarily responsible for negotiating

20   the agreement --

21           MR. BROMBERG:  Objection.  Argumentative.

22   Can you just put a question?

23           MR. WOLF:  I thought I did.

24           MR. BROMBERG:  I need to hear the question

211

1    again.

2        A.    This seems all encompassing to me.  If it's

3    Cytyc Technology, if it's FMS, which is a system

4    that uses solutions and filters, if it's one or the

5    other or both, I get my 1 percent.  That's the way I

6    read that.

7        Q.    I don't think there's any dispute, Mr.

8    Kamen, that the provided language means if it falls

9    into either or both of the camps of Cytyc or FMS

10   Technology.  My question is, in order for something

11   to be a product disposable, it must both be a filter

12   cylinder or similar disposable and utilize one of

13   those two technologies or both, correct?

14       A.    I believe what you just said is correct.

15       Q.    Is the microscope slide a filter cylinder

16   or similar disposable?

17       A.    Well, it's certainly similar if you're

18   using it to make a slide.  If they sold it for some

19   other purpose, it wouldn't be similar.  If it's in a

20   pouch with the rest of the stuff to do this job,

21   it's similar.

22       Q.    You were at Mr. Lapidus' deposition,

23   correct?

24       A.    I was there for part of it.

216

1   you.  Okay.

2           CHAIRMAN MILONAS:  Do you understand the

3   question?

4       A.   The question I believe is, can I point to

5   something in all these documents that specifically

6   says when you calculate the 1 percent include the

7   preservative solution?

8       Q.   I'm asking a broader question than that.

9       A.   Okay.

10      Q.   Can you recall any communication, written

11  or oral, prior to the initiation of this dispute

12  where DEKA told Cytyc that it owed a royalty on the

13  preservative solution?

14      A.   I know you don't like my answer, but I

15  think by saying we expected our 1 percent on FMS

16  Technology and anything similar that they did or I

17  did or we did together or their definition of Cytyc

18  Technology, I think that sort of says, If you're

19  using this stuff to make a slide, you're getting

20  paid for it, I want my 1 percent of that if you made

21  a slide.

22           The reason I'm hesitant to say I would want

23  it on the solution is because if I later found out

24  he was using FMS for anything else, I would say,

217

1    Hey, I'm owed a royalty there too.  But if he is

2    using solution, solution is different.  I am

3    agreeing with you.  You're saying, are they similar.

4    They could be different.  If he uses a solution to

5    preserve slides to make images better, to do all

6    sorts of other things besides make a slide, I'd say,

7    Hey, maybe he made a magic solution.  I didn't help

8    him do that.  Knock yourself out, sell your solution

9    for something else, it's not covered.

10        Q.    Prior to the initiation of this arbitration

11   or dispute, did you state to Cytyc, in writing or

12   orally, that it owed a royalty on the microscope

13   slide?

14        CHAIRMAN MILONAS:  Can you answer that

15   question yes or no?  Why don't you try, if you can.

16        A.    I don't think I ever made a request to be

17   paid on any of the subcomponents of the system, any

18   of them.

19        Q.    Other than the filter.

20        CHAIRMAN MILONAS:  Did you ever make a

21   request for the filter?  He wants to know only the

22   filter.

23        A.    I will answer your question by saying, I

24   never made a request to be paid only for the filter.

219

1        Q.    Okay.

2        A.    That's what your question was.

3        Q.    Did you ever say to Cytyc, prior to the

4    initiation of this dispute, that it owed a royalty

5    on the solution, the microscope slide or the

6    collection device with an express reference to any

7    of those components?

8        A.    I don't believe we ever had discussions

9    where we broke down those components.

10       Q.    If you'd look at Section 5.01.

11       A.    Before you go from there, in rereading

12   this, it says -- only because you're reading Cytyc

13   Technology different than I read Cytyc Technology.

14   But "Cytyc Technology" is in capital letters in this

15   thing.  And if you read the definition of "Cytyc

16   Technology" on the page before it, it's an entire

17   paragraph that looks to me like it is literally one

18   sentence.  One sentence.  But it just goes on and on

19   about it simply being everything.

