**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

_____

|  |  |  |
|---|---|---|
| CYTYC CORPORATION | ) | |
| | ) | |
| Applicant, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO.  05-10932-WGY |
| | ) | |
| DEKA PRODUCTS LIMITED PARTNERSHIP, | ) | |
| | ) | |
| Respondent. | ) | |

_____

**DEKA'S OPPOSITION TO CYTYC'S MOTION FOR STAY PENDING APPEAL**

The judgment creditor, DEKA Products Limited Partnership, was surprised when it received Cytyc Corporation's motion for a stay based on a letter of credit.  Usually, a judgment debtor seeking a stay and wishing to avoid the prerequisite of posting a supersedeas bond under Rule 62(d) negotiates the terms of alternative security in advance.  But Cytyc did not first seek to negotiate such terms with DEKA.  Indeed, Cytyc did not even comply with Local Rule 7.1 by failing to confer with DEKA before moving for the stay.

Cytyc has the burden of showing that it is entitled to a stay even without fulfilling the requirements of Rule 62(d).  But Cytyc has not attempted to make that showing.  Nor could it.  The most significant factor for seeking such a stay is likelihood of success on the merits of the appeal.  Cytyc is not likely to succeed.  Cytyc seeks to overturn an arbitration award issued by a panel of three distinguished jurists. The standard for overturning an arbitration award is exceedingly high and rarely met.  In effect, Cytyc has already appealed the arbitration award once, to this Court, and this Court rejected Cytyc's arguments.  As this Court noted at the hearing

on Cytyc's motion to vacate the award, Cytyc is really "just arguing that [it doesn't] like the result." **Exh. A,** Hearing Transcript at 9. And that is not nearly enough to overturn the award.

Moreover, Cytyc cannot show any financial hardship or other extraordinary circumstances that could warrant a stay without adhering to the requirements of Rule 62(d). Indeed, Cytyc would have been financially able to post a supersedeas bond had it wanted to do so. As detailed below, had Cytyc offered to post a bond, the proper amount of the bond would be at least $11,072,941.

## BACKGROUND FACTS

This case comes to this Court by way of Cytyc's motion to vacate an arbitration award. The underlying arbitration concerns a dispute over the royalties that Cytyc owes DEKA under the parties' technology license agreement ("License Agreement"). DEKA asserted that, for a number of years, Cytyc had systematically underreported and underpaid royalties.[1] The arbitrators--three prominent judges--agreed. The arbitrators issued the arbitration award in two parts. In the Partial Final Award, dated March 7, 2005, the arbitrators ruled that Cytyc had used a formula for calculating royalties that was "contrary to the agreement." **Exh. B**, Partial Final Award at 2-3. The arbitrators also ruled that the License Agreement continues in force and that Cytyc must adhere to the correct royalty calculation method going forward. *Id*. at 3-4. In the Final Award, dated April 26, 2005, the arbitrators awarded DEKA $7,524,168 in unpaid royalties, $563,645 in interest, and $1,000,000 in attorneys' fees and costs, for a total award of $9,087,813. **Exh. C**. Final Award at 1-2.

---

[1]    In its investigations, DEKA learned that Cytyc had devised its own unauthorized royalty calculation formula without ever consulting or negotiating with DEKA. One of the arbitrators, the late Judge Merhige, criticized Cytyc's failure to confer with DEKA as "unfair." **Exh. D**, Arbitration Hearing Transcript at 21-22. Apparently, Cytyc's recent failure to consult DEKA before filing the present motion is endemic.

On July 7, 2005, this Court heard arguments on the parties' cross-motions to, respectively, vacate or confirm the award. In addition to holding that Cytyc had no basis for its objections (other than it didn't like the result), the Court held that the arbitrators correctly fulfilled their duty in construing the License Agreement, specifically commenting that the arbitrators' ruling is "close enough" and thus should be confirmed. **Exh. A,** Hearing Transcript at 9. The reasons for denying Cytyc's motion to vacate the award were so plain that this Court announced its ruling before even hearing DEKA's arguments. The Court thus granted DEKA's motion to confirm the award and DEKA's motion for additional interest from the April award to the date of the judgment. The Court then formalized the ruling and entered judgment the next day. *See* **Exh. E,** Order of July 8, 2005, and Electronic Clerk's Notes of Proceedings.[2]

## ARGUMENT

## I.    CYTYC IS NOT ENTITLED TO A STAY

Fed. R. Civ. P. 62(d) states that "the appellant by giving a supersedeas bond may obtain a stay" pending appeal. Under Rule 62(d), the appellant must post a supersedeas bond, and <u>only</u> a supersedeas bond, even to be entitled to a stay, absent an exceptional showing. *Trustman Ins. Co. v. Gallucci,* 193 F.3d 558, 559 (1st Cir. 1999) (defendant required to post bond to avoid execution on the judgment); *Elias Bros. Restaurants, Inc. v. Acorn Enters., Inc.*, 931 F. Supp. 930, 939 (D. Mass. 1996) ("To the extent that the defendants seek a stay while their appeal is pending, it is incumbent upon them to give a supersedeas bond as provided in Rule 62(d)")*; Enserch Corp. v. Shand Morahan & Co.*, 918 F.2d 462, 463-64 (5th Cir. 1990) ("losing parties in the district court can obtain a stay pending appeal <u>only</u> by giving a supersedeas bond") (emphasis

---

[2] Accordingly, the judgment from which Cytyc now appeals also includes the additional interest through July 8, 2005. Cytyc has failed to include that amount in its calculation of the amount for the letter of credit, as discussed below.

added); *Hamlin v. Charter Twp. of Flint*, 181 F.R.D. 348, 351 ("a full supersedeas bond should almost always be required").

Here, Cytyc has not posted a supersedeas bond, has not even offered to do so, and is thus not entitled to stay. *See Elias Bros.*, 931 F. Supp. at 939; *Marandino v. D'Elia*, 151 F.R.D. 227, 229 (D. Conn. 1993) (denying stay of execution because appellant did not post bond); *Wilmer v. Board of County Comm'rs*, 844 F. Supp. 1414, 1419 (D. Kan. 1993) (denying stay). Rather than meeting the requirements of Rule 62(d) in seeking a stay, Cytyc offers to arrange for a letter of credit. DEKA objects to this offer, and the Court should deny it for two reasons.

## A.    Cytyc Has Shown Neither Likelihood of Success on Appeal Nor "Extraordinary Circumstances" Justifying a Stay

First, a request to waive the bond requirement should ordinarily be denied except in the most "extraordinary circumstances." *Bank of Nova Scotia v. Pemberton*, 964 F. Supp. 189, 192 (D.V.I. 1997). Cytyc has the burden "of objectively demonstrating reasons for a departure from the requirement that a party post a supersedeas bond." *Maradino*, 151 F.R.D. at 228; *accord*, *Wilmer*, 844 F. Supp. at 1419. Cytyc has not even attempted to meet its burden.

To meet its burden, Cytyc must satisfy the four traditional factors for seeking a stay: (1) the likelihood of success on appeal, (2) irreparable harm if the stay is denied, (3) the absence of substantial harm to DEKA if the stay issues, and (4) no harm to the public interest. *See, e.g., Schmude v. Sheahan,* No. 00 C 44580, 2004 WL 1179418 at *2-3 (N.D. Ill., May 25, 2004) (denying stay under Rule 62(d) because appellant did not post bond and did not make sufficient showing of likelihood of success); *Bank of Nova Scotia*, 964 F. Supp. at 190 (same).

Cytyc cannot make a strong showing of likelihood of success on appeal. Review of an arbitration award is "extremely narrow and exceedingly deferential." *Bull HN Info. Sys., Inc. v. Hutson*, 229 F.3d 321, 330 (1st Cir. 2000) (citation omitted). As such, arbitration awards "are

nearly impervious to judicial oversight." *Id.* (citation omitted); *see also Gupta v. Cisco Sys., Inc.*, 274 F.3d 1, 3 (1st Cir. 2001) ("judicial review of an arbitration award is among the narrowest known to the law") (citation omitted). This Court has already heard Cytyc's best arguments for vacating the award and has deemed them insufficient. Indeed, at the July 7th hearing, this Court recognized that Cytyc's sole basis for complaint is that it doesn't like the results of the award. But that is not enough. Cytyc has identified no manifest error, no bias, no fraud that could upset the award. Indeed, this Court found that the arbitrator's interpretation of the License Agreement was "close enough" and will thus withstand scrutiny in the First Circuit.

Cytyc also has the burden of showing "extraordinary circumstances," such as financial hardship. *Maradino*, 151 F.R.D. at 228; *Wilmer*, 844 F. Supp. at 1419. Cytyc cannot argue hardship. Cytyc currently has cash and cash equivalents of $52,353,000, as well as investment securities of $44,603,000 and other assets, such as accounts receivable. **Exh. F,** SEC Form 10-Q Quarterly Report, dated August 5, 2005, at 4 (Consolidated Balance Sheets).

Even so, Cytyc is not such a blue chip prospect for payment that it should be allowed a stay on the strength of its cash position alone. Indeed, financial strength of the appellant--*i.e.*, seemingly having the funds to satisfy a judgment--is not reason alone to waive the bond requirement. *Hamlin*, 181 F.R.D. at 353. Cytyc also has current liabilities of $54,429,000, not including long-term debt and non-current liabilities of $251,517,000. In particular, Cytyc has recently been acquiring other medical products companies and thus drawing down its cash and equity reserves. For example, On March 7, 2005, the same date as the Partial Final Award, Cytyc acquired Proxima Therapeutics, Inc., for approximately $160 million in cash. *See* **Exh. F** at 7. Moreover, Cytyc is now engaged in substantial litigation in this district (*Cytyc Corp. v. Tripath Imaging, Inc.*, 03-cv-11142-DPW) in which one of its leading products is accused of

infringing its competitor's patents.  According to Cytyc's 10-Q, a *Markman* hearing is scheduled for September 6-8, 2005, with a trial to follow in early-to-mid 2006.  **Exh. F** at 15.  An adverse result in that case could disrupt Cytyc's business and ability to satisfy the judgment here.  Given Cytyc's current liabilities, therefore, DEKA requests to execute the judgment now.

### B.    A Letter of Credit Does Not Equal a Supersedeas Bond

Second, a letter of credit is not the same as a bond.  A supersedeas bond is a negotiable instrument containing an unconditional promise to pay.  A letter of credit, however, is not itself a negotiable instrument and is conditioned upon presentation of particular documents by a specific date.  Nor is it payable to bearer, like a bond.  *Heritage Housing Corp. v. Ferguson*, 651 S.W.2d 272, 273-274  (Ct. App. Tex. 1983) (irrevocable letter of credit could not be used in lieu of a supersedeas bond).  Cytyc offers no good cause for substituting a letter of credit for the required supersedeas bond.  And DEKA does not agree to this substitution.  Under these circumstances, Cytyc's motion for a stay must be denied.  *See Evolution, Inc. v. Sun Trust Bank*, No. Civ. A. 01-2409-CM, 2005 WL 1041348 (D. Kan., Jan. 10, 2005) (denying motion to stay because appellant never asserted good cause and appellees did not agree to the letter of credit).[3]

Cytyc's cited cases do not stand for the proposition that a letter of credit equals a bond.  For example, the parties in both *Landau & Cleary* and *Trans World Airlines* agreed to the substitution in advance.  As prefaced above, Cytyc never picked up the phone to call DEKA before moving for a stay.  Cytyc never sought DEKA's agreement.  Cytyc never attempted to negotiate the terms of a letter of credit in advance.  Cytyc did not even comply with its obligations under Local Rule 7.1  Accordingly, Cytyc's motion to substitute a letter of credit for the supersedeas bond should be denied. *See Boston Children's Heart Foundation, Inc. v. Nadal-*

---

[3]  For the Court's convenience, all cited WestLaw case reports are attached at Exhibit H.

*Ginard*, No. Civ. A. 93-12539, 1995 WL 17015062 at * 1 (D. Mass., Aug. 23, 1995) (Keeton, J.)

(denying motion for award of costs for failure to comply with LR 7.1).

## II.    CYTYC HAS INCORRECTLY CALCULATED THE BOND AMOUNT

Local Rule 62.2 requires that a bond must be "in the amount of the judgment plus ten

(10%) percent of the amount . . . plus Five Hundred and no/100 ($500.00) Dollars to cover costs,

unless the court directs otherwise."  Had Cytyc consented to post one, the bond would be for

$11,072,941, as seen in the attached declaration of Brendan Duffy, DEKA's financial manager.

Very simply, Mr. Duffy started with the amount of the award as of April 26, which both

parties agree is $9,087,813, and then added the court-approved additional interest of $56,895 for

a total of $9,144,708.  Cytyc neglected to add this interest when it calculated the amount of its

proposed letter of credit.  Mr. Duffy then added 10% and $500 for a total minimum required

bond of $10,059,679.  *See* **Exh. G,** Declaration of Brendan J. Duffy at ¶¶ 3-5 and Schedule A.

The award, however, does not only require Cytyc to pay past royalties due.  Rather, the

award also requires Cytyc to calculate properly all royalties for the remainder of the License

Agreement.  But Cytyc did not use the authorized formula and thus underpaid when it sent

DEKA royalties for the first and second quarters of this year.  Even by Cytyc's own admission,

had it paid all royalties due according to the arbitration award, it would have paid an additional

$496,032 for Q1 and $422,066 for Q2.  *See* Duffy Decl. at ¶ 7.[4]  Accordingly,  Mr. Duffy added

to the original award these two underpayments, plus interest, to determine a total bond amount of

$11,072,941.  *Id*. at ¶¶ 6-8 and Schedule B.

---

[4]    Cytyc did not provide documentation to support its claimed deficiency calculation. Mr. Duffy has been unable to verify Cytyc's claim.  Based on the available data, however, the actual royalty underpayments could be substantially larger. Duffy Decl. at  ¶ 7.  While reserving its rights, DEKA is willing to use Cytyc's underpayment figures to calculate the bond amount.

Because the award requires payment of all future royalties according to the authorized formula, and Cytyc has still not done so, this Court should include the recent underpayments in the bond calculation. *See, e.g., Standard Havens Prods., Inc. v. Gencor Indus., Inc.*, 897 F.2d 511, 516 (Fed. Cir. 1990) (requiring as additional security that infringer deposit into an escrow account royalties on sales of infringing products during the appeal).

## CONCLUSION

For all of the foregoing reasons, DEKA respectfully requests that this Court deny Cytyc's motion for a stay.

DATED:  August 19, 2005                           DEKA PRODUCTS LIMITED
PARTNERSHIP

/s/ Erik P. Belt
Lee Carl Bromberg, BBO # 058480
Erik Paul Belt, BBO # 558620
BROMBERG & SUNSTEIN LLP
125 Summer Street
Boston, MA 02110
Tel: (617) 443-9292
E-mail: ebelt@bromsun.com

01062/00507 425231.1

# Exhibit A

transcript

1

1                  UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF MASSACHUSETTS
2
                                              Civil Action
3                                             No. 05-10932-WGY

4     * * * * * * * * * * * * * * *
                                    *
5                                   *
CYTYC CORPORATION,                  *
6                                   *
              Applicant,            *
7                                   *
v.                                  * MOTION HEARING
8                                   *
DEKA PRODUCTS LIMITED               *
9     PARTNERSHIP,                  *
                                    *
10              Respondent.         *
                                    *
11    * * * * * * * * * * * * * * *
                BEFORE:  The Honorable William G. Young,
12                          District Judge

13    APPEARANCES:

14              WILMER CUTLER PICKERING HALE and DORR (By
          Lisa J. Pirozzolo, Esq.), 60 State Street, Boston,
15        Massachusetts 02109
                    - and -
16              HOWREY, LLP (By Matthew M. Wolf, Esq.),
          1299 Pennsylvania Avenue, N.W., Washington, D.C.
17        20004, on behalf of Cytyc Corporation, Inc.

18              BROMBERG & SUNSTEIN, LLP (By Erik Paul
          Belt, Esq. and Lee Carl Bromberg, Esq.), 125
19        Summer Street, Boston, Massachusetts 02110
                    - and -
20              DEKA RESEARCH & DEVELOPMENT CORPORATION
          (By Maureen K. Toohey, Esq.), 340 Commercial
21        Street, Manchester, New Hampshire 03101-1129, on
          behalf of DEKA Products Limited Partnership

22

23
                                        1 Courthouse Way
24                                      Boston, Massachusetts

25                                      July 7, 2005


                                                    2


1              THE CLERK:  Calling Civil Action 05-10932, Cytyc v.

2     DEKA.

```
                               transcript
 3                 THE COURT:  Would counsel identify themselves.
 4                 MS. PIROZZOLO:  Lisa Pirozzolo from Wilmer Cutler
 5      Pickering Hale and Dorr for Applicant, Cytyc Corporation.
 6      With me today is Matthew Wolf from the firm Howrey, Simon
 7      Arnold and White.  And with the Court's permission he'll be
 8      arguing on behalf of Cytyc today.
 9                 THE COURT:  And you're admitted pro hac vice to the
10      bar of this Court?
11                 MR. WOLF:  I am, your Honor.
12                 THE COURT:  And you're certainly welcome.  Thank
13      you.
14                 MS. PIROZZOLO:  We filed the papers this morning
15      so --
16                 THE CLERK:  And paid.
17                 THE COURT:  And paid the fee?
18                 MS. PIROZZOLO:  Yes, your Honor.
19                 MR. BELT:  Good afternoon, your Honor.  Erik Belt
20      from Bromberg and Sunstein and I'm here for the Respondent,
21      DEKA Products Limited Partnership.
22                 MR. BROMBERG:  Lee Bromberg, Bromberg and Sunstein,
23      for DEKA, your Honor.
24                 MS. TOOHEY:  Maureen Toohey, in-house counsel for
25      DEKA Products.
```

                                                                    3

```
 1                 THE COURT:  All right.
 2                 MR. BELT:  Your Honor, excuse me, before we start,
 3      in case it gets to that, I had prepared a booklet of just
 4      some of the exhibits I may be referring to today just to
 5      make it easier for you.  I have a copy for your clerk.
 6                 THE COURT:  Fine.
```

transcript

7              MR. BELT:  And I've given a copy to the opposing

8       counsel.

9              THE COURT:  I'll hear you.

10              MR. WOLF:  Thank you, your Honor.

11              Your Honor, we're here in an unusual circumstance.

12       I understand that the standard for vacating an arbitration

13       award is quite high.  But we're here under unusual

14       circumstances because the award was granted under very

15       unusual circumstances, and a series of unusual

16       circumstances.

17              To begin with, DEKA is seeking to confirm an award

18       today that is based upon a reading of the contract that was

19       never proffered prior to the arbitration and indeed wasn't

20       even proffered at the outset of the arbitration.

21              THE COURT:  But you agreed to arbitrate.  It's,

22       it's absolutely crystal clear here that it's properly

23       arbitrable as of the time of the license agreement.  Isn't

24       that true?

25              MR. WOLF:  That is correct.  We do not challenge

                                                              4

1       that, your Honor, that's correct.

2              THE COURT:  All right.  So you chose that method of

3       dispute resolution.

4              MR. WOLF:  There's no dispute about the

5       arbitrability of this particular issue.  The problem we

6       have, your Honor, is that we have a position as to what the

7       contract meant that was not proffered at the time of the

8       arbitration's initiation that was brought in after the fact.

9       And that in and of itself is significant, it tends to show

10       that DEKA's confidence or belief in that position might have

transcript

11    been a late-in-the-day view.  It also resulted in a problem

12    that, as to the three prongs that needed to be met for a

13    product to be royalty bearing.  One, that it be a filter

14    cylinder or similar disposable; two, that it practice the

15    FMS Technology, Cytyc Technology or both; and the third was

16    what it presently includes.

17        As to the second issue, there was no evidence

18    proffered at the arbitration.  In fact, your Honor, if I

19    may, the only evidence that the panel cited in support of

20    the second prong, practicing Cytyc Technology, FMS

21    Technology or both, was as to Robert Goldscheider.

22        Now, Mr. Goldscheider is just a lawyer.  He's a

23    lawyer who's had his testimony thrown out twice by courts in

24    reported opinions.  But more to the point here --

25        THE COURT:  You chose these people to decide your

5

1    dispute.  The fact that they botched it is not reason to

2    vacate the award.  And I'm using words favorable to you.  I

3    mean, that's the standard.

4        MR. WOLF:  I understand, your Honor.  But if I

5    could continue on this point.  First, there has to be some

6    evidence.  They can't be manifestly disregarding the law.

7        THE COURT:  Well, they can't be manifestly

8    disregarding the law.  But this is not, this is not review

9    of the determination of an administrative agency --

10        MR. WOLF:  Absolutely not, your Honor.

11        THE COURT:  -- where I have to go through all the

12    evidence to see if there is, I know it's a euphemism,

13    substantial evidence.  This is the award of an arbitrator,

14    or an arbitration panel.

Page 4

transcript

15          MR. WOLF:  Two-thirds of an arbitration panel,

16    correct, your Honor.

17          THE COURT:  I stand corrected.

18          MR. WOLF:  Well, I mean, and I --

19          THE COURT:  Two wins.

20          MR. WOLF:  I don't want to be -- understood, your

21    Honor.  But included among the unusual circumstances are the

22    tragic circumstances of the arrival of the opinion.  But I

23    want to finish on the second point, the second prong of the

24    royalty provision.

25          The question is does this, does the preservative

                                                           6

1     solution, for example, practice the FMS Technology, the

2     Cytyc Technology or both.  Because Cytyc, DEKA, rather, did

3     not actually believe in this position when they started, or

4     at least didn't assert this position when they started the

5     arbitration, they didn't proffer any evidence on it.  They

6     had to backfill.  And they backfilled with Mr. Goldscheider.