20            "'Cytyc Technology' shall mean the

21   technology reflected" -- it goes on and on --

22   "together with all technology incorporated in the

23   Products, and together with patents, patent

24   applications and divisions, continuations,

220

1    continuations-in-part, reexaminations and reissues

2    of any of the foregoing, and all inventions,

3    drawings, prototypes, schematics, trade secrets,

4    know-how, formulas, compositions of matter" --

5    composition of matter is everything except energy;

6    it's the known universe -- "designs and intellectual

7    property rights existing that embody or are embodied

8    by, in whole or in part, any of such technology or

9    that pertain to it, including" -- I mean, if that

10   doesn't say, if you make a slide I get my 1 percent,

11   I don't know.  I mean, I probably could have found a

12   simpler way to say it.

13        Q.    If we can turn to 5.01, Mr. Kamen.

14        A.    Section 5?  Oh, in this, Page 5?

15        Q.    Section 5.01, which also is on Page 5.

16        A.    Yes.

17        Q.    The first clause says, "DEKA has developed

18   the" -- capital P -- "Products."  Do you see that?

19        A.    "Has developed the" -- capital P --

20   "Products," yes.

21        Q.    DEKA didn't develop the preservative

22   solution, correct?

23        A.    No, we didn't.

24        Q.    So the preservative solution can't be a

221

1   capital P Product, correct?

2       A.    It can be part of it.  Again, for one

3   function.

4       Q.    Well, are you saying this statement is

5   wrong, that it should read "DEKA has developed some

6   of the Products"?

7       A.    I can't debate language like that.  I can

8   tell you that English in general fails to be as

9   precise as mathematics, which is why I'd rather read

10  physics books than contracts.

11      Q.    Isn't the point, Mr. Kamen, the slide, the

12  solution and the collection device aren't Products?

13      A.    They're not products?

14      Q.    Capital P Products?

15      A.    They're part of a product.

16      Q.    Which product are they part of?

17      A.    The FMS slide manufacturing system that has

18  a disposable and a piece of hardware, ThinPrep

19  hardware, and it's disposable.

20      Q.    DEKA didn't develop the microscope slide,

21  correct?

22      A.    Long before we got here.

23      Q.    The specific microscope slide at issue in

24  this case?

# EXHIBIT 2

2-1

Volume II
Pages 2-1 to 2-305
Exhibits-See Index

AMERICAN ARBITRATION ASSOCIATION

Case No. 11 Y 133 02624 03

- - - - - - - - - - - - - - - - - -x
                                    :
DEKA PRODUCTS LIMITED               :
PARTNERSHIP,                        :
              Claimant,             :
                                    :
      vs.                           :
                                    :
CYTYC CORPORATION,                  :
              Respondent.           :

- - - - - - - - - - - - - - - - - -x


BEFORE:   Hon. E. Leo Milonas, Chairman
          Hon. Robert R. Merhige, Jr., Member
          Hon. Vincent L. McKusick, Member


PRESENT:

      Bromberg & Sunstein LLP
          (by Lee Carl Bromberg, Esq. and
          Erik Paul Belt, Esq.)
          125 Summer Street, Boston, MA 02110-1618,
              -and-
      DEKA Research & Development Corporation
          (by Maureen K. Toohey, Esq.)
          340 Commercial Street, Manchester, NH
          03101-1129, for the Claimant.


      (Continued on Page 2-2)

2-2

PRESENT (Continued):

    Howrey Simon Arnold & White, LLP
        (by Matthew M. Wolf, Esq., Marc A. Cohn,
        Esq. and Nabina Sinha, Esq.)
        1299 Pennsylvania Avenue, N.W.,
        Washington, DC 20004-2402,
            -and-
    Cytyc Corporation (by Mark J. Casey, Esq.)
        85 Swanson Road, Boxborough, MA 01719,
        for the Respondent.


    ALSO PRESENT:   Dean Kamen
                  Brendan Duffy
                  Robert Goldscheider
                  Amy West
                  Iain Cockburn
                  Yvette Thomas
                  John Turnbull


    (Anne H. Bohan, Registered Diplomate Reporter)

                -held at-
      American Arbitration Association
          133 Federal Street
          Boston, Massachusetts
        Tuesday, December 14, 2004
             8:57 a.m.

2-130

1    Q.    You took notes at this first meeting?

2    A.    I did.

3    Q.    But you destroyed those notes, correct?

4          MR. BELT:  Objection.

5          CHAIRMAN MILONAS:  Did you destroy those

6    notes?