7     This is what Mr. Goldscheider said at deposition.

8           What FMS Technology is in the filter?

9           Answer:  Now you are asking me to get into the

10    technical side of this.  I am not somebody who can answer

11    this.

12          That's the sole basis the panel gave, the sole

13    basis for saying that the second prong of the royalty

14    provision was satisfied, a man who at deposition said I'm

15    not qualified to make this judgment.  I can't construe the

16    claims.

17          THE COURT:  They're not under the rules of

18    evidence.  If you wanted the rules of evidence you could

                                Page 5

transcript

19    have come to this Court.  We follow the rules of evidence

20    here.  You chose this type of dispute resolution, and now

21    you don't like the outcome.

22          MR. WOLF:  Your Honor, let's move to the second

23    point because that's far more important in the context of

24    this, the arbitration and review.

25          New Hampshire law says that you must, must

⎕

7

1    construe, must consider the extrinsic evidence of intent of

2    the parties pre- and post-contract.  Here we have another

3    unusual circumstance.  The parties expressly discussed the

4    provision in play.  It was proposed by DEKA's counsel saying

5    this filter similar, or similar, filter cylinder or similar

6    disposable language, here, this alleviates your concern that

7    the preservative solution will ever be swept up.  You, the

8    little company that my client was at the time, take our word

9    for it.  We as the lawyers have drafted language that will

10    protect you.  And beyond that, we'll tell you that, although

11    we all know about the preservative solution, we have been

12    talking about it for years, we'll put the express provision

13    in the contract that the preservative solution, that,

14    rather, that the royalty bearing product presently includes

15    the filter.  Presently includes the filter.  We've been

16    discussing the preservative solution for years and we're

17    going to tell you that as of this moment the only thing

18    that's royalty bearing is the filter.

19          Yet the panel ignored both of those pieces of

20    evidence.  The fact that the very provision in suit had been

21    discussed in the very context of the dispute, and we had

22    been made assurances.  No mention of that.  No mention of

transcript

23    that whatsoever in the award.

24           THE COURT:  Well, it doesn't have to be mentioned

25    in the award.  There's an assumption that the arbitrators

8

1    consider the entire record.

2           You cite me any case where it has to be mentioned

3    in the award.  The law is expressly to the contrary.  They

4    don't have to write decisions that mention all the evidence.

5           MR. WOLF:  You're absolutely right, your Honor.

6    But what the cases say is if there is an opinion, and for

7    the record both parties requested a reasoned opinion, that

8    was part of the provision --

9           THE COURT:  Right.

10           MR. WOLF:  -- if there is an opinion then this

11    Court is entitled to review that opinion within the four

12    corners to see --

13           THE COURT:  And, and I have to the extent that it's

14    been discussed in the brief.

15           What do you say to the Federal Circuit's Kansas

16    Jack case which expressly says because testimony was not

17    mentioned in an opinion doesn't mean it was not considered.

18           MR. WOLF:  Frankly, your Honor -- excuse me.

19           THE COURT:  No, go ahead.

20           MR. WOLF:  The First Circuit, to be blunt, has a

21    more liberal standard for review of arbitrable decision than

22    any other circuit out there, including the Federal Circuit.

23    The Bull case -- we cite a number of cases in our brief that

24    make it perfectly clear that they go beyond the express

25    language of section, express language of Sections 9 and 10

transcript

9

1    of the FAA and talk about slightly squishier standards, to
2    use a colloquial term, and we fall well within those
3    squishier standards.  They tell you, the cases tell you that
4    if you do not draw the opinion from the essence of the
5    contract, if you don't draw your opinion from the essence of
6    the contract you shall not confirm the award.  Here the
7    panel didn't draw its opinion from the essence of the
8    contract.
9          Let me give you one more example, your Honor.  We
10   put four questions in our opposition to confirmation.  What
11   does filter cylinder or similar disposable mean?  And let's
12   stop there.  The panel was obligated, whether they were
13   obligated to write it down, they were obligated to construe
14   that language.  And this is DEKA's best view of how the
15   panel took a run at it.  Quote, the phrase "or similar
16   disposable provided such disposable utilizes the Cytyc
17   Technology, the FMS Technology or both" cannot be read to be
18   restricted to only the filter.
19         Fine.  But what does it mean?  The panel never told
20   us.  The panel never construed the most important two words
21   in the contract.  What is a similar disposable?  If they had
22   construed it we wouldn't be here today.  If they had taken
23   an opportunity in light of the evidence that New Hampshire
24   law requires and said we understand there was this history
25   but something superseded it, there were countervailing

□

10

1    facts, countervailing law, whatever, we wouldn't be here
2    today.  But we're here today because they didn't construe
3    the language, because they didn't construe the evidence.
Page 8

transcript

4        And we're not asking, your Honor, just to be clear,

5    we're not asking you to reverse this decision.  We're asking

6    you to vacate it, send it back to the arbitration that the

7    panels both thought they were going to have when they

8    started this process, send it back for a proper review, a

9    proper consideration of the evidence under New Hampshire

10   law, a proper consideration of the commissions issue and the

11   interest issue.

12       THE COURT:  You know, with all respect, I hear, and

13   I have read the briefs here, you're just arguing that you

14   don't like the result.  That's the quality of justice that

15   this panel gave you.  And my own view is it's close enough.

16       The motion to vacate the arbitration award is

17   denied.  DEKA's motion to confirm the arbitration award is

18   allowed.

19       The motion for additional attorneys' fees and costs

20   is denied.

21       The motion for additional interest from May 24th,

22   2005 until today, that's allowed.

23       That's the order of the Court.

24       MR. WOLF:  Thank you, your Honor.

25       MR. BELT:  Thank you, your Honor.

⧠

                                                              11

1        MR. BROMBERG:  Thank you, your Honor.

2        (Whereupon the matter concluded.)

3

4

5            C E R T I F I C A T E

6

7

transcript

8        I, Donald E. Womack, Official Court Reporter for

9    the United States District Court for the District of

10   Massachusetts, do hereby certify that the foregoing pages

11   are a true and accurate transcription of my shorthand notes

12   taken in the aforementioned matter to the best of my skill

13   and ability.

14

15

16

17

18   _____

19              DONALD E. WOMACK
            Official Court Reporter
20             P.O. Box 51062
        Boston, Massachusetts 02205-1062
21          womack@megatran.com

22

23

24

25

Exhibit B

AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| DEKA PRODUCTS LIMITED PARTNERSHIP, | ) ) ) |
| Claimant | ) ) |
| v. | ) ) ) |
| CYTYC CORPORATION, | ) ) ) |
| Respondent | ) |

Case No. 11 Y 133 02624 03
Case Manager: Ms. Paula Dubois

## <u>PARTIAL FINAL AWARD</u>

### 1.    <u>Royalty Base</u>

On March 22, 1993 the parties to this arbitration entered into a License Agreement wherein DEKA (Claimant) licensed to Cytyc (Respondent) the right to utilize "FMS Technology" for the preparation of slides for medical and laboratory purposes, specifically for Pap smear tests, for which Cytyc would pay DEKA a royalty of one percent (1%) of net sales of "Products or Improvements."

The central issues in this arbitration are what is meant by "Products and Improvements" and how should a royalty "equal to one percent (1%) of the Net Sales" be calculated.

The parties were successful in developing a lucrative ThinPrep Pap Test, which is based on the ThinPrep System consisting of the processor and four disposables (the "Kit"): (1) the filter cylinder, (2) the vial of preservative solution, (3) the microscope slide, and (4) the collection device.

DEKA claims that royalty payments of one percent (1%) are due on the total net sales price of the four disposables, while Cytyc asserts that royalties are due only on the filter component and are to be determined by a "relative cost ratio" formula. By that formula Cytyc has determined the base on which to apply the one percent (1%) royalty by calculating the ratio of the filter cost to the total Kit cost and then multiplying net Kit sales by that ratio.

The evidence reveals that Cytyc's founder, Stan Lapidus, sought out his friend Dean Kamen, DEKA's founder, to solve a critical problem he confronted in developing a system to machine-read Pap smear slides. A way was needed to prepare a uniform, thin-layered slide specimen unobscured by clumps of mucus and blood. Kamen had patented the FMS (Fluid Management System) technology, which could be adapted for use in slide preparation. The two entered into a financial and work allocation arrangement to develop the ThinPrep slide preparation system. That system has proven highly successful, both technically and financially. The evidence establishes that the development of the ThinPrep system was a collaborative effort and that indeed the "key" component of that system was the FMS technology. Without the filter, the system would not work and would have no value.

As DEKA's technology licensing expert Robert Goldscheider testified:

FMS Technology is a system; it is not a specific product. It is the operation of a system on certain components. In this particular situation the components are the four units that were approved by the FDA: the filter, the collection device, the vial and the slide. And it is the operation of the FMS Technology, in conjunction with these units, which Mr. Sullivan tells us in his deposition are worthless by themselves, but when put together and governed by this patented system, the FMS Technology, it becomes enormously valuable.

The accuracy of this assessment is reflected in the parties' agreement. The License Agreement defines "Products" to include "Product Hardware" and "Product Disposables." Product Disposables means any filter cylinder or similar disposable utilizing Cytyc and/or FMS Technology. The four disposables are systematically integrated by design and function in order to work and in order to be patentable.

The phrase "or similar disposable provided such disposable utilizes the Cytyc Technology, the FMS Technology or both" cannot be read to be restricted to only the filter. The very next sentence, which reads "Product Disposable presently includes (emphasis supplied) Cytyc's 'TransCyt Filters'," must mean that the term "Disposables" includes the other disposables in the Kit and any improvements or modifications.

Furthermore, we find that Cytyc's proposed formula for determining royalties is not only contrary to the agreement, but makes it difficult for the parties to fairly assess the value of each part of the Kit. Indeed the parts, if they could be sold separately, would have little value as it is the entire Kit that is approved for use, and the Kit works as a unit. The

evidence shows that the parties never intended that royalties would be paid on parts of the Kit rather that the Kit as a whole. Cytyc's view of royalty payment could lead to its benefiting by its fixing costs of the components in an arbitrary or unreasonable manner, or, as alleged by DEKA, by DEKA itself making cost-saving improvements on its filter, or by Cytyc's outsourcing the manufacture of the filter. We find that the evidence establishes that royalties of one percent (1%) are due on the net sales of total disposables.

**2.  Defenses: Statute of Limitations, Laches, Estoppel, and Waiver**

We find that DEKA's claim is not barred by laches, estoppel or waiver, but we do find that under the applicable New Hampshire statute of limitations a contract claim must be commenced within three years of when it arose and that this three-year statute applies to DEKA's royalty claims. Therefore, DEKA may not receive any unpaid royalties that were due prior to November 17, 2000, three years prior to the date it filed its Demand in these proceedings. DEKA cannot avoid the bar of the statute of limitations because, in the exercise of reasonable diligence, DEKA "could" or "should" have discovered Cytyc's method of calculating royalties well before November 17, 2000.

**3.  Other DEKA Claims**

We find that DEKA has failed to establish that Cytyc acted irrationally or in a secretive manner in its calculation of royalties. We therefore dismiss DEKA's claim for breach of implied covenant of good faith and fair dealing.

We dismiss DEKA's claim for deceptive trade practices as DEKA's claim is not based on deceptive or immoral acts.

The relationship between DEKA and Cytyc was at arms length, was an ordinary contractual relationship without any fiduciary duties, and therefore DEKA's claim of breach of fiduciary duty is also dismissed.

Whatever rights and duties the parties owe to each other are strictly contractual in nature and any claims asserted by DEKA are subsumed under its demand for royalty payments under the contract. In this context and in the face of the above rulings, we find no basis to award DEKA treble damages and that demand is dismissed.

**4.  Cytyc's Claim of Termination and DEKA's Request for Injunction**

This panel has previously ruled that the license agreement has not been terminated and we adhere to that decision. We deny DEKA's request for injunctive relief as

unnecessary in light of our decision. The panel finds that the contractual relationship between the parties continues.

5. **Cost of KPMG Audit**

We find that by the terms of Section 3.03 of the License Agreement Cytyc is obligated to reimburse DEKA for the cost of the audit conducted by KMPG for the period 1996 through 2002. That audit disclosed "an underpayment of Cytyc's royalty obligations" under the License Agreement well in excess of $10,000 for the 1996-2002 period "which [was] subject to the audit." Cytyc shall reimburse DEKA for its costs of the KMPG audit in the amount of $155,758.00 within 30 days of the date of this Partial Final Award.

6. **Calculation of Unpaid Royalties**

The panel, however, does not find it possible on the record before us to determine accurately the royalty payments remaining due to DEKA from November 17, 2000 forward and we therefore order the parties to submit and exchange initial royalty calculations, including the calculation of interest, limited to fifteen (15) pages within fifteen (15) days from the date of this Partial Final Award with reply calculations to be submitted and exchanged within twenty-five (25) days of that date. The royalty calculations should cover a period through the end of the most recent quarter. Any evidentiary material outside the existing record should be presented by affidavit.

7. **Reservation of Final Decision**

Subject to the above submissions, the panel reserves decision on the amount of the award of unpaid royalties with interest due to DEKA, on attorney fees and on the costs of arbitration and any other costs.

SO ORDERED:

DATED: 3/7/05

B. Leo Milonas
Arbitrator

Vincent L. McKusick
Arbitrator

Exhibit C

## AMERICAN ARBITRATION ASSOCIATION
### Commercial Arbitration Tribunal

In the Matter of the Arbitration between

Re: 11 133 Y 02624 03
    DEKA Products Limited Partnership      ("DEKA")
    and
    Cytyc Corporation           ("Cytyc")

## FINAL AWARD OF ARBITRATORS

WE, THE UNDERSIGNED ARBITRATORS, having been designated in accordance with the arbitration

agreement entered into by the above-named parties and dated March 22, 1993, and having been duly

sworn, and having duly heard the proofs and allegations of the Parties, and having previously rendered a

Partial Final Award dated March 7, 2005 and Claimant having made a motion to amend its claim and the

Arbitrators having agreed to consider same do hereby, AWARD, as follows:

      1.      <u>Panel's Earlier Decision</u>. The Partial Final Award dated March 7, 2005, is incorporated

herein and made a part hereof.

      2.      <u>Unpaid Royalties and Interest</u>.  DEKA is awarded against Cytyc judgments in the amount

of Seven Million Five Hundred Twenty Four Thousand One Hundred Sixty Eight Dollars and Zero Cents

($7,524,168.00), representing unpaid royalties that became due and payable during the period from

November 17, 2000 through the end of 2004, and in the amount of Five Hundred Sixty Three Thousand Six

Hundred Forty Five Dollars and Zero Cents ($563,645.00), representing interest on those unpaid royalties.

Except as expressly noted below, the Panel has found persuasive the royalty and interest calculations set

forth in the sworn declaration dated March 25, 2005, of DEKA's expert witness, Christopher C. Barry.

      <u>Commissions</u>.  In the determination of the base for royalties due under the License Agreement, *i.e.*,

"net sales," section 1.01(e) plainly provides that commissions may be deducted to determine net sales <u>only</u>

<u>if</u> those commissions are "actually stated on a customer invoice."  The only customer invoices in the record

are devoid of any such statement of commissions.

In the Matter of the Arbitration between

Re: 11 133 Y 02624 03
    DEKA Products Limited Partnership      ("Claimant")
    and
    Cytyc Corporation            ("Respondent")

FirstCyte Products and Imager "Upcharge".  Excluded from the Panel's award is any royalty on Cytyc's FirstCyte products or on the so-called "upcharge" that Cytyc has added to the ThinPrep Kit to serve as a per-test user charge for the associated Imager.  Claimant DEKA has failed to carry its burden of proof on those claims for the period covered by this arbitration proceeding.

"Reagent Rental".  The Panel's award includes $24,436.00 in royalties and interest arising from Cytyc's "Reagent Rental" program – an alternative way of selling the ThinPrep System by giving the processor away for free or at a substantial discount and receiving income from the sale of disposables.  Cytyc's Rebuttal Submission on Royalties raises no objection to DEKA's claim of a royalty on "Reagent Rental" that DEKA had asserted in its earlier submission on royalties and that DEKA's expert witness Barry had included in his earlier sworn declaration.

Interest.  Commercial Arbitration Rule 43(d)(1) gives the Panel discretion to award "interest at such rate and from such date as the arbitrators may deem appropriate."  The parties have agreed on the use of the applicable New Hampshire interest rate schedule.  Equity requires that interest start to run on each quarterly royalty payment on the date it became due.

3.    Legal Fees and Expenses.  DEKA is awarded against Cytyc a judgment in the amount of One Million Dollars and Zero Cents ($1,000,000.00) toward reimbursement of DEKA's legal fees and expenses in this arbitration proceeding, including expert fees and expenses and payments to the American Arbitration Association.

Section 12.1 of the License Agreement provides that the Panel has "the right to assess the losing party with the legal fees and expenses of both parties."  This award reduces the legal fees and costs that DEKA has actually incurred, to reflect the fact that Cytyc is not "the losing party" on DEKA's claim for unpaid royalties that became due prior to November 17, 2000.

In the Matter of the Arbitration between

Re: 11 133 Y 02624 03
    DEKA Products Limited Partnership          ("Claimant")
    and
    Cytyc Corporation                         ("Respondent")

---

    4.    <u>Payment Date</u>.  Cytyc shall make the payments to DEKA required by paragraphs 2 and 3 within 30 days of the date of this Final Award.

The administrative fees of the American Arbitration Association ("the Association") totaling $18,950.00 and the compensation and expenses of the arbitrators totaling $112,120.02 shall be borne by Cytyc. Therefore, Cyctc shall reimburse DEKA as outlined in Paragraph 3 above. Cytyc shall pay to the Association the sum of $19,560.02, representing amounts still due the Association.  This amount reflects all payments made to date.

This Award is in full settlement of all claims and counterclaims submitted to this Arbitration.  All claims not expressly granted herein are hereby, denied.

This Award may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute together one and the same instrument.

| 4/25/05 | | E. Leo Milonas |
|---|---|---|
| Date | | |

| | | |
|---|---|---|
| Date | | Vincent L. McKusick |

I, E. Leo Milonas, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is my Award.

| 4/25/05 | | E. Leo Milonas |
|---|---|---|
| Date | | |

3

In the Matter of the Arbitration between

Re: 11 133 Y 02624 03
      DEKA Products Limited Partnership      ("Claimant")
      and
      Cytyc Corporation      ("Respondent")

---

The administrative fees of the American Arbitration Association ("the Association") totaling $18,950.00 and the compensation and expenses of the arbitrators totaling $112,120.02 shall be borne by Cytyc. Therefore, Cyctc shall reimburse DEKA as outlined in Paragraph 3 above. Cytyc shall pay to the Association the sum of $19,560.02, representing amounts still due the Association. This amount reflects all payments made to date.

This Award is in full settlement of all claims and counterclaims submitted to this Arbitration. All claims not expressly granted herein are hereby, denied.

This Award may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute together one and the same instrument.

_____      _____
      Date                      E. Leo Milonas

4/25/05
      Date                      Vincent L. McKusick

I, E. Leo Milonas, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is my Award.

_____      _____
      Date                      E. Leo Milonas

I, Vincent L. McKusick, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is my Award.

4/25/05
_____
      Date                      Vincent L. McKusick

Exhibit D

1

Volume I
Pages 1 to 264
Exhibits-See Index

AMERICAN ARBITRATION ASSOCIATION

Case No. 11 Y 133 02624 03

- - - - - - - - - - - - - - - - - -x
                                    :
DEKA PRODUCTS LIMITED               :
PARTNERSHIP,                        :
            Claimant,               :
                                    :
      vs.                           :
                                    :
CYTYC CORPORATION,                  :
            Respondent.             :

- - - - - - - - - - - - - - - - - -x


BEFORE:   Hon. E. Leo Milonas, Chairman
          Hon. Robert R. Merhige, Jr., Member
          Hon. Vincent L. McKusick, Member



PRESENT:

    Bromberg & Sunstein LLP
          (by Lee Carl Bromberg, Esq., and
          Erik Paul Belt, Esq.)
          125 Summer Street, Boston, MA 02110-1618,
             -and-
    DEKA Research & Development Corporation
          (by Maureen K. Toohey, Esq.)
          340 Commercial Street, Manchester, NH
          03101-1129, for the Claimant.


    (Continued on Page 2)

2

PRESENT (Continued):

    Howrey Simon Arnold & White, LLP
        (by Matthew M. Wolf, Esq., Marc A. Cohn,
        Esq. and Nabina Sinha, Esq.)
        1299 Pennsylvania Avenue, N.W.,
        Washington, DC 20004-2402,
             -and-
    Cytyc Corporation (by Mark J. Casey, Esq.)
        85 Swanson Road, Boxborough, MA 01719,
        for the Respondent.


    ALSO PRESENT:   Dean Kamen
                    Brendan Duffy
                    Robert Goldscheider
                    Amy West
                    Iain Cockburn
                    Patrick Sullivan
                    Yvette Thomas
                    John Turnbull



                    -held at-
          American Arbitration Association
               133 Federal Street
               Boston, Massachusetts
          Monday, December 13, 2004
                    9:06 a.m.


    (Anne H. Bohan, Registered Diplomate Reporter)

21

1          CHAIRMAN MILONAS:  Right.

2          MR. BROMBERG:  And in our view, a          .

3     "disposable" means anything that's used to create

4     this good slide as part of the FMS system.  And

5     that's, we think, what the definition says.  And

6     that's in the same exhibit, the same page, same

7     section, except it's Subsection (g).

8          ARBITRATOR MERHIGE:  Both parties knew the

9     methods which were going to be used to determine the

10    royalties, didn't they?