7          THE WITNESS:  I no longer have those notes.

8                (Document marked as Joint

9                Exhibit 99 in evidence)

10   Q.    If we look at Exhibit 99, which I think

11   also is the same as Exhibit 257, so you probably

12   have 257 that Claimant's counsel put in front of

13   you, the February 26, 2002 letter.

14   A.    I have it.

15   Q.    At the time of this letter, was it your

16   belief that the parties were working together in

17   good faith?

18   A.    Our first meeting was cordial, and Cytyc

19   didn't want to give us certain data, which if I had

20   been in their shoes, maybe I would have taken the

21   same position at that point.  So at the time I wrote

22   this letter, I thought that we were still going down

23   the path of trying to mutually determine what the

24   appropriate application of the License Agreement was

2-131

1  in this case, at the time I wrote this letter.

2      Q.   As of the time you wrote this letter, had

3  you told Cytyc that it had not appropriately applied

4  the License Agreement royalty structure in any way?

5      A.   At the first meeting we had, yes, we had a

6  discussion about what the License Agreement said and

7  the fact it covers, specifically with respect to

8  disposables, the filter cylinder and similar

9  disposables.  It was my opinion that "similar

10  disposables" means disposables that use the FMS and

11  Cytyc technology.  They had a different view of that

12  and didn't want to discuss that issue any more.  So

13  I went on to other topics to try to understand their

14  business.

15      Q.   Do you recall at your deposition, Mr.

16  Duffy, I asked you whether you ever told Cytyc that

17  it was DEKA's view that Cytyc should pay 1 percent

18  on the entire kit and your answer was no?

19      A.   I remember that, yes.

20      Q.   Now, three months have passed since Ms.

21  Singleton's letter, looking at Exhibit 257, and

22  you've had an in-person meeting with Cytyc personnel

23  regarding the royalty, yet this letter still does

24  not assert Cytyc's payment on only the filter

2-132

1    violates the parties' agreement, correct?

2         A.    There's nothing in this letter that asserts

3    that they have violated the agreement.

4         Q.    And there's nothing in this letter that

5    suggests that the use of a relative cost-ratio

6    method is inappropriate in any way, correct?

7         A.    There's no mention of a cost-ratio method

8    in this letter.

9         Q.    From the date of this letter, up to the

10   date of this letter, you had never told Cytyc,

11   either orally or in writing, there was something

12   inappropriate with the use of the cost-ratio method,

13   correct?

14        A.    This letter is before our second meeting,

15   and I said that was where we had the first

16   discussion, so that would be correct.

17        Q.    Speaking of costs, standard costs are

18   publicly -- are audited information, correct?

19        A.    That's not correct.

20        Q.    It's not correct?

21        A.    That is not correct.

22        Q.    So it's your opinion that standard costs

23   are not audited by any outside accounting firm?

24        A.    That is my opinion, and I'll explain to you

# EXHIBIT 3

3-1

Volume III
Pages 3-1 to 3-166
Exhibits-See Index

AMERICAN ARBITRATION ASSOCIATION

Case No. 11 Y 133 02624 03

- - - - - - - - - - - - - - - - - -x
                                    :
DEKA PRODUCTS LIMITED               :
PARTNERSHIP,                        :
          Claimant,                 :
                                    :
     vs.                            :
                                    :
CYTYC CORPORATION,                  :
          Respondent.               :
                                    :
- - - - - - - - - - - - - - - - - -x


BEFORE:   Hon. E. Leo Milonas, Chairman
          Hon. Robert R. Merhige, Jr., Member
          Hon. Vincent L. McKusick, Member


PRESENT:

     Bromberg & Sunstein LLP
          (by Lee Carl Bromberg, Esq. and
          Erik Paul Belt, Esq.)
          125 Summer Street, Boston, MA 02110-1618,
               -and-
     DEKA Research & Development Corporation
          (by Maureen K. Toohey, Esq.)
          340 Commercial Street, Manchester, NH
          03101-1129, for the Claimant.


     (Continued on Page 3-2)

3-2

PRESENT (Continued):

    Howrey Simon Arnold & White, LLP
        (by Matthew M. Wolf, Esq., Marc A. Cohn,
        Esq. and Nabina Sinha, Esq.)
        1299 Pennsylvania Avenue, N.W.,
        Washington, DC 20004-2402,
            -and-
    Cytyc Corporation (by A. Suzanne
        Meszner-Eltrich, Esq. and
        Mark J. Casey, Esq.)
        85 Swanson Road, Boxborough, MA 01719,
        for the Respondent.