11         MR. BROMBERG:  Yes, they did.

12         ARBITRATOR MERHIGE:  And that method got

13    changed?

14         MR. BROMBERG:  That method got changed.  It

15    certainly got changed in '96, and then it got

16    changed again, in our view, in '98, and then again

17    in 2001.

18         ARBITRATOR MERHIGE:  By the consent of both

19    parties?

20         MR. BROMBERG:  No.  It was done

21    unilaterally without notice.

22         ARBITRATOR MERHIGE:  Without even telling

23    them.

24         MR. BROMBERG:  Without even telling them.

22

1    And I might add, Your Honor, without providing any

2    description or explanation of how the royalties were

3    being computed.

4            ARBITRATOR MERHIGE:  I don't want to hit

5    you with something.  Just for a guy who knows little

6    about it, that sounds unfair.

7            MR. BROMBERG:  We believe it is unfair,

8    Your Honor, and that's why we're here.

9            ARBITRATOR MERHIGE:  It'd better be more

10   than that.

11           MR. BROMBERG:  I'm sorry?

12           ARBITRATOR MERHIGE:  I said it'd better be

13   more than that if you're going to enjoy your trip.

14           MR. BROMBERG:  Yes, I agree, Your Honor.

15           It's our view that they implemented these

16   methods to chisel away at the full amount of the

17   royalty and have underpaid us and didn't tell us and

18   didn't inform us.  To this day, they have no

19   explanation for this 20 percent rule.  It was just

20   arbitrarily adopted, never fixed, never changed,

21   never made up.

22           And in 2001, Your Honors, they sent us a

23   letter.  Actually, what happened was, November of

24   2001, a royalty payment was missed.  So people at

264

1                    C E R T I F I C A T E

2           I, Anne H. Bohan, Registered Diplomate

3    Reporter, do hereby certify that the foregoing

4    transcript, Volume I, is a true and accurate

5    transcription of my stenographic notes taken on

6    December 15, 2004.

7

8

9     *Anne H. Bohan*

10                    Anne H. Bohan

11             Registered Diplomate Reporter

12

13                    -   -   -   -

14

15

16

17

18

19

20

21

22

23

24

# Exhibit E

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action
No: <u>05-10932-WGY</u>

CYTEC
Plaintiff

v.

DEKA
Defendant

ORDER

YOUNG, C.J.

　　　　After a hearing on this matter, this court affirms the arbitration award. Case is closed.

By the Court,

/s/ Elizabeth Smith

_____

Deputy Clerk

July 8, 2005

To: All Counsel

## Courtney Quish

| | |
|---|---|
| **From:** | ECFnotice@mad.uscourts.gov |
| **Sent:** | Friday, July 08, 2005 9:06 AM |
| **To:** | CourtCopy@mad.uscourts.gov |
| **Subject:** | Activity in Case 1:05-cv-10932-WGY Cytyc Corporation v. Deka Products Limited Partnership "Hearing (Other)" |

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* You may view the filed documents once without charge. To avoid later charges, download a copy of each document during this first viewing.**

### United States District Court

### District of Massachusetts

Notice of Electronic Filing

The following transaction was received from Smith, Bonnie entered on 7/8/2005 at 9:06 AM EDT and filed on 7/7/2005

| | |
|---|---|
| **Case Name:** | Cytyc Corporation v. Deka Products Limited Partnership |
| **Case Number:** | 1:05-cv-10932 |
| **Filer:** | |
| **Document Number:** | |

**Docket Text:**
Electronic Clerk's Notes for proceedings held before Judge William G. Young : Hearing re Application to Vacate/Affirm Award held on 7/7/2005. After hearing the Court affirms the arbitration award. The Motion for attorneys fees is denied. The Motion for additional interest is allowed. (Court Reporter Womack.) (Smith, Bonnie)

The following document(s) are associated with this transaction:

**1:05-cv-10932 Notice will be electronically mailed to:**

Erik Paul Belt    ebelt@bromsun.com, idiaz@bromsun.com

Lee C. Bromberg    lbromberg@bromsun.com, jcreedon@bromsun.com

Saklaine Hedaraly    saklaine.hedaraly@wilmerhale.com

Lisa J. Pirozzolo    lisa.pirozzolo@wilmerhale.com, patricia.bessette@wilmerhale.com

**1:05-cv-10932 Notice will not be electronically mailed to:**

Exhibit F

# CYTYC CORP

## FORM 10-Q
(Quarterly Report)

## Filed 8/5/2005 For Period Ending 6/30/2005

| | |
|---|---|
| Address | 85 SWANSON ROAD |
| | BOXBOROUGH, Massachusetts 01719 |
| Telephone | 978-263-8000 |
| CIK | 0000849778 |
| Industry | Scientific & Technical Instr. |
| Sector | Technology |
| Fiscal Year | 12/31 |

Powered By 

http://www.edgar-online.com/
© Copyright 2005. All Rights Reserved.
Distribution and use of this document restricted under EDGAR Online's Terms of Use.

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

# FORM 10-Q

**(Mark One)**

☒ **QUARTERLY REPORT UNDER SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the quarterly period ended June 30, 2005

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 (NO FEE REQUIRED)**

For the transition period from _____ to _____

**Commission File Number 0-27558**

# CYTYC CORPORATION
### (Exact name of registrant as specified in its charter)

**DELAWARE**
**(State or other jurisdiction of incorporation or organization)**

**02-0407755**
**(I.R.S. Employer Identification No.)**

**250 Campus Drive, Marlborough, MA 01752**
**(Address of principal executive offices, including Zip Code)**

**(508) 263-2900**
**(Registrant's telephone number, including area code)**

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    Yes ☒    No ☐

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b-2 of the Act).    Yes ☒    No ☐

Indicate the number of shares outstanding of each of the issuer's classes of common stock, as of the latest practicable date: The number of shares of the issuer's Common Stock, $0.01 par value per share, outstanding as of July 28, 2005 was 112,240,621.

Total Number of Pages: 29
Exhibit index located on page 29

**Table of Contents**

**CYTYC CORPORATION**

**IND EX TO FORM 10-Q**

**Part I**      **Financial Information**
     Item 1.  Condensed Consolidated Financial Statements
             Report of Independent Registered Public Accounting Firm
             Condensed Consolidated Balance Sheets as of June 30, 2005 (unaudited) and December 31, 2004
             Condensed Consolidated Statements of Income for the three and six months ended June 30, 2005 and 2004 (unaudited)
             Condensed Consolidated Statements of Cash Flows for the six months ended June 30, 2005 and 2004 (unaudited)
             Notes to Condensed Consolidated Financial Statements (unaudited)
     Item 2.  Management's Discussion and Analysis of Financial Condition and Results of Operations
     Item 3.  Quantitative and Qualitative Disclosures About Market Risk
     Item 4.  Controls and Procedures

**Part II**      **Other Information**
     Item 1.  Legal Proceedings
     Item 2.  Unregistered Sales of Equity Securities and Use of Proceeds
     Item 4.  Submission of Matters to a Vote of Security Holders
     Item 6.  Exhibits

**Signatures**

**Exhibit Index**

2

Table of Contents

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Board of Directors and Stockholders of
Cytyc Corporation
250 Campus Drive
Marlborough, Massachusetts

We have reviewed the accompanying condensed consolidated balance sheet of Cytyc Corporation and subsidiaries as of June 30, 2005, and the related condensed consolidated statements of income for the three-month and six-month periods ended June 30, 2005 and 2004, and of cash flows for the six-month period ended June 30, 2005 and 2004. These interim financial statements are the responsibility of the Company's management.

We conducted our reviews in accordance with standards of the Public Company Accounting Oversight Board (United States). A review of interim financial information consists principally of applying analytical procedures and making inquiries of persons responsible for financial and accounting matters. It is substantially less in scope than an audit conducted in accordance with standards of the Public Company Accounting Oversight Board (United States), the objective of which is the expression of an opinion regarding the financial statements taken as a whole. Accordingly, we do not express such an opinion.

Based on our reviews, we are not aware of any material modifications that should be made to such condensed consolidated interim financial statements for them to be in conformity with accounting principles generally accepted in the United States of America.

We have previously audited, in accordance with standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheet of Cytyc Corporation and subsidiaries as of December 31, 2004, and the related consolidated statements of income, stockholders' equity, and cash flows for the year then ended (not presented herein); and in our report dated February 15, 2005, we expressed an unqualified opinion on those consolidated financial statements. In our opinion, the information set forth in the accompanying condensed consolidated balance sheet as of December 31, 2004 is fairly stated, in all material respects, in relation to the consolidated balance sheet from which it has been derived.

/s/ DELOITTE & TOUCHE LLP

Boston, Massachusetts
July 26, 2005

3

Table of Contents

## Part I FINANCIAL INFORMATION

### Item 1. Condensed Consolidated Financial Statements

**CYTYC CORPORATION**
**CONDENSED CONSOLIDATED BALANCE SHEETS**
**(in thousands, except share and per share amounts)**

| | June 30, 2005 | December 31, 2004 |
|---|---|---|
| | (unaudited) | |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 52,353 | $ 86,277 |
| Investment securities | 44,603 | 146,018 |
| Accounts receivable, net of allowance of $1,243 and $1,152 at June 30, 2005 and December 31, 2004, respectively | 69,459 | 63,636 |
| Inventories | 23,126 | 17,310 |
| Deferred tax assets, net | 3,712 | 3,737 |
| Prepaid expenses and other current assets | 4,418 | 3,812 |
| Total current assets | 197,671 | 320,790 |
| Property and equipment, net | 103,672 | 91,512 |
| Intangible assets: | | |
| Patents and developed technology, net of accumulated amortization of $9,037 and $6,423 at June 30, 2005 and December 31, 2004, respectively | 195,994 | 96,708 |
| Goodwill | 368,479 | 292,200 |
| Total intangible assets | 564,473 | 388,908 |
| Other assets, net | 7,420 | 8,140 |
| Total assets | $ 873,236 | $ 809,350 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Accounts payable | $ 10,113 | $ 10,285 |
| Accrued expenses | 40,349 | 30,029 |
| Deferred revenue | 3,967 | 2,271 |
| Total current liabilities | 54,429 | 42,585 |
| Deferred tax liabilities, net | 63,909 | 29,142 |
| Long-term debt and other non-current liabilities | 251,517 | 250,178 |
| Commitments and contingencies (Note 13) | | |
| Stockholders' equity: | | |
| Preferred stock, $0.01 par value—Authorized—5,000,000 shares No shares issued or outstanding | — | — |
| Common stock, $0.01 par value—Authorized—400,000,000 shares Issued—129,687,967 and 128,707,272 shares in 2005 and 2004, respectively Outstanding—112,218,077 and 113,428,233 shares in 2005 and 2004, respectively | 1,297 | 1,287 |
| Additional paid-in capital | 485,189 | 467,265 |
| Treasury stock, at cost: 17,469,890 and 15,279,039 shares in 2005 and 2004, respectively | (207,503) | (157,447) |
| Accumulated other comprehensive income | 2,240 | 3,108 |
| Retained earnings | 222,158 | 173,232 |
| Total stockholders' equity | 503,381 | 487,445 |

| Total liabilities and stockholders' equity | $ 873,236 | $ 809,350 |

The accompanying notes are an integral part of these condensed consolidated financial statements.

Table of Contents

### CYTYC CORPORATION
### CONDENSED CONSOLIDATED STATEMENTS OF INCOME
#### (in thousands, except per share data)
#### (unaudited)

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | ---: | ---: | ---: | ---: |
| | 2005 | 2004 | 2005 | 2004 |
| Net sales | $125,381 | $ 99,474 | $238,786 | $180,199 |
| Cost of sales | 26,106 | 21,655 | 50,033 | 36,838 |
| Gross profit | 99,275 | 77,819 | 188,753 | 143,361 |
| Operating expenses: | | | | |
| Research and development | 7,958 | 5,295 | 14,757 | 9,607 |
| In-process research and development | — | — | — | 19,100 |
| Sales and marketing | 33,708 | 27,391 | 63,391 | 47,564 |
| General and administrative | 11,490 | 8,819 | 22,197 | 16,265 |
| Arbitration decision | — | — | 7,807 | — |
| Total operating expenses | 53,156 | 41,505 | 108,152 | 92,536 |
| Income from operations | 46,119 | 36,314 | 80,601 | 50,825 |
| Other expense, net: | | | | |
| Interest income | 526 | 391 | 1,418 | 1,105 |
| Interest expense | (1,792) | (1,789) | (3,584) | (1,789) |
| Other | (703) | (174) | (1,386) | (673) |
| Total other expense, net | (1,969) | (1,572) | (3,552) | (1,357) |
| Income before provision for income taxes | 44,150 | 34,742 | 77,049 | 49,468 |
| Provision for income taxes | 16,115 | 12,866 | 28,123 | 26,056 |
| Net income | $ 28,035 | $ 21,876 | $ 48,926 | $ 23,412 |
| Net income per common share: | | | | |
| Basic | $ 0.25 | $ 0.20 | $ 0.43 | $ 0.21 |
| Diluted | $ 0.23 | $ 0.19 | $ 0.41 | $ 0.21 |
| Weighted average common shares outstanding: | | | | |
| Basic | 113,173 | 110,840 | 113,417 | 110,380 |
| Diluted | 124,796 | 123,329 | 125,281 | 118,457 |

The accompanying notes are an integral part of these condensed consolidated financial statements.

Table of Contents

# CYTYC CORPORATION
## CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS
### (in thousands)
### (unaudited)

| | Six Months Ended June 30, | |
| | 2005 | 2004 |
| --- | ---: | ---: |
| **Cash flows from operating activities:** | | |
| Net income | $  48,926 | $  23,412 |
| Depreciation and amortization | 11,071 | 7,140 |
| Provision for doubtful accounts | 223 | 153 |
| Acquired in-process research and development | — | 19,100 |
| Amortization of deferred financing costs | 772 | 381 |
| Compensation expense related to issuance of stock to directors and executives | 423 | 294 |
| Change in deferred income taxes | 17,585 | (1,134) |
| Changes in assets and liabilities, excluding effects of acquisition: | | |
| Accounts receivable | (4,440) | (10,198) |
| Inventories | (4,899) | (1,114) |
| Prepaid expenses and other current assets | 819 | (1,369) |
| Accounts payable | (378) | (4,923) |
| Accrued expenses | 7,528 | 2,905 |
| Deferred revenue | 1,776 | 1,901 |
| Tax benefit from exercise of stock options | 3,836 | 3,652 |
| Net cash provided by operating activities | 83,242 | 40,200 |
| **Cash flows from investing activities:** | | |
| Acquisition of Proxima, net of cash acquired | (161,798) | — |
| Acquisition of Novacept, net of cash acquired | — | (309,321) |
| Decrease (increase) in other assets | 439 | (274) |
| Increase in equipment under customer usage agreements | (14,185) | (15,686) |
| Purchases of property and equipment, net | (7,392) | (4,199) |
| Purchases of investment securities | (1,034) | (26,938) |
| Proceeds from sale/maturity of investment securities | 103,559 | 66,437 |
| Net cash used in investing activities | (80,411) | (289,981) |
| **Cash flows from financing activities:** | | |
| Proceeds from issuance of convertible notes, net of issuance costs | — | 242,384 |
| Purchase of treasury shares | (50,056) | (1,680) |
| Proceeds from issuance of shares under employee stock purchase plan | 1,443 | 769 |
| Proceeds from exercise of stock options | 12,233 | 16,494 |
| Net cash (used in) provided by financing activities | (36,380) | 257,967 |
| Effect of exchange rate changes on cash | (375) | (195) |
| Net (decrease) increase in cash and cash equivalents | (33,924) | 7,991 |
| Cash and cash equivalents, beginning of period | 86,277 | 71,597 |
| Cash and cash equivalents, end of period | $  52,353 | $  79,588 |

The accompanying notes are an integral part of these condensed consolidated financial statements.

Table of Contents

# CYTYC CORPORATION

## NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (Unaudited)

*(1) Basis of Presentation*

The accompanying condensed consolidated financial statements of Cytyc Corporation and subsidiaries (the "Company" or "Cytyc") have been prepared pursuant to the rules and regulations of the Securities and Exchange Commission (the "SEC"). Certain information and footnote disclosures normally included in financial statements prepared in accordance with accounting principles generally accepted in the United States have been condensed or omitted pursuant to such rules and regulations. These financial statements should be read in conjunction with the financial statements and notes included in the Company's Annual Report on Form 10-K for the year ended December 31, 2004.

The notes and accompanying condensed consolidated financial statements are unaudited. The information furnished reflects all adjustments, which, in the opinion of management, are necessary for a fair presentation of results for the interim periods. Such adjustments consisted only of normal recurring items. The interim periods are not necessarily indicative of the results expected for the full year or any future period.

The preparation of these condensed consolidated financial statements in conformity with accounting principles generally accepted in the United States requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosures of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenue and expenses during the reporting period. Actual results could differ from those estimates.

Certain reclassifications have been made to the prior year balances to conform to the current year presentation (including those discussed in Note 4).

*(2) Acquisition Activity*

*(a) Acquisition of Proxima*

On March 7, 2005, the Company acquired Proxima Therapeutics, Inc. ("Proxima"), a privately held company located in Alpharetta, Georgia, in a non-taxable transaction in which Polaris Acquisition Corp., a newly formed, wholly-owned subsidiary of Cytyc ("Merger Sub"), merged with and into Proxima (the "Merger"). Pursuant to the Merger, Proxima's name changed to Cytyc Surgical Products II, Inc. The Merger was effected pursuant to the Agreement and Plan of Merger and Reorganization, dated as of February 9, 2005, among Cytyc, Merger Sub and Proxima (the "Merger Agreement"). As a result of the Merger, all of Proxima's fully-diluted equity immediately prior to the Merger was automatically converted into the right to receive an initial cash payment of approximately $160 million, all of which was paid as of June 30, 2005, plus earn out payments tied to future performance milestones. The earn out payments are based on incremental sales growth in the breast-related products during 2005 and 2006, are subject to an aggregate cap of $65 million and will be recorded as additional goodwill when paid, if at all. The initial payment was paid with Cytyc's available cash. Per the Merger Agreement, $15.8 million of the purchase price was placed in escrow to satisfy potential claims.

Proxima develops and markets delivery systems for the treatment of cancer. Proxima has two core products, the MammoSite ® Radiation Therapy System ("MammoSite") for the treatment of early-stage breast cancer and the GliaSite ® Radiation Therapy System ("GliaSite") for the treatment of malignant brain tumors. The acquisition of Proxima is intended to build on Cytyc's reputation and leadership position in providing innovative medical technologies for women's health and to further expand the Company's innovative product offerings to include breast cancer treatment. The purchase price was supported by estimates of future revenue and earnings of Proxima, as well as the value of the intellectual property, sales force and other projected synergies.

The aggregate purchase price for Proxima was $163.1 million, of which $160 million represented cash payable to Proxima shareholders and $3.1 million represented acquisition-related fees and expenses. The acquisition has been accounted for as a purchase in accordance with Statement of Financial Accounting Standards ("SFAS") No. 141, *Business Combinations* , and accordingly, the results of operations of Proxima have been included in the accompanying condensed consolidated statement of income from the date of the acquisition. In accordance with SFAS No. 141, the total purchase price has been preliminarily allocated to the tangible and intangible assets acquired and liabilities assumed based on management's estimates of current fair values and may change as additional information becomes available. The goodwill and other intangible assets resulting from the acquisition will be accounted for under SFAS No. 142, *Goodwill and Other Intangible Assets* .

**Table of Contents**

*Purchase Price Allocation*

The following table summarizes the estimated fair values of the assets acquired and liabilities assumed, at the date of acquisition, for an aggregate purchase price of approximately $163.1 million, including acquisition costs.

|  | Amount |
| --- | ---: |
|  | (in thousands) |
| Current assets | $ 6,622 |
| Property and equipment | 379 |
| Patents and developed technology | 101,900 |
| Goodwill | 76,279 |
| Other assets | 507 |
| Current liabilities | (4,143) |
| Long-term liabilities | (587) |
| Deferred tax liability and valuation allowance—long-term | (17,827) |
|  | $ 163,130 |

As part of the purchase price allocation, all intangible assets were identified and valued. Of the total purchase price, the Company allocated $101.9 million to patents and developed technology (primarily associated with MammoSite), which is being amortized using the cash flow method over 15 years. Under the cash flow method, amortization is calculated and recognized based upon the Company's estimated net cash flows over the life of the intangible asset, reflecting the pattern in which the economic benefits of the intangible asset are consumed in accordance with SFAS No. 142. The Company acquired $39.6 million of net operating loss carryforwards for which a deferred tax asset of $13.9 million, net of a $1.1 million valuation allowance, has been recorded and is included within the net deferred tax liability balance above.

*Goodwill*

The excess of the purchase price over the fair value of tangible and identifiable intangible net assets was allocated to goodwill, which is non-deductible for tax purposes and totaled $76.3 million. In accordance with SFAS No. 142, this amount will not be systematically amortized. Instead, the Company will perform an annual assessment for impairment by applying a fair-value-based test.

*(b) Acquisition of Novacept*

On March 24, 2004, Cytyc acquired Novacept, a privately held California corporation, in a non-taxable transaction. As a result of the Merger, all of Novacept's issued and outstanding capital stock immediately prior to the Merger was automatically converted into the right to receive an aggregate of $321.4 million in cash. To satisfy certain claims as provided in the Merger Agreement, $27.5 million of the purchase price was placed in escrow, of which $10 million remains as of June 30, 2005. Novacept, renamed Cytyc Surgical Products following the acquisition, manufactures and markets the NovaSure ® System, an endometrial ablation device to treat menorrhagia, or excessive menstrual bleeding.