    ALSO PRESENT:    Dean Kamen
                     Brendan Duffy
                     Amy West
                     Iain Cockburn
                     Patrick Sullivan
                     Yvette Thomas
                     John Turnbull

    (Anne H. Bohan, Registered Diplomate Reporter)

                    -held at-
        American Arbitration Association
                133 Federal Street
                Boston, Massachusetts
            Wednesday, December 15, 2004
                    9:01 a.m.

3-91

1    Q.    But you have no recollection?

2    A.    I have no recollection.

3    Q.    If we go back to the negotiation of this

4  License Agreement, sir, am I correct that you had no

5  involvement in that whatsoever?

6    A.    None.

7    Q.    Am I correct that you had no involvement in

8  the royalty payments prior to the departure of Stan

9  Lapidus?

10    A.    I don't recall.  I don't believe so.

11        MR. BROMBERG:  Could we have Exhibit 176,

12  please.

13    Q.    Exhibit 176 is a three-page exhibit, and

14  the top page is a check payable to DEKA, correct,

15  sir?

16    A.    Correct.

17    Q.    The second page is a letter from Stan

18  Lapidus to Dean dated January 13, 1992, correct?

19    A.    Correct.

20    Q.    In that letter Stan says he's enclosing a

21  royalty check for 1991, correct?

22    A.    Correct.

23    Q.    I think you told us on direct that you sold

24  30 to 36 machines, and on the third page we see a

3-92

1    quantity of 33 up at the top.  Do you see that, sir?

2        A.    Yes, sir.

3        Q.    So are those the machines that you sold?

4        A.    I sold 24 and an associate of mine sold

5    around 12.

6        Q.    So that looks like we've accounted for them

7    on here, correct?

8        A.    Yes, sir.

9        Q.    Then do you see in the line below that it

10   says "Disposables" and then in parentheses

11   "(Total)"?  Do you see that, sir?

12       A.    Yes, I do.

13       Q.    Do those disposables include preservative

14   solution at that time, sir?

15       A.    I have no basis to know what is in that

16   disposable line item.  I would imagine that it would

17   include preservative -- no.  I don't know; I don't

18   know.

19       Q.    You have no way of knowing?

20       A.    I have no way of knowing what was included

21   or not included in that line item.

22       Q.    But it's clear that Mr. Lapidus paid DEKA

23   1 percent on the net sales of the processors and the

24   disposables, correct?

3-93

1        A.    But I don't know what the definition of

2    "disposables" is, as evidenced on this sheet.

3        Q.    Why do you suppose he puts the word "total"

4    in after "disposables"?

5        A.    You'd have to ask Stan.

6        Q.    At least on the face of this document, it

7    says "Disposables (Total)," and then 1 percent is

8    paid on the sales dollars applicable to that item,

9    correct?

10        A.    Correct.  There's also some interesting

11    additional commentary on the bottom part of that.  I

12    have no knowledge of what that is either.

13            ARBITRATOR MERHIGE:  Keep your voice up.

14            THE WITNESS:  Yes, sir.

15        Q.    Now, I think you've told us about '96.  How

16    about -- there was a change in '96 to this 20

17    percent method, correct?

18        A.    I would not characterize it as a change to

19    the 20 percent method.

20        Q.    Well, it certainly is a difference to

21    multiply the net sales by .2 percent as compared to

22    multiplying them by 1 percent that we see on Exhibit

23    176.

24        A.    Yes.

3-94

1      Q.    So that's different.

2      A.    No.   I think there's a distinction that

3   needs to be drawn here.   The non-gyn filters would

4   have been subject to the 1 percent per the DEKA

5   royalty agreement.   The gyn filters would also be

6   subject to 1 percent of the gyn filter component.

7   And we calculated that to be using the relative cost

8   method at 20 percent.   So in terms of -- there was

9   not a change in methodology; it was a change in the

10  product that was approved.   So we had to come up

11  with some allocation to apportion to the filter.

12  And the only reasonable method that I could

13  ascertain in 1996 was the cost.