The aggregate purchase price for Novacept was $325.8 million, of which $321.4 million represented cash payable to Novacept shareholders and $4.4 million represented acquisition-related fees and expenses. The acquisition was accounted for as a purchase in accordance with SFAS No. 141, *Business Combinations* , and accordingly, the results of operations of Novacept were included in the consolidated statement of operations from the date of the acquisition.

As part of the purchase price allocation, it was determined that certain developed and in-development technology had value. As a result of this identification and valuation process, the Company allocated $19.1 million of the purchase price to in-process research and development projects. The acquired in-process research and development was charged to expense as of the date of the acquisition and included in the Company's statement of income for the three months ended March 31, 2004. In addition, the Company allocated $83.7 million to patents and developed technology and $201.1 million to goodwill.

8

Table of Contents

*(c) Pro Forma results*

The following unaudited pro forma financial information for the three and six months ended June 30, 2005 presents the combined results of operations of Cytyc and Proxima as if the acquisition had occurred as of January 1, 2005. The unaudited pro forma financial information for the three and six months ended June 30, 2004 presents the combined results of operations of Cytyc, Novacept and Proxima as if the acquisitions had occurred as of January 1, 2004. The pro forma results for the three and six months ended June 30, 2005 include $2.8 million of transaction fees and expenses incurred by Proxima, prior to the acquisition, related to the Merger. The pro forma results for the three and six months ended June 30, 2004 include $5.6 million of transaction fees and expenses incurred by Novacept related to the merger with Cytyc, but exclude $19.1 million of in-process research and development costs. The pro forma adjustments are based upon available information and certain assumptions that management believes are reasonable. The unaudited pro forma financial information is not intended to represent or be indicative of the consolidated results of operations or financial condition of the Company that would have been reported had the acquisitions been completed as of the dates presented, and should not be taken as representative of the future consolidated results of operations or financial condition of the Company.

Pro forma results for the three and six months ended June 30, 2005 and 2004 were as follows:

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2005 | 2004 | 2005 | 2004 |
| | (in thousands, except per share data) | | (in thousands, except per share data) | |
| Net sales | $125,381 | $103,576 | $242,981 | $200,072 |
| Net income | 28,016 | 20,778 | 45,621 | 33,637 |
| Net income per common share: | | | | |
| Basic | $ 0.25 | $ 0.19 | $ 0.40 | $ 0.30 |
| Diluted | $ 0.23 | $ 0.18 | $ 0.38 | $ 0.29 |

## (3) Amortization of Intangible Assets

Amortization expense related to identifiable intangible assets that will continue to be amortized in the future, which consists of the Company's patents and developed technology from acquisitions, was approximately $1,454,000 and $888,000 for the three months ended June 30, 2005 and 2004, respectively, and approximately $2,614,000 and $1,256,000 for the six months ended June 30, 2005 and 2004, respectively. Estimated amortization expense related to identifiable intangible assets is as follows:

| | Amount |
|---|---|
| | (in thousands) |
| Remaining six months ending December 31, 2005 | $ 4,194 |
| Year ending December 31, 2006 | 10,843 |
| Year ending December 31, 2007 | 14,487 |
| Year ending December 31, 2008 | 17,274 |
| Year ending December 31, 2009 | 19,555 |
| Year ending December 31, 2010 | 19,142 |
| Thereafter | 110,499 |
| Total | $ 195,994 |

9

Table of Contents

*(4) Investment Securities*

Investment securities consist of municipal bonds, U.S. Government and agency securities, corporate bonds, commercial paper and auction rate securities. At June 30, 2005, the Company's available-for-sale securities had contractual maturities at various dates through March 2007. The fair value of available-for-sale securities was determined based on quoted market prices at the reporting date for those securities. Available-for-sale securities are shown in the consolidated financial statements at fair market value. The Company has the ability and intent to hold securities when fair value is less than cost.

At June 30, 2005 and December 31, 2004, the Company's investment securities consisted of $5.3 million and $62.5 million, respectively, of auction rate securities ("ARS") classified as available-for-sale. Although the ARS generally have original maturities in excess of one year from date of purchase, the underlying interest rates on these securities typically reset within one month. Therefore, these ARS are priced and subsequently traded as investment securities because of remarketing and the interest rate reset feature. Prior to January 1, 2005, the Company's balances of ARS were previously classified as cash equivalents due to the Company's intent and ability to quickly liquidate these securities to fund current operations and due to the pricing reset feature. With respect to evolving views regarding the accounting for ARS, the Company has reclassified the accompanying December 31, 2004 condensed consolidated balance sheet to no longer report ARS as cash equivalents. Beginning on January 1, 2005, such investments are now reported within the Company's investment securities.

As a result of this reclassification, there was no impact on net cash used in investing activities within the condensed consolidated statement of cash flows for the six months ended June 30, 2004. The reclassification to the prior period balance sheet did not affect the Company's key financial indicators such as the combined balance of cash, cash equivalents and investment securities, total assets, net sales, net income, diluted earnings per share or cash flows from operating activities. In addition, the Company does not believe a reader's ability to understand other key aspects of the Company's financial position or operations that might be pertinent to an investment decision has been affected as a result of the reclassification. As a result, the Company believes the effects of this reclassification are not material to the Company's previously issued consolidated financial statements.

At June 30, 2005 and December 31, 2004, the cost basis, aggregate fair value and gross unrealized holding gains and losses by major security type were as follows:

| | Amortized Cost | Gross Unrealized Holding Gains | Gross Unrealized Holding Losses | Fair Value |
|---|---|---|---|---|
| | | (in thousands) | | |
| **June 30, 2005** | | | | |
| *Available-for-sale securities* | | | | |
| Municipal bonds (average maturity of 6.3 months) | $ 39,497 | $ 1 | $ (145) | $ 39,353 |
| Auction rate securities (average maturity of 1.1 month) | 5,250 | — | — | 5,250 |
| | $ 44,747 | $ 1 | $ (145) | $ 44,603 |
| **December 31, 2004** | | | | |
| *Available-for-sale securities* | | | | |
| Auction rate securities (average maturity of 0.7 month) | $ 62,450 | $ — | $ — | $ 62,450 |
| Municipal bonds (average maturity of 8.6 months) | 59,590 | 1 | (168) | 59,423 |
| U.S. government and agency securities (average maturity of 4.9 months) | 14,153 | 14 | (33) | 14,134 |
| Corporate bonds (average maturity of 6.0 months) | 9,788 | — | (27) | 9,761 |
| Commercial paper (average maturity of 1.5 months) | 250 | — | — | 250 |
| | $146,231 | $ 15 | $ (228) | $146,018 |

10

**Table of Contents**

*(5) Other Balance Sheet Information*

Components of selected captions in the consolidated balance sheets at June 30, 2005 and December 31, 2004 consisted of:

| | June 30, 2005 | December 31, 2004 |
|---|---|---|
| | (in thousands) | |
| **Inventories** | | |
| Raw material and work-in-process | $ 11,194 | $ 9,853 |
| Finished goods | 11,932 | 7,457 |
| | $ 23,126 | $ 17,310 |
| **Property and Equipment** | | |
| Property and equipment | $ 96,146 | $ 95,040 |
| Equipment under customer usage agreements | 53,669 | 42,380 |
| | 149,815 | 137,420 |
| Less—accumulated depreciation and amortization | 46,143 | 45,908 |
| | $103,672 | $ 91,512 |

*(6) Product Warranty Obligation*

The Company records a liability for product warranty obligations at the time of sale based upon historical warranty experience. The term of the warranty is generally twelve months. The Company's product warranty obligations are included in accrued expenses. Changes in the product warranty obligations for the six months ended June 30, 2005 and 2004 were as follows:

| | Six Months Ended June 30, | |
|---|---|---|
| | 2005 | 2004 |
| | (in thousands) | |
| Balance, beginning of year | $ 397 | $ 925 |
| New warranties | 122 | 121 |
| Payments | (156) | (598) |
| Adjustments | (27) | 118 |
| Balance, June 30 | $ 336 | $ 566 |

*(7) Net Income Per Common Share*

Basic net income per share is computed by dividing net income by the weighted average number of common shares outstanding. Diluted net income per share is computed by dividing net income by the weighted average number of common shares and potential common shares from outstanding stock options and convertible debt. Potential common shares for outstanding stock options are calculated using the treasury stock method and represent incremental shares issuable upon exercise of the Company's outstanding stock options.

In September 2004, the Emerging Issues Task Force ("EITF") reached a consensus on EITF Issue 04-8, *The Effect of Contingently Convertible Debt on Diluted Earnings per Share* , requiring that the dilutive effect of contingent convertible debt instruments ("CoCo's") be included in dilutive earnings per share regardless of whether the triggering contingency has been satisfied. This change in accounting principle became effective for periods ending after December 15, 2004 and, as required, has been applied on a retroactive basis. As a result of this new rule, potential common shares for the three and six months ended June 30, 2005 and 2004 include the effect of approximately 8.4 million shares of common stock (representing 8.4 million weighted average shares for the three and six months ended June 30, 2005, as well as the three months ended June 30, 2004, and 4.5 million weighted average shares for the six months ended June 30, 2004) related to the assumed conversion of the $250 million 2.25% convertible notes issued in March 2004, regardless of whether any of the triggering contingencies have been satisfied. These accounting rules also require that net income be adjusted to eliminate the interest expense related to the contingent convertible notes, net of the tax effect.

11

Table of Contents

The following table provides a reconciliation of the net income and weighted average common shares used in calculating basic and diluted net income per share for the three and six months ended June 30, 2005 and 2004:

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | 2005 | 2004 | 2005 | 2004 |
| | (in thousands) | | (in thousands) | |
| Numerator: | | | | |
| Net income, as reported, for basic earnings per share | $ 28,035 | $ 21,876 | $ 48,926 | $ 23,412 |
| Interest expense, net of tax | 1,138 | 1,127 | 2,276 | 1,109 |
| Net income, as adjusted, for diluted earnings per share | $ 29,173 | $ 23,003 | $ 51,202 | $ 24,521 |
| Denominator: | | | | |
| Basic weighted average common shares outstanding | 113,173 | 110,840 | 113,417 | 110,380 |
| Dilutive effect of assumed exercise of stock options | 3,197 | 4,063 | 3,438 | 3,608 |
| Dilutive effect of assumed conversion of convertible debt | 8,426 | 8,426 | 8,426 | 4,469 |
| Weighted average common shares outstanding assuming dilution | 124,796 | 123,329 | 125,281 | 118,457 |
| Basic net income per common share | $ 0.25 | $ 0.20 | $ 0.43 | $ 0.21 |
| Diluted net income per common and potential common share | $ 0.23 | $ 0.19 | $ 0.41 | $ 0.21 |

Diluted weighted average common shares outstanding for the three months ended June 30, 2005 and 2004 excludes 6,173,526 and 4,997,568 potential common shares, respectively, from stock options outstanding and diluted weighted average common shares outstanding for the six months ended June 30, 2005 and 2004 excludes 5,615,770 and 7,811,156 potential common shares, respectively, from stock options outstanding, because the exercise prices of such stock options were higher than the average closing price of the Company's common stock as quoted on The Nasdaq National Market during the applicable periods and their effect would be anti-dilutive.

*(8) Stock-Based Compensation*

SFAS No. 123, *Accounting for Stock-Based Compensation* , as amended, addresses the financial accounting and reporting standards for stock or other equity-based compensation arrangements. The Company has elected to continue to use the intrinsic value-based method to account for employee stock option awards under the provisions of Accounting Principles Board Opinion ("APB") No. 25 and provides disclosures based on the fair value method in the notes to the financial statements as permitted by SFAS No. 123. Pro forma net income and net income per share would have been the following if compensation cost for the Company's stock option plans had been determined consistent with SFAS No. 123:

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | 2005 | 2004 | 2005 | 2004 |
| | (in thousands, except per share data) | | (in thousands, except per share data) | |
| Net income as reported | $28,035 | $21,876 | $48,926 | $23,412 |
| Assumed stock compensation cost, net of tax | 6,429 | 11,705 | 12,705 | 23,193 |
| Pro forma net income | $21,606 | $10,171 | $36,221 | $ 219 |
| Net income per common share: | | | | |
| Basic — as reported | $ 0.25 | $ 0.20 | $ 0.43 | $ 0.21 |
| Basic — pro forma | $ 0.19 | $ 0.09 | $ 0.32 | $ — |
| Diluted — as reported | $ 0.23 | $ 0.19 | $ 0.41 | $ 0.21 |
| Diluted — pro forma | $ 0.18 | $ 0.09 | $ 0.31 | $ — |

12

**Table of Contents**

The underlying assumptions used in the Black-Scholes model were as follows:

|  | June 30, | |
|---|---|---|
|  | 2005 | 2004 |
| Risk-free interest rate | 3.8% | 2.7% |
| Expected dividend yield | — | — |
| Expected lives (in years) | 3.5 | 3.5 |
| Expected volatility | 54% | 72% |

*9) Comprehensive Income*

Comprehensive income for the three and six months ended June 30, 2005 and 2004 was as follows:

|  | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
|  | 2005 | 2004 | 2005 | 2004 |
|  | (in thousands) | | (in thousands) | |
| Net income | $28,035 | $21,876 | $48,926 | $23,412 |
| Other comprehensive income, net of tax: | | | | |
| Unrealized gains (losses) on investment securities | 47 | (143) | 43 | (178) |
| Foreign currency translation adjustments | (613) | (55) | (911) | (171) |
| Comprehensive income | $27,469 | $21,678 | $48,058 | $23,063 |

*(10) Stock Repurchase Program*

During the second quarter of 2005, the Company reactivated its stock repurchase program to repurchase shares of Cytyc's common stock through open market purchases that will be made from time to time as market conditions allow. Under this program, the Company has the authority to spend up to $200 million, plus the cost of purchasing additional shares in an amount equal to the number of shares issued to the Company's stock option holders upon exercise of their stock options during the period from August 1, 2002 to January 31, 2007. Shares repurchased under the program are held in the Company's treasury and are available for a variety of corporate purposes. The program may be suspended at any time without prior notice. During the three months ended June 30, 2005, the Company repurchased approximately 2.2 million shares with a value of $50.1 million, including $0.1 million of commissions. No shares were repurchased from January 2004 through April 2005. As of June 30, 2005 and December 31, 2004, the Company had repurchased 17,469,890 and 15,279,039 shares, respectively, under the program, with an aggregate cost of $207.5 million and $157.4 million, respectively. All of the repurchased common shares were held in treasury. The repurchase program expires on January 31, 2007.

*(11) Segment Information*

The Company operates its business in two operating segments, which are aggregated into one reportable segment — the manufacture and sale of device-based medical products. These two operating segments are described below:

*Diagnostic Products* — This segment develops and markets the ThinPrep ® System for use in diagnostic cytology applications primarily focused on women's health. The ThinPrep System is widely used for cervical cancer screening and components of this platform were used by the Company to launch its expansion into breast cancer risk assessment with the FirstCyte Breast Test. The ThinPrep System consists of the ThinPrep 2000 Processor, ThinPrep 3000 Processor, ThinPrep Imaging System, and related reagents, filters, and other supplies such as the ThinPrep Pap Test and the Company's proprietary ThinPrep PreservCyt solution.

*Surgical Products* — Following the acquisitions of Novacept on March 24, 2004 and Proxima on March 7, 2005, this segment includes the NovaSure ® System, an innovative endometrial ablation device to treat menorrhagia, or excessive menstrual bleeding, and the MammoSite ® Radiation Therapy System for the treatment of early-stage breast cancer. The NovaSure System allows physicians to treat women suffering from excessive menstrual bleeding in a minimally invasive manner to eliminate or reduce their bleeding to normal levels and consists of a single-use disposable device and a controller that delivers radio frequency energy to the lining of the uterus. The MammoSite ® Radiation Therapy System is a single-use device for the treatment of breast cancer that positions radiation sources directly into the post-lumpectomy site to optimize radiation treatment delivery while minimizing damage to healthy tissue.

13

Table of Contents

Each of the Company's operating segments has similar economic characteristics, technology, manufacturing processes, customers, distribution and marketing strategies and regulatory environments. Net sales by operating segment are as follows:

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2005 | 2004 | 2005 | 2004 |
| | (in thousands) | | (in thousands) | |
| Diagnostic products | $ 89,744 | $81,467 | $176,709 | $160,804 |
| Surgical products | 35,637 | 18,007 | 62,077 | 19,395 |
| | $125,381 | $99,474 | $238,786 | $180,199 |

*(12) Recent Accounting Pronouncements*

In December 2004, the Financial Accounting Standards Board ("FASB") issued SFAS No. 123R, *Share-Based Payment* . This standard is a revision of SFAS No. 123, *Accounting for Stock-Based Compensation* , and supersedes Accounting Principles Board Opinion No. 25, *Accounting for Stock Issued to Employees* , and its related implementation guidance. SFAS No. 123R requires all share-based payments to employees, including grants of employee stock options, to be recognized in the financial statements based on their fair values. SFAS No. 123R is effective for Cytyc as of January 1, 2006. The Company is currently evaluating the impact that adoption of SFAS No. 123R will have on the Company's financial position and results of operations.

In June 2005, the EITF reached a consensus on Issue No. 05-6, *Determining the Amortization Period for Leasehold Improvements* . The guidance requires that leasehold improvements acquired in a business combination or purchased subsequent to the inception of a lease be amortized over the lesser of the useful life of the assets or a term that includes renewals that are reasonably assured at the date of the business combination or purchase. The guidance is effective for periods beginning after June 29, 2005. The Company adopted the provisions of EITF Issue No. 05-6 on July 1, 2005 and such adoption did not have a significant effect on the Company's financial position or results of operations.

*(13) Commitments and Contingencies*

On November 17, 2003, DEKA Products Limited Partnership ("DEKA") initiated arbitration proceedings against Cytyc alleging that Cytyc underpaid royalties due to DEKA pursuant to a cross-license agreement entered into in 1993 (the "1993 DEKA Agreement"). Under the 1993 DEKA Agreement, Cytyc is obligated to pay a one percent royalty on net sales of the ThinPrep 2000 and 3000 Processors plus "...any filter cylinder or similar disposable...." The dispute concerned the method of calculating royalties on the sale of the single use disposable ThinPrep Pap Test kit. The 1993 DEKA Agreement required disputes to be resolved through binding arbitration. The ThinPrep 2000 and 3000 Processors may be used to prepare both gynecological and/or non-gynecological specimen slides. Cytyc's gynecological product, the ThinPrep Pap Test, consists of four disposable components sold in a kit: Cytyc's patented preservative solution and filter, a proprietary microscope slide, and collection devices manufactured for Cytyc by third parties. With respect to the ThinPrep Pap Test, Cytyc formerly calculated the royalty owed to DEKA based only on the value of the filter, not the full kit. Specifically, Cytyc used a cost-ratio method to derive the portion of ThinPrep Pap Test kit sales price attributable to the filter. DEKA, however, challenged Cytyc's method of calculating the royalty and sought a one percent royalty on the entire Thin Prep Pap Test kit rather than on just the filter. DEKA also made claims that Cytyc breached an implied covenant of good faith; engaged in deceptive trade practices; breached an alleged fiduciary duty; and sought treble damages.

In March 2005, the arbitration panel issued a partial final award in which it agreed with DEKA's interpretation of the 1993 DEKA Agreement and on April 26, 2005, issued its final decision. According to the award, Cytyc is required to pay a one percent royalty on the net sales of all ThinPrep Pap disposable components, both for the period from November 17, 2000 to December 31, 2004 (the "Retroactive Royalties") as well as for future sales, plus interest related to the Retroactive Royalties. The panel determined

14

Table of Contents

that the applicable statute of limitations limited the Retroactive Royalties to sales from November 17, 2000. The panel also awarded DEKA the recovery of audit costs related to the royalty audit conducted after the dispute arose, as well as reimbursement for a portion of DEKA's legal fees and expenses related to the arbitration proceeding. As to DEKA's other claims, with the exception of certain equitable defenses, the arbitration panel found in favor of Cytyc. The panel rejected DEKA's contentions of bad faith, finding that Cytyc did not act irrationally or in a secretive manner, did not engage in deceptive trade practices and did not breach any fiduciary duties. In addition, the panel rejected DEKA's claim for treble damages.

As a result of the arbitration panel's decision, Cytyc has recorded a pre-tax charge in the three months ended March 31, 2005 in the amount of $7.8 million, which is in addition to the $1.3 million previously recorded. On May 5, 2005, the Company filed a motion to vacate the arbitration award in the United States District Court for the District of Massachusetts as the Company believes the award manifestly disregarded applicable law as well as the language of the underlying agreement. The Company's motion to vacate the arbitration award was denied by the United States District Court on July 7, 2005 and the Company is evaluating its legal alternatives.

On June 16, 2003, Cytyc filed a suit for Declaratory Judgment in the United States District Court for the District of Massachusetts asking the court to determine and declare that certain of TriPath Imaging, Inc.'s ("TriPath") patents are invalid and not infringed by the Company's ThinPrep Imaging System. On June 17, 2003, TriPath announced that it had filed a lawsuit against the Company in the United States District Court for the Middle District of North Carolina alleging patent infringement, false advertising, defamation, intentional interference, unfair competition, and unfair and deceptive trade practices. On October 30, 2003, an order was entered by the district court judge in North Carolina transferring the North Carolina action to Massachusetts, thereby consolidating the cases into a single action to be heard in the United States District Court for the District of Massachusetts. Additionally, on October 30, 2003, the district court judge in Massachusetts denied a motion by TriPath to have the Company's Massachusetts case dismissed. The case is currently in the discovery phase and the Massachusetts court has not yet set a trial date. During a status conference on May 5, 2005, a so called Markman or claim construction hearing was scheduled for September 6-8, 2005. Based on the current case schedule, the Company anticipates that a trial will be scheduled to occur sometime in early-to-mid 2006. The Company believes that the claims against it are without merit and intends to vigorously defend this suit. Given the stage and current status of the litigation, the Company is unable to reasonably estimate the ultimate outcome of this case.