14     Q.    But it's true, isn't it, you just told us a

15  couple of minutes ago, you can't really recall what

16  was done.   So you're just speculating here, isn't

17  that --

18     A.    The report you showed me earlier,

19  counselor, showed for the non-gyn on this exhibit,

20  we paid at 100 percent.   And for the preservative

21  solution, we paid at zero percent.   So as far as I

22  know, between the time of 1991 through 1996, we paid

23  DEKA 1 percent of the filter sales associated with

24  non-gyn.   That's on information and belief.

3-95

1          Q.    You don't know; is that fair to say?

2          A.    This document would support, at least in

3    that instance, we paid 1 percent on non-gyn filters.

4          Q.    This document would support that for 1991,

5    you paid 1 percent on total disposables, correct?

6          A.    It doesn't say that, counselor.

7          Q.    What does it say?  Doesn't it say

8    "Disposables (Total)"?

9          A.    I don't know what is in that line item.

10         Q.    Okay.  So whatever it means, it means.

11         A.    But in the previous document that you

12   showed me, the royalty report clearly stipulates for

13   the non-gyn TransCyt filters, it's paid at 100

14   percent.

15              CHAIRMAN MILONAS:  What else could it mean

16   if it doesn't mean that?  What else could it mean?

17              THE WITNESS:  It could mean -- I don't know

18   whether the disposables only meant the filters or

19   whether it included the preservative solution.  I

20   have no way to determine that.

21              CHAIRMAN MILONAS:  So what does the first

22   item mean?  Are you saying the first item is the

23   "system," quote, and the second item is only the

24   filters?

# EXHIBIT 4

# CYTYC

corporation



September 26, 1991

Mr. Dean Kamen
DEKA Products Limited Partnership
c/o DEKA Research and Development Company
340 Commerical Street
Manchester, NH  03101

Dear Dean,

As we discussed today on the phone, the scope of the covered products in our 1% royalty agreement is:

Cytyc will pay DEKA a 1% royalty on the net sales price (price out of Cytyc's door) of all Cytyc ThinPrep Processors which use FMS technology.  In addition, we will pay DEKA a 1% royalty on Cytyc filter cylinders which use FMS technology; we call these devices TransCyt™ Filters.

If Cytyc were to license the manufacture of TransCyt filters to another company, we would use Cytyc's license income as the basis for computing the DEKA royalty.

Finally, sales of solution-containing vials and Cytyc image processing systems are specifically excluded.

Best regards,

Stanley N. Lapidus
President

D 00954

# EXHIBIT 5

125 SUMMER STREET BOSTON, MA 02110-1618

BROMBERG ⋇ SUNSTEIN LLP

T 617 443 9292   F 617 443 0004   WWW.BROMSUN.COM

ERIK PAUL BELT
T 617 443 9292 x260
EBELT@BROMSUN.COM

March 10, 2005

**VIA E-MAIL,**
**CONFIRMATION BY MAIL**          **FILE COPY**

Matthew W. Wolf, Esq.
Marc A. Cohn, Esq.
Howrey Simon Arnold & White, LLP
1299 Pennsylvania Avenue, NW
Washington, DC 20004

Re    DEKA Products Limited Partnership v. Cytyc Corporation
       AAA Case No. 11-Y-133-02624-03
       Our File:    01062/00507

Dear Matt and Marc:

The Partial Final Award, dated March 7, 2005, orders the parties to submit and exchange royalty calculations based on 1% of Net Sales of total disposables.  To complete its calculations, DEKA will need domestic, international, and consolidated sales summaries (such as Arbitration Exhs. 8 and 9) and the monthly financial reports (such as Arb. Exh. 3) from June through December 2004.  To facilitate this production, DEKA will accept quarterly and year-end sales summaries and financial reports for Q3 and Q4 2004.

Additionally, if Cytyc contends that applicable commissions should be deducted from the Net Sales of disposables, DEKA requires appropriate documentation to support such deductions.  Despite prior requests, Cytyc has failed to provide such documentation to date and DEKA has been forced to calculate such commissions based on the limited data available. Please provide appropriate documentation.

Given the time constraints, please produce all such documents to me by Monday, March 14, 2005.  Thank you for your attention to this matter.

Matthew W. Wolf,
Marc A. Cohn, Esq.
Howrey Simon Arnold & White, LLP
March 10, 2005
Page 2


Very truly yours,


Erik Paul Belt

EPB/id
cc:     Maureen K. Toohey, Esq.
        Lee Carl Bromberg, Esq.


01062/00507  369382.1