The Company is also involved in ordinary, routine litigation incidental to its business. Although the outcomes of these other lawsuits and claims are uncertain, management does not believe that, individually or in the aggregate, these other lawsuits and claims will have a material adverse effect on the Company's business, financial condition, results of operations or liquidity.

15

Table of Contents

**Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations**

*The following discussion should be read in conjunction with our consolidated financial statements and the related notes appearing in our annual report on Form 10-K for the year ended December 31, 2004. Our discussion contains forward-looking statements that involve risks and uncertainties, such as our plans, objectives, expectations and intentions. Actual results and events could differ materially from those anticipated in these forward-looking statements as a result of a number of factors, including those set forth below under the heading "Certain Factors Which May Affect Future Results".*

## Overview

Cytyc Corporation is a leading women's health company that designs, develops, manufactures, and markets innovative and clinically effective products. Our products cover a range of women's health applications, including cervical cancer screening, breast cancer risk assessment and radiation treatment and treatment of excessive menstrual bleeding. We operate our business in two operating segments: diagnostic products and surgical products. Our diagnostics products segment develops and markets the ThinPrep ® System for use in cytology testing applications primarily focused on women's health, such as cervical cancer screening. Our surgical products segment primarily manufactures and markets the NovaSure ® System, an innovative endometrial ablation device to treat menorrhagia, or excessive menstrual bleeding, and the MammoSite ® Radiation Therapy System, a device for the treatment of breast cancer that positions radiation sources directly into the post-lumpectomy site to optimize radiation treatment delivery while minimizing damage to healthy tissue.

## Critical Accounting Estimates

Our discussion and analysis of our financial condition and results of operations are based upon our consolidated financial statements, which have been prepared in accordance with accounting principles generally accepted in the United States. The preparation of these financial statements requires us to make estimates and judgments that affect the reported amounts of assets, liabilities, revenues and expenses, and related disclosure of contingent assets and liabilities. A "critical accounting estimate" is one which is both important to the portrayal of our financial condition and results and requires management's most difficult, subjective or complex judgments, often as a result of the need to make estimates about the effect of matters that are inherently uncertain. We continuously evaluate our critical accounting estimates. We base our estimates on historical experience and on various other assumptions that are believed to be reasonable under the circumstances, the results of which form the basis for making judgments about the carrying values of assets and liabilities that are not readily apparent from other sources. Actual results may differ from these estimates under different assumptions or conditions.

*Valuation of Long-Lived Assets, Intangibles and Goodwill.* Intangible assets acquired in a business combination, including acquired in-process research and development, are recorded under the purchase method of accounting at their estimated fair values at the date of acquisition. The fair values of acquired intangible assets are determined by management using relevant information and assumptions and assisted, in certain situations, by independent appraisers. Fair value is generally calculated as the present value of estimated future cash flows using a risk-adjusted discount rate, which requires significant management judgment with respect to revenue and expense growth rates, and the selection and use of an appropriate discount rate. Amortization of intangibles with defined lives is calculated either using the straight-line or cash flow method. The cash flow method requires management's estimate of net cash flows over the life of the intangible asset, reflecting the pattern in which the economic benefits of the intangible asset are expected to be consumed.

We assess the impairment of identifiable intangibles, long-lived assets and goodwill whenever events or changes in circumstances indicate that the carrying value may not be recoverable and at least annually in the case of goodwill. If it is determined that the carrying value of intangible, long-lived assets and goodwill might not be recoverable based upon the existence of one or more indicators of impairment, we would measure any impairment based on a projected discounted cash flow method if the undiscounted cash flows did not exceed the carrying value of such assets. No such impairment charges have been recorded to date. We are required to perform an impairment review for goodwill on an annual basis, or earlier if indicators of potential impairment exist. Based on our impairment review during 2004, the carrying amount of goodwill did not exceed its fair value and, accordingly, no impairment loss exists. At June 30, 2005, we had $564.5 million of net intangible assets, of which $368.5 million represented goodwill. An impairment of our intangible assets could result in a material, non-cash expense in our consolidated statement of income.

16

Table of Contents

Property and equipment are depreciated over their useful lives. Useful lives are based on our estimate of the period that the assets will generate revenue. Included in property and equipment are equipment under customer-usage agreements (for example, a ThinPrep Processor or a ThinPrep Imaging System), where we install the equipment at customer sites under an agreement whereby customers commit to purchasing minimum quantities of disposable supplies from us over a defined contract term. Under these arrangements, the equipment remains our property and we have the right to either remove the equipment or increase the price per disposable if the customer does not consume at least the number of disposable supplies committed in the contract. The cost of the equipment is depreciated as cost of sales over its estimated useful life. Any change in conditions that would cause us to change our estimate as to the useful lives of a group or class of assets included in property and equipment may significantly increase or decrease our depreciation expense on a prospective basis. In January 2005, we revised our estimate of the useful lives of our equipment under customer-usage agreements from the specific contract terms (which are generally between three to five years) to a range of three to eight years, depending on the nature of the equipment under the usage agreement. This change in estimate was based on our assessment of historical usage patterns and the useful lives of similar devices. This change in estimate has been reflected in our operating results beginning on January 1, 2005 and will continue to be reflected prospectively and is not expected to have a material impact on our fiscal year 2005 financial statements for equipment under customer-usage agreements as of June 30, 2005.

*Income Taxes and Deferred Taxes* . We file income tax returns in ten countries as well as many states and other localities. We must estimate our income tax expense after considering, among other factors, differing tax rates between jurisdictions, allocation factors, tax credits, non-deductible items and changes in enacted tax rates. Deferred taxes arise because of the different treatment between financial statement accounting and tax accounting, known as "temporary differences." We record the tax effect of these temporary differences as "deferred tax assets" and "deferred tax liabilities" on our consolidated balance sheet. Deferred tax assets generally result in tax deductions or credits subsequent to the period in which the related item was recorded in the consolidated statement of income. Deferred tax liabilities typically reflect a current tax deduction for which the related item has not yet been recorded in the consolidated statement of income. The carrying value of our deferred tax assets assumes that we will be able to generate sufficient future taxable income in certain tax jurisdictions, based on estimates and assumptions, to fully recover the net carrying value of the assets. If these estimates and related assumptions change in the future, we may be required to record a valuation allowance against our deferred tax assets resulting in additional income tax expense in our consolidated statement of income. When we acquired Proxima Therapeutics, Inc. ("Proxima") in March 2005, we recorded $13.9 million of deferred tax assets related to acquired net operating losses ("NOL's"), tax credits and other tax assets, against which we have recorded a valuation allowance of $1.1 million on our consolidated balance sheet for uncertainties related to such items. If we are unable to realize the benefits of these NOL's in future years, we may be required to record additional tax expense in our consolidated statement of income.

*Legal Proceedings* . We are involved in various legal actions, the outcomes of which are not within our complete control and may not be known for prolonged periods of time. In some actions, the claimants seek damages, as well as other relief, which, if granted, would require significant expenditures. We record a liability in our consolidated financial statements for these actions when a loss is known or considered probable and the amount can be reasonably estimated. We review these estimates each accounting period as additional information is known and adjust the loss provision when appropriate. If the loss is not probable or cannot be reasonably estimated, a liability is not recorded in the consolidated financial statements. During the three months ended March 31, 2005, we recorded a pre-tax charge in the amount of $7.8 million, which is in addition to the $1.3 million we had previously recorded, in connection with the arbitration panel's decision regarding the DEKA Products Limited Partnership proceeding against Cytyc. Our significant legal proceedings are discussed in Note 13 to our condensed consolidated financial statements and in Part II, Item 1. "Legal Proceedings" of this Form 10-Q, as well as in our annual report on Form 10-K for the year ended December 31, 2004.

The above list is not intended to be a comprehensive list of all of our accounting estimates. In many cases, the accounting treatment of a particular transaction is specifically dictated by generally accepted accounting principles, with little need for management's judgment in their application. There are also areas in which management's judgment in selecting any available alternative would not produce a materially different result. See our audited consolidated financial statements and notes thereto included in our annual report on Form 10-K for the fiscal year ended December 31, 2004, which contain accounting policies and other disclosures required by generally accepted accounting principles in the United States.

17

Table of Contents

## Results of Operations

### Net Sales

| | Three Months Ended June 30, | | | Six Months Ended June 30, | | |
|---|---|---|---|---|---|---|
| | 2005 | 2004 | % Change | 2005 | 2004 | % Change |
| | ($ in millions) | | | ($ in millions) | | |
| Diagnostic Products | | | | | | |
| Domestic | $ 77.0 | $70.8 | 9% | $152.0 | $140.4 | 8% |
| International | 12.8 | 10.7 | 19% | 24.7 | 20.4 | 21% |
| Total Diagnostic Products | 89.8 | 81.5 | 10% | 176.7 | 160.8 | 10% |
| Surgical Products (1) | 35.6 | 18.0 | 98% | 62.1 | 19.4 | 220% |
| Total Company | $125.4 | $99.5 | 26% | $238.8 | $180.2 | 33% |

(1)  *The surgical products division was created following our acquisition of Novacept on March 24, 2004. Our operating results for the six months ended June 30, 2004 include the results of Novacept from the date of acquisition. Our operating results for the six months ended June 30, 2005 include the results of Proxima from the date of acquisition (March 7, 2005).*

Net sales for our diagnostic products division, which represented 72% and 74% of our consolidated net sales of the three and six months ended June 30, 2005, respectively, increased 10% in both the three and six months ended June 30, 2005, as compared to the same respective periods of 2004, due primarily to growth in net sales from fees for use of the ThinPrep Imaging System as well as continued growth in international sales of our ThinPrep Pap Test (the disposable supplies used in gynecological applications of the ThinPrep System). International net sales for our diagnostic products division increased by 19% and 21% in the three and six months ended June 30, 2005, respectively, from the same respective periods of 2004, as a result of an increased volume of ThinPrep Pap Test units sold. ThinPrep Pap Test sales to our largest customer, Quest Diagnostics, Inc., represented 12% of our consolidated net sales in the three and six months ended June 30, 2005. ThinPrep Pap Test sales to our two largest customers together represented 23% and 26% of our consolidated net sales in the same periods of 2004, respectively. Subsequent to the expiration of our agreement with Quest Diagnostics, Inc. on June 30, 2005, we have implemented an arrangement that includes terms to supply both instrumentation and disposables of the ThinPrep System to meet their customers' demand.

Net sales for our surgical products division, which was created following our acquisition of Novacept (renamed Cytyc Surgical Products) on March 24, 2004, were $35.6 million for the three months ended June 30, 2005 as compared to $18.0 million for the three months ended June 30, 2004, primarily reflecting an increase in both unit sales and pricing of the NovaSure single-use disposable devices as well as the first full quarter of sales of the MammoSite Radiation Therapy single-use disposable devices following the acquisition of Proxima on March 7, 2005. Net sales for our surgical products division were $62.1 million and $19.4 million for the six months ended June 30, 2005 and 2004, respectively, reflecting NovaSure sales following the March 24, 2004 acquisition of Novacept and MammoSite sales following the March 7, 2005 acquisition of Proxima. Sales of NovaSure single-use disposable devices represented 76% and 79% of surgical product division net sales for the three and six months ended June 30, 2005, respectively, and sales of the MammoSite single-use devices represented 15% and 10% of surgical product division net sales for the three and six months ended June 30, 2005, respectively.

### Gross Margin

Our gross margin was 79% during both the three and six months ended June 30, 2005 as compared to 78% and 80% during the same respective periods in 2004. The gross margin has remained fairly consistent, as the impact of higher domestic net sales of the ThinPrep Pap Test and increasing sales of the NovaSure and MammoSite disposable devices at our surgical products division were offset by increased placements of the ThinPrep Imaging System and growth in international sales of our diagnostic products, both of which generally have lower profit margins.

18

Table of Contents

## Operating Expenses

Total operating expenses increased to $53.2 million and $108.2 million for the three and six months ended June 30, 2005, respectively, an increase of 28% and 17%, respectively, as compared to $41.5 million and $92.5 million for the same respective periods of 2004. Operating expenses include a $7.8 million charge in the six months ended June 30, 2005 as a result of an arbitration decision (see Note 13 to our condensed consolidated financial statements and Part II, Item 1. "Legal Proceedings" in this Form 10-Q), and a charge of $19.1 million in the six months ended June 30, 2004 to write off acquired in-process research and development costs related to the acquisition of Novacept. The following is a summary of operating expenses for the three and six months ended June 30, 2005 and 2004:

| | Three Months Ended June 30, | | | | Six Months Ended June 30, | | | |
|---|---|---|---|---|---|---|---|---|
| | 2005 | | 2004 | | 2005 | | 2004 | |
| | $ | % of Sales | $ | % of Sales | $ | % of Sales | $ | % of Sales |
| | ($ in millions) | | | | ($ in millions) | | | |
| Research and development | $ 8.0 | 6% | $ 5.3 | 5% | $ 14.8 | 6% | $ 9.6 | 5% |
| In-process research and development | — | — | — | — | — | — | 19.1 | 11% |
| Sales and marketing | 33.7 | 27% | 27.4 | 28% | 63.4 | 27% | 47.6 | 26% |
| General and administrative | 11.5 | 9% | 8.8 | 9% | 22.2 | 9% | 16.2 | 9% |
| Arbitration decision | — | — | — | — | 7.8 | 3% | — | — |
| Total operating expenses | $53.2 | 42% | $41.5 | 42% | $108.2 | 45% | $92.5 | 51% |

## Research and Development

Our core research and development strategy is to enhance our existing product lines, such as the ThinPrep Imaging System, the NovaSure System and the MammoSite Radiation Therapy System, through operational enhancements and cost reductions, as well as to continue to develop additional innovative medical diagnostic and surgical technology devices and therapeutic applications for women's health. Our research and development costs increased to $8.0 million and $14.8 million for the three and six months ended June 30, 2005, an increase of 50% and 54%, respectively, as compared to the same respective periods of 2004, reflecting the first full quarter of expenses supporting the MammoSite Radiation Therapy System, our efforts to continue to improve the NovaSure System and the MammoSite Radiation Therapy System by augmenting our medical development team, increasing clinical trial costs in support of the FirstCyte Breast Test, as well as $0.6 million and $1.4 million of incremental non-cash amortization of the developed technology intangible asset in the three and six months ended June 30, 2005, respectively, that resulted from our acquisitions of Novacept in March 2004 and Proxima in March 2005.

## In-Process Research and Development

As part of the allocation of the purchase price of Novacept in March 2004, all intangible assets were identified and valued. It was determined that certain developed and in-development technology had value. As a result of this identification and valuation process, we allocated approximately $19.1 million of the purchase price to in-process research and development projects for the six months ended June 30, 2004. This allocation represented the estimated fair value based on risk-adjusted cash flows related to incomplete research and development activities primarily associated with an upgrade to the radio frequency ("RF") Controller, a primary component of the NovaSure System. At the date of acquisition, the development of the next generation RF Controller had not yet reached technological feasibility and the research and development in progress had no alternative future uses. Accordingly, the acquired in-process research and development was charged to expense as of the date of the acquisition. There were no such charges in connection with our acquisition of Proxima in March 2005.

19

Table of Contents

### Sales and Marketing

Sales and marketing costs increased to $33.7 million and $63.4 million for the three and six months ended June 30, 2005, respectively, an increase of 23% and 33%, respectively, as compared to the same respective periods of 2004. This increase was mainly due to an increase in sales and marketing costs at our surgical products business of approximately $3.8 million and $11.7 million for the three and six months ended June 30, 2005, respectively, as compared to the same respective periods in 2004, primarily reflecting the expansion of our sales force resulting from the acquisitions of Novacept and Proxima in March 2004 and March 2005, costs to integrate and cross-train our sales forces following the Proxima acquisition and increased selling efforts in support of the ThinPrep Imaging System. We also incurred additional international sales and marketing costs of $1.5 million and $2.2 million for the three and six months ended June 30, 2005, respectively, as compared to the same respective periods in 2004, as we continue to support our expansion efforts.

### General and Administrative

General and administrative costs increased to $11.5 million and $22.2 million for the three and six months ended June 30, 2005, respectively, an increase of 30% and 36%, respectively, as compared to $8.8 million and $16.2 million for the same respective periods of 2004, primarily due to increased personnel and facility costs to support the growth of our business, increased efforts to enhance and expand our management information systems, increased costs relating to product liability insurance largely due to the expansion of our business and legal costs associated with litigation (see Note 13 to our condensed consolidated financial statements and Part II, Item 1. "Legal Proceedings" in this Form 10-Q for an update regarding ongoing litigation in the first two quarters of 2005). As a percentage of net sales, general and administrative expenses remained at 9% for the three and six months ended June 30, 2005 and 2004.

### Arbitration Decision

On November 17, 2003, DEKA Products Limited Partnership ("DEKA") initiated arbitration proceedings against us alleging that we underpaid royalties due to DEKA pursuant to a cross-license agreement entered into in 1993 (the "1993 DEKA Agreement") (see Note 13 to our condensed consolidated financial statements and Part II, Item 1. "Legal Proceedings" in this Form 10-Q for details). In March 2005, the arbitration panel issued a partial final award in which it agreed with DEKA's interpretation of the 1993 DEKA Agreement and on April 26, 2005, issued its final decision. According to the award, we are required to pay a one percent royalty on the net sales of all ThinPrep Pap disposable components, both for the period from November 17, 2000 to December 31, 2004 (the "Retroactive Royalties") as well as for future sales, plus interest related to the Retroactive Royalties. The panel determined that the applicable statute of limitations limited the Retroactive Royalties to sales from November 17, 2000. The panel also awarded DEKA the recovery of audit costs related to the royalty audit conducted after the dispute arose, as well as reimbursement for a portion of DEKA's legal fees and expenses relating to the arbitration proceeding. As to DEKA's other claims, with the exception of certain equitable defenses, the arbitration panel found in favor of us. The panel rejected DEKA's contentions of bad faith, finding that we did not act irrationally or in a secretive manner, did not engage in deceptive trade practices and did not breach any fiduciary duties. In addition, the panel rejected DEKA's claim for treble damages.

As a result of the arbitration panel's decision, we have recorded a pre-tax charge in the three months ended March 31, 2005 in the amount of $7.8 million, which is in addition to the $1.3 million previously recorded. On May 5, 2005, we filed a motion to vacate the arbitration award in the United States District Court for the District of Massachusetts as we believe the award manifestly disregarded applicable law as well as the language of the underlying agreement. Our motion to vacate the arbitration award was denied by the United States District Court on July 7, 2005 and we are evaluating our legal alternatives.

### Other Expense, net

We recorded interest expense of $1.8 million and $3.6 million for the three and six months ended June 30, 2005, respectively, related to our 2.25% convertible notes due 2024, which were issued on March 22, 2004, including amortization of $0.4 million and $0.8 million, respectively, of deferred financing costs associated with the issuance of these notes. Before March 22, 2004, we did not have any long-term debt obligations. Interest income increased slightly to $0.5 million and $1.4 million for the three and six months ended June 30, 2005, respectively, as compared to $0.4 million and $1.1 million for the same respective periods of 2004, as the average interest rate was higher during the three and six months ended June 30, 2005 as compared to the same periods in the prior year.

20

Table of Contents

*Income Taxes*

Our effective tax rate for the three and six months ended June 30, 2005 was 36.5%. This compares to an effective tax rate of 37% and 38% for the same respective periods of 2004, which tax rates exclude the effects of the non-deductible $19.1 million in-process research and development charge incurred in connection with the Novacept acquisition in March 2004. The decrease is due to savings from tax planning initiatives which began in 2003 as well as the impact in 2005 of the American Jobs Creation Act of 2004.

**Liquidity and Capital Resources**

At June 30, 2005, we had cash, cash equivalents and investment securities totaling $97.0 million. Cash provided by operations was $83.2 million for the six months ended June 30, 2005, an increase of 111% compared to $39.5 million during the same period of 2004, primarily as a result of increased net sales and tax benefits from the Novacept and Proxima acquisitions. Our net accounts receivable increased 9% to $69.5 million at June 30, 2005, as compared to $63.6 million at December 31, 2004, reflecting continued growth in net sales, as well as the addition of receivables from the growth of our surgical products division, which was created following our acquisition of Novacept in March 2004 and expanded in March 2005 with the acquisition of Proxima. Our Days Sales Outstanding decreased from 50 days at December 31, 2004 to 49 days at June 30, 2005. We have had no significant issues of collectibility. The term "Days Sales Outstanding", which we calculate by dividing gross trade accounts receivable at the end of the quarter by our average consolidated daily net sales for the quarter, refers to the estimated number of days' worth of sales that are outstanding and unpaid at any given time. Our inventories increased 34% to $23.1 million at June 30, 2005, as compared to $17.3 million at December 31, 2004, reflecting the addition of inventory from our acquisition of Proxima, an increase in disposable supplies for use with the ThinPrep Imaging System to meet customer demand, as well as an increase in inventory to support our international diagnostic products operations and domestic surgical products division.

Our investing activities used cash of $80.4 million during the six months ended June 30, 2005, primarily related to the purchase of Proxima in March 2005, partially offset by proceeds from sales and maturities of investment securities. We paid $163.1 million to purchase Proxima, including $3.1 million of acquisition-related costs, using a combination of cash, cash equivalents and investment securities to fund the purchase. During the six months ended June 30, 2005, we invested $14.2 million in equipment for customer usage agreements, of which $11.7 million represented ThinPrep Imaging Systems for use at customer sites. We also made $7.4 million of capital expenditures during the six months ended June 30, 2005, related primarily to our investment in manufacturing processes for both our diagnostic and surgical products as a result of the growth of our business, as well as costs to manufacture the ThinPrep Imaging System units to be placed at customer sites under usage agreements.

Our financing activities during the six months ended June 30, 2005 used cash of $36.4 million primarily related to our repurchase of $50.1 million of Cytyc common stock, including $0.1 million in commissions, as part of our stock repurchase program, partially offset by proceeds of $12.2 million and $1.4 million from the exercise of stock options and employee purchases of Cytyc common stock under the employee stock purchase plan, respectively. During the first six months of 2004, our financing activities consisted primarily of cash generated from our private placement of $250 million of convertible notes and the exercise of stock options.

*Long-Term Debt and Contractual Obligations.* On March 22, 2004, we completed the sale of $250 million aggregate principal amount of our 2.25% convertible notes due 2024. The convertible notes initially were sold to qualified institutional buyers pursuant to exemptions from the registration requirements of the Securities Act of 1933, as amended. We subsequently filed a registration statement with the Securities and Exchange Commission to register the resale of the convertible notes. We used the proceeds from the offering along with existing cash to finance the acquisition of Novacept. Total proceeds from the private placement were $242.3 million, net of debt issuance costs of $7.7 million. The notes bear interest at a rate of 2.25% per year on the principal amount, payable semi-annually in arrears in cash on March 15 and September 15 of each year, beginning September 15, 2004. Holders may require us to repurchase the notes on March 15 of 2009, 2014 and 2019 at a repurchase price equal to 100% of their principal amount, plus accrued and unpaid interest, including contingent interest and liquidated damages, if any, to, but excluding, the repurchase date. We may redeem any of the notes beginning March 20, 2009, by giving holders at least 30 days' notice. We may redeem the notes either in whole or in part at a redemption price equal to 100% of their principal amount, plus accrued and unpaid interest, including contingent interest and liquidated damages, if any, to, but excluding, the redemption date.

As of June 30, 2005, we had no material additions to the contractual cash obligations described in our annual report on Form 10-K for the fiscal year ended December 31, 2004, except for the potential future earn-out payments relating to our acquisition of Proxima (see Note 2 to our condensed consolidated financial statements).

We expect that our cash and cash equivalents, investment securities and cash flows from operating activities will be sufficient to meet our projected operating cash needs, including capital expenditures, lease and purchase commitments and tax payments.

21

Table of Contents

However, from time to time, we review our capital structure and financing arrangements. As a result of these reviews, we may periodically elect to pursue alternatives to our current structure, including the refinancing of our existing debt securities, the issuance of additional debt securities and the emplacement of a credit facility. In addition, if we make future acquisitions, we may be required to seek additional capital.

### Recent Accounting Pronouncements

In December 2004, the Financial Accounting Standards Board ("FASB") issued Statement of Financial Accounting Standards ("SFAS") No. 123R, *Share-Based Payment* . This standard is a revision of SFAS No. 123, *Accounting for Stock-Based Compensation* , and supersedes Accounting Principles Board Opinion No. 25, *Accounting for Stock Issued to Employees* , and its related implementation guidance. SFAS No. 123R requires all share-based payments to employees, including grants of employee stock options, to be recognized in the financial statements based on their fair values. SFAS No. 123R is effective for us as of January 1, 2006. We are currently evaluating the impact that adoption of SFAS No. 123R will have on our financial position and results of operations.

In June 2005, the Emerging Issues Task Force reached a consensus on Issue No. 05-6, *Determining the Amortization Period for Leasehold Improvements* . The guidance requires that leasehold improvements acquired in a business combination or purchased subsequent to the inception of a lease be amortized over the lesser of the useful life of the assets or a term that includes renewals that are reasonably assured at the date of the business combination or purchase. The guidance is effective for periods beginning after June 29, 2005. We adopted the provisions of EITF Issue No. 05-6 on July 1, 2005 and such adoption did not have a significant effect on our financial position or results of operations.

### Certain Factors Which May Affect Future Results

The forward-looking statements in this Form 10-Q are made under the safe harbor provisions of Section 21E of the Securities Exchange Act of 1934, as amended. Our operating results and financial condition have varied and may in the future vary significantly depending on a number of factors. Statements in this Form 10-Q which are not strictly historical statements, including, without limitation, statements regarding management's expectations for future growth and plans and objectives for future management and operations, domestic and international marketing and sales plans, key customer relationships, product plans and performance, research and development plans, the successful integration of new technologies or businesses, regulatory uncertainties, potential savings to the healthcare system, management's assessment of market factors, costs and uncertainties related to current or future litigation, as well as statements regarding our strategy and plans, constitute forward-looking statements that involve risks and uncertainties. In some cases these forward-looking statements can be identified by the use of words such as "may," "will," "could," "should," "would," "expect," "project," "predict," "potential" or the negative of these words or comparable words.

In addition to the risk factors detailed below related to our acquisition of Proxima, the factors listed under "Certain Factors Which May Affect Future Results" in our annual report on Form 10-K for the fiscal year ended December 31, 2004, among others, could cause actual results to differ materially from those contained in forward-looking statements made in this report and presented elsewhere by management from time to time. Such factors, among others, may have a material adverse effect upon our business, financial condition, and results of operations. We undertake no obligation to update publicly or revise any forward-looking statements, whether as a result of new information, future events or otherwise. Accordingly, you are cautioned not to place undue reliance on forward-looking statements, which speak only as of the date on which they are made.

22

Table of Contents

**Risks related to our acquisition of Proxima**

*Sales of our MammoSite System and GliaSite System are dependent on third-party reimbursement.*

Widespread adoption of our newly acquired MammoSite Radiation Therapy System and the GliaSite Radiation Therapy System in the United States and other countries is dependent upon the ability of healthcare providers to secure adequate reimbursement from third-party payors such as private insurance plans, managed care organizations, and Medicare and Medicaid. Reimbursement and healthcare payment systems in international markets vary significantly by country and include both government-sponsored healthcare and private insurance. Although treatments using the MammoSite System or the GliaSite System are reimbursed by many private healthcare insurance and managed care payors, we cannot guarantee that reimbursement will increase or continue to be available, or that reimbursement levels will be adequate to enable healthcare providers in the United States and other countries to use the MammoSite System or the GliaSite System instead of existing therapies such as whole breast irradiation and brachytherapy or the products of our competitors. Also, healthcare cost containment efforts similar to those we face in the United States are prevalent in many of the other countries in which we intend to sell our MammoSite product or license or sell our GliaSite product, and may negatively affect our efforts to increase adoption of MammoSite or GliaSite products in these foreign jurisdictions.

*If we are unable to compete effectively against existing and future competitors, sales of our MammoSite System could decline.*

The market for products treating breast cancer is intensely competitive, subject to rapid change and significantly affected by new product introductions and other market activities of industry participants. Improvements in existing competitive products or the introduction of new competitive products may reduce our ability to compete for sales, particularly if those competitive products demonstrate better safety or effectiveness, clinical results, ease of use or lower cost than the MammoSite System. If we are unable to compete effectively against existing and future competitors and existing and future alternative treatments, our sales of MammoSite could fail to grow or could decline and our operating results may be adversely affected.

*If breast surgeons, radiation oncologists and patients do not adopt the MammoSite System as a preferred treatment for early stage breast cancer, the intended benefits of our acquisition of Proxima may not be realized and the market price of our common stock could decline.*

The main product acquired as a result of our acquisition of Proxima is the MammoSite System, which is used to treat early stage breast cancer. The MammoSite System is supported by only four years of patient follow-up studies from the initial 43-patient study that was designed to gain clearance from the Food and Drug Administration ("FDA") and the one year follow-up study from a 1,600-patient registry following the FDA clearance. We could discover that the results of these clinical trials are not indicative of results experienced in the market over time. Furthermore, some of the existing data has been produced in studies that involve relatively small patient groups, and such data may not be reproduced in wider patient populations. Currently, we are competing against breast cancer treatment using external beam radiation, which has longer-term data on patient outcome.

We may have difficulty gaining further acceptance of the MammoSite System among breast surgeons, radiation oncologists and patients for a number of reasons including:

- the introduction or existence of competing products or technologies that may be more effective, safer or easier to use than the MammoSite System;

- the results of long-term clinical studies relating to the effectiveness of the MammoSite System;

- the availability of alternative treatments or procedures that provide comparable levels of treatment for breast cancer at a lower cost than the MammoSite System;

- breast surgeons, radiation oncologists and patient perceptions of the MammoSite System as compared to other treatments for breast cancer; and

- the continued availability of satisfactory reimbursement from healthcare payors for breast cancer treatment procedures.

23

Table of Contents

We believe that continued recommendation and support for the use of the MammoSite System by influential breast surgeons and radiation oncologists and treatment centers are essential for widespread market acceptance. If the MammoSite System does not continue to receive support from these key constituencies, or if longer-term data do not provide continued support for the clinical efficacy of the MammoSite System, breast surgeons and radiation oncologists may not use, and hospitals and outpatient surgery centers may not purchase, the MammoSite System. If this occurs, the intended benefits of the acquisition, such as increased net sales, may not be realized and the market price of our common stock could decline.

*Our reliance on single source or limited source suppliers to manufacture the MammoSite System could adversely affect our sales of the MammoSite System.*

We currently obtain certain key components of the MammoSite System from single or a limited number of sources. Significant portions of key components and processes relating to the MammoSite System are purchased from single sources due to technology, availability, price, quality and other considerations. Key components and processes currently obtained from single sources include radioisotopes, certain balloons and certain other items used in the design and manufacture of the MammoSite System. We attempt to mitigate these risks by working closely with key suppliers regarding our supply needs and we have qualified backup vendors for several of our key components. However, although we believe that alternative sources for these components are available, a supply interruption could harm our ability to manufacture our products until a new source of supply is identified and qualified. Switching components may require product redesign and submission to the FDA of a pre-market supplement or possibly a separate pre-market approval, either of which could significantly delay production. If we are unable to obtain sufficient quantities of these components that meet our quality and technical requirements at reasonable prices and in a timely manner, we will not be able to manufacture and sell our MammoSite System on a timely and cost-competitive basis, which may materially and adversely affect our operating results.

*If we are unable to prevent third parties from using the intellectual property related to the MammoSite System and the GliaSite System, our ability to market the MammoSite System and GliaSite System will be harmed and our operating results could be adversely affected.*

With our acquisition of Proxima, we acquired all of Proxima's intellectual property rights, including those with respect to the MammoSite System and the GliaSite System. If we fail to protect, defend and maintain the intellectual property rights with respect to the MammoSite and GliaSite Systems or if we are subject to a successful third party claim of infringement, the competitive position of the MammoSite and GliaSite Systems could be impaired. In addition, infringement, interference and other intellectual property claims and proceedings, with or without merit, are expensive and time-consuming to litigate and could adversely affect our business, financial condition and operating results.

*If we are unable to divest the GliaSite System or if we divest the GliaSite System for an amount less than what we paid for it, we may incur a loss.*

As a result of our acquisition of Proxima, we acquired the GliaSite System, which is used in the treatment of malignant brain tumors. We are in the process of seeking to potentially divest the GliaSite System. If we are unable to divest this business and are unable to compete effectively against existing and future competitors, sales of our GliaSite System could decline and we may incur a loss relating to this product line. In addition, if we are unable to divest our GliaSite business at a price sufficient to recover the portion of the Proxima acquisition purchase price allocated to it, we will incur a loss.

24

Table of Contents

### Item 3. Quantitative and Qualitative Disclosures About Market Risk

*Derivative Financial Instruments, Other Financial Instruments, and Derivative Commodity Instruments.* We do not participate in derivative financial instruments, other financial instruments for which the fair value disclosure would be required under SFAS No. 107, *Disclosures about Fair Value of Financial Instruments* , or derivative commodity instruments. All of our investments are in investment-grade commercial paper, corporate bonds, municipal bonds, auction rate securities and U.S. Government and agency securities that are carried at fair value on our books. Accordingly, we have no quantitative information concerning the market risk of participating in such investments.

*Primary Market Risk Exposures.* Our primary market risk exposures are in the areas of interest rate risk and foreign currency exchange rate risk. Our investment portfolio of cash equivalents and investment securities is subject to interest rate fluctuations, but we believe this risk is immaterial due to the short-term nature of these investments. Our business outside the United States is conducted primarily in local currency, except in Costa Rica, where the majority of business is conducted in the U.S. dollar. We have no foreign exchange contracts, option contracts, or other foreign hedging arrangements. We estimate that any market risk associated with our foreign operations is not significant and is unlikely to have a material adverse effect on our business, financial condition or results of operations.

### Item 4. Controls and Procedures

(a)     *Evaluation of Disclosure Controls and Procedures.* As of the end of the period covered by this report, we carried out an evaluation, under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934). Based on this evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures are effective in timely notification to them of information we are required to disclose in our periodic SEC filings and in ensuring that this information is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and regulations.

(b)     *Changes in Internal Control.* During the period covered by this report, there have been no significant changes in our internal control over financial reporting that have materially affected, or were reasonably likely to materially affect, our internal control over financial reporting.

Table of Contents

# PART II — OTHER INFORMATION

## Item 1. Legal Proceedings

As a result of the arbitration panel's decision regarding our arbitration proceeding with DEKA (see Note 13 to our condensed consolidated financial statements), we have recorded a pre-tax charge in the six months ended June 30, 2005 in the amount of $7.8 million, which is in addition to the $1.3 million previously recorded. On May 5, 2005, we filed a motion to vacate the arbitration award in the United States District Court for the District of Massachusetts as we believe the award manifestly disregarded applicable law as well as the language of the underlying agreement. Our motion to vacate the arbitration award was denied by the United States District Court on July 7, 2005 and we are evaluating our legal alternatives.

On June 16, 2003, we filed a suit for Declaratory Judgment in United States District Court for the District of Massachusetts asking the court to determine and declare that certain of TriPath Imaging, Inc.'s ("TriPath") patents are invalid and not infringed by our ThinPrep Imaging System. On June 17, 2003, TriPath announced that it had filed a lawsuit against us in the United States District Court for the Middle District of North Carolina alleging patent infringement, false advertising, defamation, intentional interference, unfair competition, and unfair and deceptive trade practices. On October 30, 2003, an order was entered by the district court judge in North Carolina transferring the North Carolina action to Massachusetts, thereby consolidating the cases into a single action to be heard in United States District Court for the District of Massachusetts. Additionally, on October 30, 2003, the district court judge in Massachusetts denied a motion by TriPath to have our Massachusetts case dismissed. The case is currently in the discovery phase and the Massachusetts court has not yet set a trial date. During a status conference on May 5, 2005, a so called Markman or claim construction hearing was scheduled for September 6-8, 2005. Based on the current case schedules we anticipate that a trial will be scheduled to occur sometime in early-to-mid 2006. We believe that the claims against us are without merit and intend to vigorously defend this suit. Given the stage and current status of the litigation, we are unable to reasonably estimate the ultimate outcome of this case.

We are subject to legal claims and assertions in the ordinary course of business. Except for the matters described in our annual report on Form 10-K for the year ended December 31, 2004 and in our quarterly report on Form 10-Q for the three months ended March 31, 2005, filed with the SEC, we are not aware of any such claims or assertions that could have a material effect on us.

## Item 2. Unregistered Sales of Equity Securities and Use of Proceeds

(c)    Issuer Purchases of Equity Securities:

| Period | Total Number of Shares Purchased | Average Price Paid per Share | Total Number of Shares Purchased as Part of Publicly Announced Plans or Programs (1) | Maximum Number of Shares that May Yet Be Purchased Under the Plans or Programs |
|---|---|---|---|---|
| April 2005 | — | $ — | — | (2) |
| May 2005 | 1,590,600 | 22.59 | 1,590,600 | (2) |
| June 2005 | 600,251 | 23.43 | 600,251 | (2) |
| Total | 2,190,851 | $ 22.82 | 2,190,851 | 5,989,195 |

(1)    Our stock repurchase program was established in January 2002. The repurchase program may be suspended at any time and from time to time without prior notice. The repurchase program was suspended in January 2004, but we reactivated our stock repurchase program during the second quarter of 2005 to repurchase shares of our common stock through open market purchases. Shares repurchased under the program are held in our treasury and are available for a variety of corporate purposes. Under this program, we have the authority to spend up to $200 million, plus the cost of purchasing additional shares in an amount equal to the number of shares issued to our stock option holders upon exercise of their stock options during the period from August 1, 2002 to January 31, 2007. As of June 30, 2005 and December 31, 2004, we had repurchased 17,469,890 and 15,279,039 shares, respectively, under the program, with an aggregate cost of $207.5 million and $157.4 million, respectively. The repurchase program expires on January 31, 2007.

(2)    As described above, we have the authority to spend $200 million, plus the cost of purchasing additional shares issued upon exercise of stock options during the period from August 1, 2002 to January 31, 2007. Therefore, the maximum number of shares of common stock that may be purchased under the repurchase program depends on the total number of shares issued to our stock option holders upon exercise of their stock options during the period from August 1, 2002 to January 31, 2007. As of April 30, 2005, May 31, 2005 and June 30, 2005, we had issued 6,014,539 shares, 6,119,190 shares and 6,305,455 shares of common stock, respectively, to our stock option holders upon exercise of their stock options since August 1, 2002. In addition, on the first day of the quarter ended June 30, 2005, we had $42.6 million remaining from the $200 million authorized under the repurchase program. All of the remaining $42.6 million was used to repurchase shares in the quarter ended June 30, 2005. In June 2005, we also purchased 316,260 of the shares that were issued since August 1, 2002 upon exercise of stock options. Therefore, as of June 30, 2005, the maximum number of shares that may yet be purchased under the repurchase program was 5,989,195. However, this number will increase in the future as additional stock options are exercised. As of June 30, 2005, options to purchase 19,751,747 shares of common stock were outstanding.

**Item 4. Submission of Matters to a Vote of Security Holders**

At our annual meeting of stockholders held on May 11, 2005 (the "2005 Annual Meeting"), our stockholders took the following actions:

1. The approval of the following nominees as Class III Directors to the board of directors with the nominees receiving the following votes:

| | For | Withheld |
|---|---|---|
| Brock Hattox | 104,191,974 | 3,476,462 |
| William McDaniel | 105,833,455 | 1,834,981 |
| Marla S. Persky | 106,119,940 | 1,548,496 |

Each of the Class III Directors will serve for a three year term expiring at our annual meeting of stockholders in 2008, or until his or her successor has been duly elected and qualified or until his earlier resignation or removal. Election of the directors was determined by a plurality of the votes cast at the 2005 Annual Meeting. No other persons were nominated or received votes for election as our directors at the 2005 Annual Meeting.

26

Table of Contents

2.  Our stockholders approved and adopted an amendment to Cytyc's Third Amended and Restated Certificate of Incorporation, as amended, to increase the number of authorized shares of Cytyc's common stock, $0.01 par value, to 400,000,000 from 200,000,000 (the "Charter Amendment"). The Charter Amendment became effective upon its filing with the Secretary of State of Delaware on June 8, 2005. With respect to such matter, the votes were cast as follows: 92,730,885 shares were voted for the proposal, 14,386,996 shares were voted against the proposal and 550,555 shares were abstained from voting on the proposal.

3.  Our stockholders ratified the selection of Deloitte & Touche LLP as our independent registered public accounting firm for the fiscal year ending December 31, 2005. With respect to such matter, the votes were cast as follows: 106,792,960 shares were voted for the proposal, 488,752 shares were voted against the proposal and 386,724 shares were abstained from voting on the proposal.

## Item 6. Exhibits

| Exhibit No. | Description |
|---|---|
| 3.1(1) | Third Amended and Restated Certificate of Incorporation of Cytyc Corporation. |
| 3.2(1) | Amended and Restated By-Laws of Cytyc Corporation. |
| 3.3(2) | Certificate of Amendment of Third Amended and Restated Certificate of Incorporation. |
| 3.4(8) | Certificate of Amendment of Third Amended and Restated Certificate of Incorporation, as amended. |
| 4.1(3) | Specimen certificate representing the Common Stock. |
| 4.2(4) | Rights Agreement, dated as of August 27, 1997, between Cytyc Corporation and BankBoston, N.A (the "Rights Agreement") which includes as Exhibit A the Form of Certificate of Designations, as Exhibit B the Form of Rights Certificate, and as Exhibit C the Summary of Rights to Purchase Preferred Stock. |
| 4.3(5) | Amendment No. 1 to Rights Agreement, dated as of June 22, 1998, between Cytyc Corporation and BankBoston, N.A., amending the Rights Agreement. |
| 4.4(6) | Amendment to the Rights Agreement, dated as of January 3, 2003, among Cytyc Corporation, BankBoston, N.A. and EquiServe Trust Company, N.A. |
| 4.5(7) | Amendment No. 2 to Rights Agreement, dated as of November 6, 2003, between Cytyc Corporation and EquiServe Trust Company, N.A., amending the Rights Agreement. |
| 15 * | Letter on Unaudited Interim Financial Information |
| 31.1 * | Certification of Patrick J. Sullivan, Chief Executive Officer and President, pursuant to Rules 13a-14 and 15d-14 under the Securities Exchange Act of 1934, as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 31.2 * | Certification of Timothy M. Adams, Vice President, Chief Financial Officer, pursuant to Rules 13a-14 and 15d-14 under the Securities Exchange Act of 1934, as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 32.1 * | Certification of Patrick J. Sullivan, Chief Executive Officer and President, pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 32.2 * | Certification of Timothy M. Adams, Vice President, Chief Financial Officer, pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |

(1)  Incorporated herein by reference to the exhibits to our Registration Statement on Form S-1 (File No. 333-19367).
(2)  Incorporated herein by reference to the exhibits to our Quarterly Report on Form 10-Q, filed August 14, 2000.
(3)  Incorporated herein by reference to the exhibits to our Registration Statement on Form S-1 (File No. 333-00300).
(4)  Incorporated herein by reference to Exhibit 4.1 to our Current Report on Form 8-K, filed August 29, 1997.
(5)  Incorporated herein by reference to Exhibit 4.2 to our Quarterly Report on Form 10-Q, filed August 13, 1998.
(6)  Incorporated herein by reference to Exhibit 4.4 to our Annual Report on Form 10-K, filed January 30, 2004.
(7)  Incorporated herein by reference to Exhibit 4.4 to our Quarterly Report on Form 10-Q, filed November 12, 2003.
(8)  Incorporated herein by reference to Exhibit 3.1 to our Current Report on Form 8-K, filed June 13, 2005.
*    Filed herewith

Table of Contents

SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

CYTYC CORPORATION

Date: August 5, 2005

By: /s/ TIMOTHY M. ADAMS

Timothy M. Adams
Vice President, Chief Financial Officer and Treasurer

28

Table of Contents

## EXHIBIT INDEX

| Exhibit No. | Description |
|---|---|
| 3.1(1) | Third Amended and Restated Certificate of Incorporation of Cytyc Corporation. |
| 3.2(1) | Amended and Restated By-Laws of Cytyc Corporation. |
| 3.3(2) | Certificate of Amendment of Third Amended and Restated Certificate of Incorporation. |
| 3.4(8) | Certificate of Amendment of Third Amended and Restated Certificate of Incorporation, as amended. |
| 4.1(3) | Specimen certificate representing the Common Stock. |
| 4.2(4) | Rights Agreement, dated as of August 27, 1997, between Cytyc Corporation and BankBoston, N.A (the "Rights Agreement") which includes as Exhibit A the Form of Certificate of Designations, as Exhibit B the Form of Rights Certificate, and as Exhibit C the Summary of Rights to Purchase Preferred Stock. |
| 4.3(5) | Amendment No. 1 to Rights Agreement, dated as of June 22, 1998, between Cytyc Corporation and BankBoston, N.A., amending the Rights Agreement. |
| 4.4(6) | Amendment to the Rights Agreement, dated as of January 3, 2003, among Cytyc Corporation, BankBoston, N.A. and EquiServe Trust Company, N.A. |
| 4.5(7) | Amendment No. 2 to Rights Agreement, dated as of November 6, 2003, between Cytyc Corporation and EquiServe Trust Company, N.A., amending the Rights Agreement. |
| 15 * | Letter on Unaudited Interim Financial Information |
| 31.1 * | Certification of Patrick J. Sullivan, Chief Executive Officer and President, pursuant to Rules 13a-14 and 15d-14 under the Securities Exchange Act of 1934, as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 31.2 * | Certification of Timothy M. Adams, Vice President, Chief Financial Officer, pursuant to Rules 13a-14 and 15d-14 under the Securities Exchange Act of 1934, as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 32.1 * | Certification of Patrick J. Sullivan, Chief Executive Officer and President, pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 32.2 * | Certification of Timothy M. Adams, Vice President, Chief Financial Officer, pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |

(1)   Incorporated herein by reference to the exhibits to our Registration Statement on Form S-1 (File No. 333-19367).
(2)   Incorporated herein by reference to the exhibits to our Quarterly Report on Form 10-Q, filed August 14, 2000.
(3)   Incorporated herein by reference to the exhibits to our Registration Statement on Form S-1 (File No. 333-00300).
(4)   Incorporated herein by reference to Exhibit 4.1 to our Current Report on Form 8-K, filed August 29, 1997.
(5)   Incorporated herein by reference to Exhibit 4.2 to our Quarterly Report on Form 10-Q, filed August 13, 1998.
(6)   Incorporated herein by reference to Exhibit 4.4 to our Annual Report on Form 10-K, filed January 30, 2004.
(7)   Incorporated herein by reference to Exhibit 4.4 to our Quarterly Report on Form 10-Q, filed November 12, 2003.
(8)   Incorporated herein by reference to Exhibit 3.1 to our Current Report on Form 8-K, filed June 13, 2005.
*     Filed herewith

**Exhibit 15**

July 26, 2005

Cytyc Corporation
250 Campus Drive
Marlborough, Massachusetts

We have made a review, in accordance with the standards of the Public Company Accounting Oversight Board (United States), of the unaudited interim financial information of Cytyc Corporation and subsidiaries for the three and six month periods ended June 30, 2005 and 2004, as indicated in our report dated July 26, 2005; because we did not perform an audit, we expressed no opinion on that information.

We are aware that our report referred to above, which is included in your Quarterly Report on Form 10-Q for the quarter ended June 30, 2005, is incorporated by reference in Registration Statement Nos. 333-82925, 333-38644, 333-59172, 333-64362, 333-88764, 333-75292 and 333-117812 on Form S-8 and Nos. 333-116237 and 333-120013 on Form S-3 of Cytyc Corporation.

We also are aware that the aforementioned report, pursuant to Rule 436(c) under the Securities Act of 1933, is not considered a part of the Registration Statement prepared or certified by an accountant or a report prepared or certified by an accountant within the meaning of Sections 7 and 11 of that Act.

/s/ DELOITTE & TOUCHE LLP

Boston, Massachusetts

**Exhibit 31.1**

## CERTIFICATION PURSUANT TO RULES 13a-14(a) AND 15d-14(a)
## UNDER THE SECURITIES EXCHANGE ACT OF 1934 AS ADOPTED PURSUANT TO
## SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002

I, Patrick J. Sullivan, certify that:

1.  I have reviewed this quarterly report on Form 10-Q of Cytyc Corporation;

2.  Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report;

3.  Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)  designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this quarterly report is being prepared;

    (b)  designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)  evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this quarterly report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this quarterly report based on such evaluation; and

    (d)  disclosed in this quarterly report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)  all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: August 5, 2005                    /s/ PATRICK J. SULLIVAN
                                        _____
                                        Patrick J. Sullivan
                                        Chief Executive Officer and President

**Exhibit 31.2**

## CERTIFICATION PURSUANT TO RULES 13a-14(a) AND 15d-14(a)
## UNDER THE SECURITIES EXCHANGE ACT OF 1934 AS ADOPTED PURSUANT TO
## SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002

I, Timothy M. Adams, certify that:

1.  I have reviewed this quarterly report on Form 10-Q of Cytyc Corporation;

2.  Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report;

3.  Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)  designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made

known to us by others within those entities, particularly during the period in which this quarterly report is being prepared;

(b)    designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)    evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this quarterly report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this quarterly report based on such evaluation; and

(d)    disclosed in this quarterly report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)    all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)    any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: August 5, 2005        /s/ TIMOTHY M. ADAMS

Timothy M. Adams
Vice President, Chief Financial Officer and Treasurer

**Exhibit 32.1**

## WRITTEN STATEMENT OF CHIEF EXECUTIVE OFFICER
## PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO
## SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the Quarterly Report of Cytyc Corporation (the "Company") on Form 10-Q for the three months ended June 30, 2005 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Patrick J. Sullivan, Chief Executive Officer of the Company, certify that, to my knowledge on the date hereof:

1.    The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2.    The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: August 5, 2005        /s/ PATRICK J. SULLIVAN

Patrick J. Sullivan
Chief Executive Officer and President

A signed original of this written statement required by Section 906, or other document authenticating, acknowledging, or otherwise adopting the signature that appears in typed form within the electronic version of this written statement required by Section 906, has been provided to the Company and will be retained by the Company and furnished to the Securities and Exchange Commission or its staff upon request.

The foregoing certification is being furnished to the Securities and Exchange Commission as our exhibit to the Form 10-Q and shall not be deemed to be considered filed as part of the Form 10-Q.

**Exhibit 32.2**

## WRITTEN STATEMENT OF CHIEF FINANCIAL OFFICER
## PURSUANT TO 18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO
## SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the Quarterly Report of Cytyc Corporation (the "Company") on Form 10-Q for the three months ended June 30, 2005 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Timothy M. Adams, Chief Financial Officer of the Company, certify that, to my knowledge on the date hereof:

1.    The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2.    The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: August 5, 2005        /s/ TIMOTHY M. ADAMS

Timothy M. Adams
Vice President, Chief Financial Officer and Treasurer

Exhibit G

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| CYTYC CORPORATION | ) | |
| Applicant, | ) | |
| v. | ) | CIVIL ACTION NO. 05-10932-WGY |
| DEKA PRODUCTS LIMITED PARTNERSHIP, | ) | |
| Respondent. | ) | |

## DECLARATION OF BRENDAN J. DUFFY
## REGARDING THE PROPER AMOUNT OF A SUPERSEDEAS BOND

I, Brendan J. Duffy, declare as follows.

1.       I have been employed at DEKA Research & Development Corp., the general partner of the respondent, DEKA Products Limited Partnership ("DEKA"), since September 24, 2001. I oversee DEKA's financial and accounting systems and treasury and tax functions. In this capacity, I have had responsibility for overseeing DEKA's royalty income from Cytyc and from DEKA's many other technology licensees.

2.       Before joining DEKA, I spent eight years in public accounting, most recently as a Senior Manager with Ernst & Young. Subsequently, I spent eleven years with a billion dollar manufacturing operation, most recently as the Finance Director for its New Hampshire operations. I hold an MBA from the University of Buffalo and an MST from Bentley College. I am a CPA in New Hampshire and New York (inactive) and a CMA (Certified Management Accountant) in New Hampshire.

3.       DEKA's counsel asked me to compute the proper amount for a bond according to Local Rule 62.1, which I understand provides that the supersedeas bond "shall be in the amount of the judgment plus ten (10%) percent of the amount to cover interest and any award of damages for delay plus Five Hundred and no/100 ($500.00) Dollars to cover costs, unless the court directs

otherwise." Schedule A, attached, reflects my calculation of the minimum bond amount according to Local Rule 62.2. I started with Final Award of April 26, 2005, which awards DEKA $7,524,168 in unpaid royalties, $563,645 in interest, and $1,000,000 in attorneys' fees and costs. These figures add up to $9,087,183.

4.    I also understand, however, that, per order dated July 8, 2005, this Court granted the additional prejudgment interest that DEKA had requested in its motion papers. Using the New Hampshire prejudgment interest rates, as authorized by the arbitrators, I calculated that interest on unpaid royalties from April 30, 2005, through July 8, 2005, amounts to $56,895. I started the calculation from April 30th because the arbitration award already included interest to that date.

5.    I then added the award ($9,087,183) and the additional interest ($56,895) to get $9,144,708. Ten percent of this figure, rounded, is $914,471. I added these figures, plus $500, to compute a minimum bond amount of $10,059,679, as seen in Schedule A.

6.    I then performed an additional calculation, shown in Schedule B. This calculation includes Cytyc's underpayments since the arbitration award.

7.    Specifically, under the terms of the license agreement between DEKA and Cytyc, Cytyc must pay royalties each calendar quarter during the term of the agreement. The payment is due forty-five days after the end of each quarter. Thus, Cytyc owed royalties for Q1 2005 (January-March) on May 15, 2005, and for Q2 (April-June) on August 14, 2005. But in the cover letters accompanying these payments, Cytyc explained that it was continuing to pay royalties under its old formula, which the arbitrators rejected. Cytyc also explained that it had calculated the royalties that would be due under the formula adopted by the arbitration panel. Cytyc reported that it was withholding $496,032 in royalties for Q1 and $422,066 in royalties for Q2, for a total of $918,098. Cytyc, however, did not show its underlying calculations or otherwise explain how it derived these figures. I attempted to confirm these totals, but I was unable to correlate them with the sales data provided. Based on the available data, the royalty underpayments may actually be much larger.

8.    In any event, to be conservative, I used Cytyc's claimed royalty underpayments and added these into the amount of a bond. I also included interest on the Q1 royalty underpayment

2

from May 15 to July 8, 2005. I then added these amounts to the award, applied the 10% factor, and

added the $500. As shown in Schedule B, the resulting amount of the bond $11,072,941.

**I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT. EXECUTED ON AUGUST 19, 2005.**

/s/ Brendan J. Duffy
Brendan J. Duffy

01062/00507 425961.1

SCHEDULE A

## DEKA v. Cytyc
### Minimum Required Bond

| | |
|---|---|
| Final Award - April 26, 2005 | $9,087,813 |
| Interest from April 30 to July 8, 2005 [1] | 56,895 |
| Amount of the District Court judgment dated 7/8/05 | 9,144,708 |
| Plus 10% | 914,471 |
| Plus $500 | 500 |
| Minimum Required Bond | $10,059,679 |

[1]  The Final Award included interest through April 30, 2005

SCHEDULE B

# DEKA v. Cytyc
## Calculation of Required Bond

| | |
|---|---:|
| Final Award - April 26, 2005 | $9,087,813 |
| Interest from April 30 to July 8, 2005 [1] | 56,895 |
| Amount due 4/26/05 plus interest through 7/8/05 | 9,144,708 |
| Ongoing under payments: | |
| May 15, 2005 | 496,032 |
| August 14, 2005 | 422,066 |
| Interest on May 15th under payment through July 8, 2005 | 3,049 |
| Amount due under the Final Award | 10,065,855 |
| Plus 10% | 1,006,586 |
| Plus $500 | 500 |
| Total Bond Amount | $ 11,072,941 |

[1]  The Final Award included interest through April 30, 2005

Exhibit H

Westlaw.

Not Reported in F.Supp.                                                Page 1
Not Reported in F.Supp., 1995 WL 17015062
**(Cite as: Not Reported in F.Supp.)**

**H**
Not Reported in F.Supp., 1995 WL
17015062
Briefs and Other Related Documents
Only the Westlaw citation is currently
available.
United States District Court,D.
Massachusetts.
BOSTON CHILDREN'S HEART
FOUNDATION, INC. Plaintiff
v.
Bernardo NADAL-GINARD Defendant
BOSTON CHILDREN'S HEART
FOUNDATION, INC. and James E. Locke,
Counterclaim Defendants
**No. Civ.A. 93-12539-REK.**

Aug. 23, 1995.

Memorandum and Order

KEETON, J.
*1 Pending before this court is non-party
Massachusetts General Hospital's Motion
for an Award of Costs in Connection with
Discovery (Docket No. 229, filed Dec. 29,
1994) and defendant Bernardo Nadal-
Ginard's Opposition to the Motion (Docket
No. 243, filed Jan. 12, 1995).

The General Hospital Corporation d/b/a
Massachusetts General Hospital and the
Massachusetts General Physicians
Organization, Inc. (collectively, "the
Hospital") moves this court for an award of
costs in connection with (1) the Hospital's
Opposition to the Omnibus Motion of
Nadal-Ginard to Compel Production of
Documents (Docket No. 63, filed February
8, 1994) and (2) the Hospital's preparation
of materials in response to defendant Nadal-

Ginard's subpoena.

I.

Defendant Nadal-Ginard subpoenaed several
non-parties, including the Hospital, in order
to obtain certain information in connection
with discovery in this case. The Hospital
objected to the subpoena, and defendant
Nadal-Ginard filed the Omnibus Motion to
Compel Production of Documents (Docket
No. 38, filed Jan. 25, 1995). At a hearing on
February 17, 1994, Magistrate Judge Karol
deferred ruling on the motion and directed
the parties to reach an agreement on the
issue. Correspondence between defendant
Nadal-Ginard and the Hospital resulted in
what Magistrate Judge Karol referred to, in
his Memorandum and Order of May 11,
1994, as "an agreement ... between the
parties." Magistrate Judge Karol's
Memorandum and Order of May 11, 1994
(Docket No. 114). In light of "an agreement
having been reached between the parties,"
the Magistrate Judge "denied" the motion to
compel "without prejudice to defendant's
right to seek additional documents" through
a new subpoena, if necessary. *Id.* at 2.

The Hospital now brings this motion for an
award of costs for the time its employees
expended opposing the motion to compel
and complying with the discovery
agreement.

This motion is denied in the Order below for
several independent reasons.

II.

First, the Hospital did not comply with

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 2
Not Reported in F.Supp., 1995 WL 17015062
**(Cite as: Not Reported in F.Supp.)**

Local Rule 7.1(A)(2) with respect to the filing of this motion. Local Rule 7.1(A)(2) states that "No motion shall be filed unless counsel certify that they have conferred and have attempted in good faith to resolve or narrow the issue." Since the Hospital did not file a Rule 7.1 certification with this motion, the motion is appropriately dismissed.

Second, the Hospital has not cited any authority to support an award of costs to the Hospital in these circumstances.

Federal Rule of Civil Procedure 37, which governs motions to compel discovery, states that

> [i]f the motion [to compel] is denied, the court ... shall ... require the moving party or the attorney filing the motion ... to pay to the party or deponent who opposed the motion the reasonable expenses incurred in opposing the motion ..., unless the court finds that the making of the motion was substantially justified or that other circumstances make an award of expenses unjust.

*2 Fed.R.Civ.P. 37(a)(4)(B).

Assuming, without deciding that this rule should be interpreted to apply to non-party recipients of subpoenas, such as the Hospital, I conclude that the Hospital is not entitled to an award of expenses under this rule. Although, in his Memorandum and Order of May 11, 1994, Magistrate Judge Karol stated that the motion to compel was "denied" with respect to the Hospital, I do not interpret Magistrate Judge Karol's "denial" as a ruling on the merits of the motion to compel. Magistrate Judge Karol's ruling was more akin to a dismissal of the motion to compel as moot in light of "an agreement being reached between the parties." A motion that is dismissed as moot and without prejudice to renewal is not a

"denied" motion for the purpose of awarding expenses under Rule 37(a)(4)(B).

Third, the Hospital's request for expenses is not just limited to the time expended in opposing the Omnibus Motion to Compel. Instead, the Hospital seeks to recover expenses for the expenses incurred in complying with the subpoena. The Hospital has not cited any source of authority for such an award.

Federal Rule of Civil Procedure 45(c)(1) states that a party issuing a subpoena "shall take reasonable steps to avoid imposing undue burden or expense" on a person subject to that subpoena and that the court "shall enforce this duty and impose upon [a] party [ ] in breach of this duty an appropriate sanction, which may include, but is not limited to lost earnings and a reasonable attorney's fee." Fed.R.Civ.P. 45(c)(1).

Magistrate Judge Karol never made a determination that defendant Nadal-Ginard violated his duty "to take reasonable steps to avoid imposing undue burden" on the Hospital either during the hearing on the motion or in his Memorandum and Order of May 11, 1994. In light of the Nadal-Ginard's and the Hospital's agreed-upon modification of the subpoena, it is doubtful that such a determination of breach of duty is warranted. Thus, the Hospital is not entitled to recover expenses under Fed.R.Civ.P. 45(c)(1).

Federal Rule of Civil Procedure 45(c)(2)(B) states that, in the event of an objection to a subpoena, the serving party may file a motion to compel compliance with the subpoena. Rule 45(c)(2)(B) goes on to say that "an order to compel production shall protect any person who is not a party ... from significant expense resulting from the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                              Page 3
Not Reported in F.Supp., 1995 WL 17015062
**(Cite as: Not Reported in F.Supp.)**

inspection and copying commanded." Fed.R.Civ.P. 45(c)(2)(B). Since the Magistrate Judge never entered an order to compel compliance with the subpoena, the Hospital is not entitled to recover any expenses under this rule.

Fourth, the Hospital has not provided this court with an accounting of the expenses for which the Hospital is requesting an award. The Hospital has simply attached affidavits that state how many hours various persons spent in connection with this case. The total number of hours is approximately 232. This time purportedly includes hours spent filing a motion to quash, filing the Opposition to the Omnibus Motion to Compel, negotiating an agreement with Nadal-Ginard's counsel, and preparing the agreed-upon information, but the affidavits do not specify how many hours were spent doing each task. More importantly, the Hospital has not provided the court with any information upon which this court could base a determination of the reasonable monetary value of the time spent by the Hospital's various employees.

**\*3** For the foregoing reasons, the Motion of Massachusetts General Hospital for an Award of Costs in Connection with Discovery is denied in the Order below.

Order

The Motion of Massachusetts General Hospital for Award of Costs in Connection with Discovery (Docket No. 229, filed Dec. 29, 1994, and Docket No. 268, filed Aug. 2, 1995) is denied.

D.Mass.,1995.
Boston Children's Heart Foundation, Inc. v. Nadal-Ginard
Not Reported in F.Supp., 1995 WL

17015062

Briefs and Other Related Documents (Back to top)

• 1:93CV12539 (Docket) (Nov. 19, 1993)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                      Page 1
Not Reported in F.Supp.2d, 2004 WL 1179418
**(Cite as: Not Reported in F.Supp.2d)**

---

**H**
Not Reported in F.Supp.2d, 2004 WL
1179418
Briefs and Other Related Documents
Only the Westlaw citation is currently
available.
United States District Court,N.D. Illinois,
Eastern Division.
Joan SCHMUDE, Administrator of the
Estate of Louis Schmude Plaintiff,
v.
Michael SHEAHAN, in his official capacity
as Cook County Sheriff, William Spatz,
Patricia Pultz, and Lawrence Koscianski
Defendants.
**No. 00 C 4580.**

May 25, 2004.

Brian Thomas Nash , John T. Karnezis ,
Clifford Law Offices, P.C. , Chicago, IL,
Patrick Joseph Doherty , Farano, Wallace &
Doherty, Palos Hills, IL, for Executor
Plaintiff.
Michael K. Forde , Mayer, Brown, Rowe &
Maw LLP , Steven J. Thompson , Ungaretti
& Harris , Michael Andrew Ficaro ,
Ungaretti & Harris , John Francis Kennedy ,
Brian F. Hynes , Shefsky & Froelich, Ltd. ,
Michael D. Smith , Foley & Lardner ,
Robert H. King, Jr. , Sonnenschein, Nath &
Rosenthal, LLP , Ruth A. Bahe-Jachna ,
Daniel T. Fahner , Francis A. Citera ,
Greenberg Traurig, LLP. , Edward R.
Theobald , Law Offices of Edward R.
Theobald , Anthony Pinelli , Law Offices of
Anthony Pinelli , Chicago, IL, Alan R.
Brunell, Attorney at Law, Orland Park, IL,
for Defendants.
Gina T. Marotta , Thomas M. Breen and
Associates, Chicago, IL, for Respondent.

OPINION AND ORDER

NORGLE, J.
**\*1** Before the court is Edward R. Theobald's
motion styled as an "Agreed Motion to Stay
Enforcement of the Judgment Pending
Appeal Without Posting a Bond," brought
pursuant to Federal Rules of Civil Procedure
62(c) and 62(d). For the following reasons,
the motion is denied.

I. BACKGROUND

On March 29, 2004, the court issued an
order finding that the conduct of Anthony
Pinelli, Alan R. Brunell and Edward R.
Theobald (collectively "counsel") was
sanctionable, stating:

> The court finds that attorneys Edward R.
> Theobald, Alan R. Brunell and Anthony
> Pinelli have disobeyed the orders of the
> United States District Court and acted
> improperly by seeking and obtaining
> numerous awards of attorney fees, as
> improperly appointed counsel, in the
> Circuit Court of Cook County, after the
> entire cause of action had been removed to
> the United States District Court. Further,
> counsel proceeded with that conduct after
> a motion to remand had been denied,
> while that issue of remand was on appeal
> in the Seventh Circuit and after the
> Seventh Circuit's decision, after they were
> aware that the court was handling issues of
> appointments and awards of attorney fees
> pursuant to 55 Ill. Comp. Stat. § 5/3-9008
> for other attorneys in the case, and despite
> the court's repeated admonitions that
> further litigation in the state court would
> be in contravention of the federal court's

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1179418
(Cite as: Not Reported in F.Supp.2d)

jurisdiction and improper. Additionally, the court finds that the statements and actions of each attorney violated their duty of candor to the court. The sanctionable conduct of each officer of the court was willful, intentional and repeated, and was an attempt to circumvent the United States District Court's removal jurisdiction. Attorneys Edward R. Theobald, Alan R. Brunell and Anthony Pinelli are hereby sanctioned pursuant to the court's inherent powers. *See Schmude v. Sheahan, et al.,* -F.Supp.2d-, 2004 WL 718501, \*43 (N.D.Ill. March 29, 2004). The court sanctioned counsel, ordering disgorgement of all improperly acquired attorney fees and payment of a $5,000.00 fine. *See id.* at \*44. In order to assess the exact amount of disgorgement, the court ordered that counsel file "a detailed accounting of all fees requested and received in the Circuit Court of Cook County which relate to this civil matter, including copies of all pleadings filed by counsel, orders entered by the Circuit Court of Cook County, and all fee petitions submitted to date" within 28 days of the court's order. *See id.* The court stated that "[o]nce counsel submit such accountings, the court will enter an order requiring counsel to disgorge those improperly acquired attorney fees in a specific dollar amount to the source of such funds by May 28, 2004." *See id.* On April 26, 2004, counsel submitted their accountings to the court. On May 4, 2004, the court entered a Final Judgment Imposing Sanctions Against Anthony Pinelli, Alan R. Brunell and Edward R. Theobald. *See Schmude v. Sheahan, et al.,* -F.Supp.2d-, 2004 WL 1045798 (N.D.Ill. May 4, 2004). The court ordered counsel to pay a sanction of $5,000.00 to the Clerk of the United States District Court for the Northern District of Illinois by May 28, 2004. *See id.* at 40. The court also imposed the sanction of disgorgement, ordering counsel to disgorge the full amounts of improperly obtained attorneys to Cook County by May 28, 2004, and to certify compliance with the court's order by June 14, 2004. *See id.* Lastly, the court also "enjoined [counsel] from seeking attorney fees or receiving remuneration from Cook County for their representation of their clients in this case or for defending themselves against the Rule to Show Cause and resultant proceedings." *Id.* The court also indicated that in order to ensure compliance with the court's orders, the injunction would be reviewed at six-month intervals from the date of entry of judgment. *See id.*

**\*2** The court has addressed numerous other motions filed by counsel, and issued decisions, which are not directly relevant to the instant motion. The court will now proceed to address the instant motion.

## II. DISCUSSION

### A. Standard of Decision

Attorney Theobald  FN1 is asking the court to stay enforcement of the court's May 4, 2004 sanction order pending appeal, without posting a supersedeas bond, pursuant to Federal Rules of Civil Procedure 62(c) and 62(d). Rules 62(c) and 62(d) state:

> FN1. Noteworthy, attorney Theobald has signed the instant motion while Robert V. Boharic has filed an appearance in this case as counsel for Theobald. *See* Attorney Appearance of Robert V. Boharic [docket entry 139-1].

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 3
Not Reported in F.Supp.2d, 2004 WL 1179418
(Cite as: Not Reported in F.Supp.2d)

(c) Injunction Pending Appeal. When an appeal is taken from an interlocutory or final judgment granting, dissolving, or denying an injunction, the court in its discretion may suspend, modify, restore, or grant an injunction during the pendency of the appeal upon such terms as to bond or otherwise as it considers proper for the security of the rights of the adverse party....

(d) Stay Upon Appeal. When an appeal is taken the appellant by giving a supersedeas bond may obtain a stay subject to the exceptions contained in subdivision (a) of this rule. The bond may be given at or after the time of filing the notice of appeal or of procuring the order allowing the appeal, as the case may be. The stay is effective when the supersedeas bond is approved by the court.

Fed.R.Civ.P. 62(c, d).

Under Rule 62(d), a party may obtain an automatic stay of execution of a money judgment pending appeal by posting a supersedeas bond. See BASF Corp. v. Old World Trading Co., 979 F.2d 615, 616 (7th Cir.1992); see also Northern District of Illinois Local Rules 62.1, 65.1 and 65.2 (discussing procedures for supersedeas bond). In the instant motion, attorney Theobald requests the court to stay enforcement of the court's May 4, 2004 sanction order without first requiring him to post a supersedeas bond; thus, he is not entitled to a stay as a matter of right. See Fed.R.Civ.P. 62(d) ; BASF, 979 F.2d at 616.

In its discretion, however, the district court may waive the bond requirement. See Dillon v. City of Chicago, 866 F.2d 902, 904 (7th Cir.1988); see also Olympia Equip. Leasing Co. v. Western Union Tel. Co., 786 F.2d 794, 796 (7th Cir.1986) (indicating that sometimes equivalent security may replace the bond). When determining whether to waive the posting of bond, the court looks to several criteria, including: (1) the complexity of the collection process; (2) the amount of time required to obtain a judgment after it is affirmed on appeal; (3) the degree of confidence that the district court has in the availability of funds to pay the judgment; (4) whether the movant's ability to the bond to pay the judgment is so plain that the cost of a bond would be a waste of money; and (5) whether the movant is in such a precarious financial situation that the requirement to post a bond would place other creditors of the defendant in an insecure position. See Dillon, 866 F.2d at 904-05 (citations omitted). However, before the court can exercise its discretion to grant a stay without a bond, it must first determine whether a stay is warranted.

*3 The United States Supreme Court has set forth the general factors regulating the issuance of a stay pending appeal: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceedings; and (4) where the public interest lies." Hilton v. Braunskill, 481 U.S. 770, 776, 107 S.Ct. 2113, 95 L.Ed.2d 724 (1987) (citations omitted); see also Bradford-Scott Data Corp. v. Physician Computer Network, Inc., 128 F.3d 504, 505 (7th Cir.1997) ; Glick v. Koenig, 766 F.2d 265, 269 (7th Cir.1985). "Since the traditional stay factors contemplate individualized judgments in each case, the formula cannot be reduced to a set of rigid rules." Id. at 777. Further, a request for a stay is a request for extraordinary relief, equitable in character, and the movant bears a heavy burden. See Winston-Salem/Forsyth County Bd. of Educ. v. Scott, 404 U.S. 1221,

Not Reported in F.Supp.2d                                                        Page 4
Not Reported in F.Supp.2d, 2004 WL 1179418
**(Cite as: Not Reported in F.Supp.2d)**

1231, 92 S.Ct. 1236, 31 L.Ed.2d 441 (1971) (Burger, C.J., in chambers); *Chan v. Wodnicki,* 67 F.3d 137, 139 (7th Cir.1995).

*B. Analysis of Stay Factors under Rules 62(c) and (d)*

*1. Likelihood of Success on the Merits*

Attorney Theobald has not made a sufficient showing of his likelihood of success on the merits. "In the context of a stay pending appeal, where the applicant's arguments have already been evaluated on the success scale, the applicant must make a stronger threshold showing of likelihood of success to meet his burden." *In re Forty-Eight Insulations,* 115 F.3d 1294, 1300-01 (7th Cir.1997) (citation omitted). Further, the Seventh Circuit has stated: "Our case law is adamant that an appellant faces an uphill battle in seeking to reverse an award of sanctions by the district court." *Langley v. Union Elec. Co.,* 107 F.3d 510, 513 (7th Cir.1997) (citing *Marrocco v. General Motors Corp.,* 966 F.2d 220, 223 (7th Cir.1992) ("We cannot understate the difficulty of the task litigants face when challenging a district court's choice of sanctions.")).

To reiterate, in the Rule to Show Cause, the court framed the issues to which counsel were ordered to respond. The Rule to Show Cause alleged that counsel had willfully disobeyed established statutory and case law authority and the court's orders by improperly seeking to become court-appointed counsel and obtaining numerous awards of attorney fees in the Circuit Court of Cook County after the cause of action had been removed to the United States District Court for the Northern District of Illinois.

The Rule to Show Cause also alleged that counsel had exhibited a lack of candor toward the court. The allegedly sanctionable conduct involved one simple matter-circumventing the federal court's removal jurisdiction and the obtaining of substantial public funds.

The instant motion simply reiterates arguments that the court has previously ruled upon and found to be without merit on numerous occasions. The arguments that are proffered as a sufficient showing of the likelihood of success on the merits present an untenable position in response to the sanction, as repeatedly indicated by the court. The court has reviewed these arguments on no less than five separate occasions. First, the court addressed these arguments in its 80-page opinion, which found that counsel's conduct was sanctionable. *See Schmude v. Sheahan, et al.,*-F.Supp.2d-, 2004 WL 718501 (N.D.Ill. March 29, 2004). Second, the court reviewed these arguments in its 9-page opinion, which found the first motion to reconsider to be untimely because the amount of the sanction had yet to be determined. *See* Opinion of April 23, 2004 [docket entry 166-1]. Third, the court reviewed these arguments in its 60-page final order imposing sanctions. *See Schmude v. Sheahan, et al.,*-F.Supp.2d-, 2004 WL 1045798 (N.D.Ill. May 4, 2004). Fourth, the court again reviewed these arguments in its 13-page opinion, which found the second (timely) motion to reconsider to be without merit. *See* Opinion of May 19, 2004 [docket entry 176-1]. Lastly, here they are again. For all the reasons stated in the court's initial opinion finding that counsels' conduct was sanctionable, these arguments are largely immaterial, failing to respond to the discrete acts alleged by the Rule to Show Cause and later found to be sanctionable, and equally

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                  Page 5
Not Reported in F.Supp.2d, 2004 WL 1179418
**(Cite as: Not Reported in F.Supp.2d)**

without merit. *See Schmude v. Sheahan, et al.,*-F.Supp.2d-, 2004 WL 718501 (N.D.Ill. March 29, 2004). In sum, attorney Theobald has not made a sufficient showing of the likelihood that the court's sanction will be reversed on appeal.

### 2. Irreparable Injury to Attorney Theobald

*4 Additionally, attorney Theobald's paltry submission, containing various self-serving statements, does not provide the court with a basis for waiving the requisite supersedeas bond. Attorney Theobald states that his financial situation is such that the immediate payment of the sanction and disgorgement of ill-gotten fees, or the posting of a supersedeas bond, would cause him economic hardship and place his creditors in an insecure position. *See* Theobald Mot. of May 20, 2004, at 13-14. No realistic assessment of the scanty financial information given by Theobald can support a bondless appeal.

As a preliminary matter, mere economic injury does not equate to irreparable injury. Further, the assertions of Theobald about his dire financial condition are unsubstantiated. He presents nothing to indicate his personnel balance sheet or income at relevant times. Thus, on the other hand, attorney Theobald has represented to the court very reason why parties are required to post a supersedeas bond, to ensure that once a sanction or monetary judgment has been imposed that payment will be made and a court's order or judgment will not be thwarted. *See BASF, 979 F.2d at 617* ("A bond secures both sides: the winner is sure to recover if the judgment is affirmed, and the loser need not fear inability to recoup if the judgment is reversed.").

The sanction is case-specific and directed at Edward R. Theobald, an officer of the court. The court, in fixing the amount of the disgorgement, cannot consider the economic circumstances of a wrongdoer. The economic circumstances of the wrongdoer may be considered regarding the manner and schedule of payments to recoup the loss; however, the economic circumstances of the wrongdoer do not vitiate the obligation to recoup the loss. One cannot retain that to which one is not entitled. Theobald personally is to return the money to the public fund.

The argument of irreparable injury to attorney Theobald based upon having to disgorge improperly obtained attorney fees rings hollow. In short, attorney Theobald has not established that he will be irreparably injured absent a stay pending appeal.

### 3. Substantial Injury to Other Parties / Public Interest

In its simplest terms, the court has found that attorney Theobald went improperly to the well to draw $301, 321.29. The court rejects his argument that he should be permitted to continue with that sanctionable conduct by returning to draw again from the public well to supply bond funds and support expenses of appealing the sanction. To allow otherwise would thwart the court-ordered sanction of disgorgement of ill-gotten public funds, and in effect reward the sanctionable conduct.

Lastly, the sanctionable conduct at issue in this matter was an affront to the federal court, and well-settled principles and federalism and comity. The public interest requires that the courts remain able to address conduct that calls their authority and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                             Page 6
Not Reported in F.Supp.2d, 2004 WL 1179418
**(Cite as: Not Reported in F.Supp.2d)**

jurisdiction into question.

**\*5** Attorney Theobald has failed to establish that other parties would not be substantially injured, nor that the public interest would not be adversely affected, by the issuance of the stay.

### III. CONCLUSION

Attorney Theobald has presented nothing to the court that would implicate its equitable discretion to grant a stay of the court's May 4, 2004 sanction order, without posting a supersedeas bond, pending appeal. For the foregoing reasons, Edward R. Theobald's motion styled as an "Agreed Motion to Stay Enforcement of the Judgment Pending Appeal Without Posting a Bond" is denied.

IT IS SO ORDERED.

N.D.Ill.,2004.
Schmude v. Sheahan
Not Reported in F.Supp.2d, 2004 WL 1179418

Briefs and Other Related Documents (Back to top)

• <u>2004 WL 2282216</u> (Trial Motion, Memorandum and Affidavit) Alan R. Brunell's Motion for Relief Pursuant to Federal Rules of Civil Procedure 59(a) and 59(e) or in the Alternative Under Rule 60(b) (Apr. 13, 2004)
• <u>2004 WL 869910</u> (Trial Motion, Memorandum and Affidavit) Edward R. Theobald's Motion to Stay Disposition on all Other Issues Until Disqualification is Resolved (Feb. 03, 2004)
• <u>2004 WL 869911</u> (Trial Motion, Memorandum and Affidavit) Motion for Leave to Cite Supplemental Authority on

Previously Filed Motion to Disqualify Judge Charles R. Norgle (Feb. 03, 2004)
• <u>2003 WL 23419305</u> (Trial Pleading) Edward Theobald's and Anthony Pinelli's Answer To Sua Sponte Rule to Show Cause (Nov. 25, 2003)
• <u>2003 WL 23419315</u> (Trial Pleading) Alan R. Brunell's Answer to this Court's Rule to Show Cause (Nov. 24, 2003)
• <u>2003 WL 23419532</u> (Trial Motion, Memorandum and Affidavit) Memorandum in Support of Alan R. Brunell's Answer to this Court's Rule to Show Cause (Nov. 24, 2003)
• <u>2003 WL 23419536</u> (Trial Motion, Memorandum and Affidavit) Motion to Disqualify Judge Charles R. Norgle (Nov. 24, 2003)
• <u>2003 WL 23419542</u> (Trial Motion, Memorandum and Affidavit) Supplemental Memorandum and Affidavit by Anthony Pinelli to Answer to Rule to Show Cause (Nov. 24, 2003)
• <u>2003 WL 23419543</u> (Trial Motion, Memorandum and Affidavit) Motion to Dismiss Rule to Show Cause (Nov. 24, 2003)
• <u>2003 WL 23419544</u> (Trial Motion, Memorandum and Affidavit) Motion to Dismiss Rule to Show Cause for Lack of Jurisdiction Under Fed. R. Civ. P. 12(b)(1) (Nov. 24, 2003)
• <u>2003 WL 23419546</u> (Trial Motion, Memorandum and Affidavit) Motion to Dismiss Rule to Show Cause Pursuant to Fed. R. Civ. P. 12(b)(1) on the Basis of Qualified Immunity (Nov. 24, 2003)
• <u>2003 WL 23831815</u> (Trial Motion, Memorandum and Affidavit) Supplemental Memorandum and Affidavit By Anthony Pinelli to Answer Torule to Show Cause (Nov. 24, 2003)
• <u>2003 WL 23831817</u> (Trial Pleading) Edward Theobald's and Anthony Pinelli's Answer to Sua Sponte Rule to Show Cause

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy
Slip Copy, 2005 WL 1041348
**(Cite as: Slip Copy)**

H

Slip Copy, 2005 WL 1041348
Briefs and Other Related Documents
Only the Westlaw citation is currently
available.

United States District Court,D. Kansas.
EVOLUTION, INC., Plaintiff,
v.
SUN TRUST BANK, et al., Defendants.
**No. Civ.A.01-2409-CM.**

Jan. 10, 2005.

Lance Y. Kinzer , Michael R. Clarke,
Olathe, KS, for Plaintiff.
Bryan G. Harrison , Atlanta, GA, Russell S.
Jones, Jr., Kansas City, MO, for Defendants.

*MEMORANDUM AND ORDER*

MURGUIA, J.
**\*1** On November 5, 2004, a jury verdict was
awarded to defendants Sun Trust Bank and
Premium Assignment Corporation and
against plaintiff Evolution, Inc., in the
amount of $89,365.00. Plaintiff has filed a
notice of appeal with this court (Doc. 270).
Now pending before the court is plaintiff's
Motion for Stay of Proceedings to Enforce
Judgment Pending Appeal (Doc. 273).

Pursuant to Fed. R. Civ. Proc. 62(d), an
appellant has the right to stay the
enforcement of a money judgment by
posting a supersedeas bond. Local rules
require that, unless otherwise directed by the
court, the security provided to stay
execution of a money judgment shall equal
the amount of the judgment "plus 25% of
that amount to cover interest and any award
of damages for delay." D. Kan. R. 62.2.

Rather than filing a supersedeas bond,
however, plaintiff filed an irrevocable
standby letter of credit in the amount of
$111,706.25, equaling the $89,365.00
judgment plus 25%.

A district court has discretionary authority to
allow a stay of proceedings without a full
supersedeas bond "when the judgment
creditor's interests would not be unduly
endangered." *Wilmer v. Bd. of County
Comm'rs of Leavenworth County,* 844
F.Supp. 1414, 1419 (D.Kan.1993) (citing
*Miami Int'l Realty Co. v. Paynter,* 807 F.2d
871, 873 (10th Cir.1986); *Olympia Equip.
Leasing Co. v. Western Union Tel. Co.,* 786
F.2d 794, 796 (7th Cir.1986)). Moreover,
"[w]aiver of the requirement of a bond in the
full amount will only be granted if the
appellant objectively demonstrates good
cause." *Id.* (citing *Lamon v. City of
Shawnee, Kan.,* 758 F.Supp. 654, 655
(D.Kan.1991) ; *Metz v. United States,* 130
F.R.D. 458, 459 (D.Kan.1990)). The court
may consider several factors when deciding
whether to waive a full supersedeas bond
requirement, including "(1) the complexity
of the collection process; (2) the amount of
time required to obtain a judgment; (3) the
degree of confidence that the district court
has in the availability of funds to pay the
judgment; (4) whether the defendant's ability
to pay the judgment is so plain that the cost
of a bond would be a waste of money; and
(5) whether the defendant is in such a
precarious financial situation that the
requirement to post a bond would place
other creditors of the defendant in an
insecure position." *Id.* (citing *Brinkman v.
Dep't of Corr.,* 815 F.Supp. 407, 408-09
(D.Kan.1993)).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                    Page 2
Slip Copy, 2005 WL 1041348
**(Cite as: Slip Copy)**

Here, plaintiff has taken no steps to assert or demonstrate good cause, and defendants are unwilling to accept a letter of credit in lieu of a supersedeas bond. Accordingly, the court is unwilling to deviate from the standard supersedeas bond requirement. *See Dow Chem. Corp. v. Weevil-Cide Co.,* 1988 Dist. LEXIS 8004, at \*3 (D.Kan. July 26, 1988).

IT IS THERFORE ORDERED that plaintiff Evolution, Inc.'s Motion for Stay of Proceedings to Enforce Judgment Pending Appeal (Doc. 273) is denied.

D.Kan.,2005.
Evolution, Inc. v. Sun Trust Bank
Slip Copy, 2005 WL 1041348

Briefs and Other Related Documents (Back to top)

• 2:01cv02409 (Docket) (Aug. 15, 2001)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.